UNITED STATES DEPARTMENT OF JUSTICE
John T. Stemplewicz
Senior Trial Counsel
Michael J. Quinn (D.C. Bar No. 401376)
Jessica S. Wang (CA Bar No. 278300)
Trial Attorneys
Commercial Litigation Branch
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
Telephone: (202) 307-0243
Washington, D.C. 20044-0875
Telephone: (202) 307-0243
michael.quinn3@usdoj.gov
jessica.s.wang@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CIV-_____ |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| Barron Collier Company, a Florida partnership, | |
| Defendant. | |

The United States of America brings this Complaint against the Barron Collier Company ("Collier"), a partnership organized under Florida law and doing business in the City of Phoenix, Arizona and elsewhere. This Complaint seeks specific performance or, in the alternative, imposition of a constructive trust to prevent Collier from being unjustly enriched at the expense of the United States and American Indians disadvantaged by Collier's refusal to perform its agreed contractual obligations.

The claims arise from a land exchange between Collier and the United States in the 1990s, which has been lucrative for Collier. As part of the price of the deal, Collier agreed to pay $34.9 million to the United States. Collier refused, however, to make a lump sum cash payment and demanded that the amount be financed. In response to Collier's demands, the United States agreed to give Collier a 30-year loan. The United States, through the Secretary of the Interior, insisted that the loan remain adequately secured by collateral until the loan is satisfied. The loan is not yet satisfied, and this suit seeks to require Collier to provide additional collateral to fulfill its contractual promises to the United States.

By statute, Collier's installment payments on the debt fund programs for American Indians in Arizona, and those programs now suffer because Collier refuses to honor its contractual obligations.

As alleged in detail below, Collier acquired federal land from the United States located in Phoenix, Arizona that had been used for the Phoenix Indian School. Collier, in turn, traded some of the Indian school property with the City of Phoenix for prime commercial lots in the heart of downtown, near the Convention Center, U.S. Airways Center, and Chase Field. To finance this transaction, Collier executed a promissory note and pledged collateral that gave the United States a lien on the federal land Collier retained, as well as Collier's rights in the downtown lots acquired through an exchange with the City of Phoenix. Collier made the annual payments on its note until the end of 2011, but then refused to make any more payments and is now in default.

Collier's contract with the United States requires it to supplement the collateral with pledges of government securities whenever the value of the liened property falls below a specified minimum. According to Collier itself, the land remaining under lien is now valued at a fraction of the agreed minimum value. In addition to loss of collateral value due to market conditions, the value of the liened property may have also decreased, to an extent yet to be determined, as a result of actions or omissions by Collier itself.

Despite demands by the United States that Collier provide the required additional collateral, Collier has refused to do so. By refusing to pay on its debt and to supplement the collateral, Collier has unjustly enriched itself by tens of millions of dollars at the expense of the United States, as well as American Indian education, the direct beneficiary of Collier's loan payments.

### Jurisdiction and Venue

1. This Court has jurisdiction pursuant to 28 U.S.C. section 1345, because the United States is the plaintiff.

2. Venue in this district is proper pursuant to 28 U.S.C. section 1391(c), because Collier is, on information and belief, an unincorporated partnership that owns real property and commercial ventures within the City of Phoenix, transacts business in this district, and is, therefore, subject to personal jurisdiction in this district.

### Parties

3. The Secretary of the Interior ("Secretary"), on behalf of the United States of America, executed the contractual agreements with Defendant that are relevant to this action, and the United States is the Plaintiff here.

4. Defendant Collier, on information and belief, is a private, family-owned company, formed as a general partnership under Florida law and headquartered in Naples, Florida. Collier is also believed to maintain offices in Arizona at 4041 North Central Avenue, Suite 820, Phoenix, AZ 85012.

### The Florida-Arizona Land Exchange

5. The claims asserted arise from what many regard as the largest interstate land exchange ever consummated by the United States Department of the Interior. In or about the mid-1980s, Interior sought to acquire more than one hundred thousand acres of environmentally sensitive wetlands in the Florida Everglades, which were then owned by Collier. Short on appropriated funds for a large land acquisition, Interior looked for alternatives and eventually conceived of a land exchange.

6. The original plan, which required ratification by Congress, was for Interior to transfer property in Phoenix, Arizona, owned by the United States, that had been used to operate the Phoenix Indian School, in return for 108,000 acres of Collier-owned Florida wetlands, plus a cash payment by Collier of $34.9 million.

7. The Indian School was closing after years of declining enrollment, and its Native American students were relocating to schools in their communities.

8. In 1988, Congress ratified the parameters of the land exchange and gave the Secretary discretion to negotiate final details with Collier. The Arizona-Florida Land Exchange Act (1988) ("Act"), Public Law 100-696, 102 Stat. 4571, ratified and

confirmed an Exchange Agreement that outlined the deal and that Collier had executed with the United States on May 12, 1988.

9. The Exchange Agreement provided that Collier would exchange 108,000 acres of land near the Florida Everglades for a portion of the Phoenix Indian School property and make a payment to the United States of $34.9 million.

10. In the Act, Congress directed that the $34.9 million payment be used for the purpose of establishing two Indian education trust accounts, the "Arizona InterTribal Trust Fund" and the "Navajo Trust Fund," which would support Indian education following the closure of the Phoenix Indian School.

11. Collier was aware that the payments it would be making in the transaction would be used for purposes that benefit American Indians, and it supported that use.

12. The Act authorized the Secretary to accept the $34.9 million from Collier as either (i) a cash payment at closing or (ii) over time as follows: annual interest payments on $34.9 million at a rate of no less than 8.5% and no more than 9.0% per annum for thirty years, followed by a balloon payment of the principal at the end of thirty years.

Negotiation of the Transfer Agreements

13. Although Congress ratified the Exchange Agreement in 1988, the negotiation of its complex terms took until late 1991 to resolve, and the transaction did not finally close until 1996.

14. As ratified, the Exchange Agreement gave Collier three years from enactment of the Act to accept Interior's offer. The three-year window enabled Collier to negotiate with the City of Phoenix over public planning and zoning requirements. See 134 Cong. Rec. S13519 (daily ed. Sep. 28, 1988).

15. Collier accepted the offer on or about December 11, 1991, subject to reaching a payment agreement.

16. Interior and Collier ultimately executed several agreements implementing the Act and the Exchange Agreement, including a December 18, 1992 Trust Fund Payment Agreement ("Payment Agreement"), a Deed of Trust, and a Promissory Note (collectively, the "Transfer Agreements"), attached to the Complaint as Exhibit 1.

## Collier's Refusal to Do a Cash Deal

17. One difficulty affecting negotiations was Collier's refusal to make a cash payment of the $34.9 million. At times, Collier threatened to walk away from the deal unless the Secretary agreed to the alternative, thirty-year payment option. After protracted negotiations -- and over objections of the Indian beneficiaries of the payment[1] -- the Secretary agreed to accept the 30-year installment option.

---

[1] Certain tribal entities sued Interior challenging, among other things, the installment arrangement and the adequacy of the collateral package, but the suit was dismissed on jurisdictional grounds. See Inter Tribal Council of Ariz. v. Babbitt, 51 F.3d 199 (9th Cir. 1995).

18. As finalized, the Promissory Note requires annual interest payments of $2,966,500 (i.e., interest at the 8.5% minimum rate prescribed by the Act) and payments into an annuity, assignable to Interior upon Collier's default, to have a value of $34.9 million at the end of thirty years. Neither the Act nor the Promissory Note makes a provision for prepayment of principal or refinancing.

19. The interest payments and the $34.9 million principal payment are dedicated to the use and benefit of Arizona tribes (95%) and the Navajo Nation (5%) and their respective members for educational purposes.

### Collier's Side Deal with the City of Phoenix

20. Another complexity involved a side deal that Collier pursued with the City of Phoenix. In that deal, Collier planned to swap all but fifteen acres of the Indian School property it was about to buy from the United States for rights to develop and eventually acquire two undeveloped commercial lots in the heart of downtown Phoenix, totaling about 7.5 acres ("Downtown Lots").

21. Collier's side deal with the city meant that little of the federal property being transferred would remain in Collier's control once all the deals were consummated. This posed a problem because the United States needed to have adequate collateral in order to secure Collier's thirty-year obligation.

22. Collier tried to limit the collateral to the fifteen-acre Indian School property it would retain after the side deal with the city, but Interior demanded a lien on Collier's interest in the Downtown Lots as part of the security, plus a pledge of securities. Collier, however, resisted this proposal due, on information and belief, to

its desire to develop the parcels and generate revenue that could presumably be used to fund Collier's payment obligation.

23.  Collier ultimately acceded in part to Interior's demand for collateral, and the rights in the Downtown Lots became part of the security for Collier's $34.9 million debt. As a quid pro quo, Interior granted Collier a four-year deferral of the repayment period. Collier also obtained a right to request release of the liens when certain conditions were met. In return, Collier agreed to pledge government securities as additional collateral but only if the remaining security interest lost value beyond an agreed minimum. *See* Exhibit 1 at 73-110 (Deed of Trust).

24.  The prospect of a four-year deferral of payments after a four-year delay between congressional approval and execution of the Payment Agreement drew strong objection from tribal leaders, who emphasized the pressing need for educational resources following the 1990 closure of the Indian School. At an August 5, 1992, meeting with tribal leaders preceding execution of the Payment Agreement, then-Secretary Manuel Lujan explained that the deferral was worthwhile because the United States would gain a security interest in the Downtown Lots as part of the deal and that would assure the payment stream for Indian education funds, because the Downtown Lots were "where the value is."

25.  As finally agreed by the parties, the Deed of Trust secured the performance of Collier's payment obligations by granting the United States a security interest in the fifteen-acre Indian School property that Collier still holds plus

Collier's interests in the two Downtown Lots, along with related improvements, leases, rents, and other personal property (collectively, the "Trust Estate"). Exhibit 1 at 73-110.

### Release of the Liens on Collier's Downtown Lots

26. Article 6.2 of the Deed of Trust allows Collier to request release of a specified portion (an "Envelope") of the Trust Estate if the value of the remaining portion of the Trust Estate (the "Unreleased Property") still exceeds 130% of a defined Release Level Amount. The Deed of Trust defines the Release Level Amount as:

> (i) the unpaid principal plus accrued interest on the Promissory Note, less (ii) the value of United States Government-backed Securities and Deposited Monies held in the Trust Estate, and further less, after the expiration of two years from the Closing Date . . . (iii) the fair value, at the time of the calculation, of the Annuity.

Deed of Trust, art. 6.2(a).

27. Collier made two separate requests for the release of liens on the Downtown Lots, which Interior granted in 1998 and 2007. Appraisals performed for each release request showed that the value of the Unreleased Property at the time of the release exceeded 130% of the Release Level Amount.

28. The first Downtown Lot released in 1998, with Collier's improvements, was sold in 2007, as a mixed-use development anchored by Bank of America for $177 million. Exhibit 2 [Technical Appraisal Review Report, No. H50-2007-00001 at 2 (July 24, 2007)]. Dubbed the "Collier Center," it is now a major feature of the Phoenix skyline.

29. Collier made its second lien release request in 2007, and relied upon an

appraisal that valued the Indian School parcel at $48 million. *Id.* Collier commissioned that appraisal.

30. Interior relied on Collier's appraisal, after Interior's Office of the Special Trustee for American Indians ("OST") reviewed it and concluded that the appraisal's methodology complied with industry standards. The OST report noted that "the strict time constraints of the review" did not allow OST time "to form a corroborating opinion as to value," in light of the "complexity of the appraisal problem." *Id.* at 1-2. "[M]any variables potentially impact[ed] value," such as "recent market volatility," "dramatic price variations," "the number of projects in the pipeline," and "change[s] in the financial condition . . .of key players in the . . . marketplace." *Id.*

31. After Interior granted Collier's second release request, Interior held only a lien on the remaining Indian School parcel and improvements.

32. The current value of the remaining fifteen-acre Indian School parcel is now significantly lower than Collier's 2007 estimate of $48 million. Based on Collier's own admissions to Interior officials, the reduction in value has left the debt grossly under-collateralized.

33. Article 6.3 of the Deed of Trust provides that if an Envelope is released from lien and the fair value of the Unreleased Property falls below 130% of the Release Level Amount, Collier must supplement the collateral value by pledging United States Government-backed securities sufficient to restore the value of the collateral package to 130% of the Release Level Amount.

34. Despite demands from the United States that Collier meet its obligation to

supplement the collateral, it has not done so.

### Collier's Opportunistic Breach

35.    Instead of meeting its collateral and payment obligations, Collier embarked, in 2012, upon a scheme to enrich itself at the expense of the United States and American Indians in Arizona.

36.    Collier made regular installment payments on its debt, beginning in December 1997, one year after the Promissory Note was signed, through December 2011.

37.    However, Collier did not make the 2012 annual payment, not due to financial hardship or an inability to pay, but because it saw an opportunity for financial gain by breaching its contract with the United States.

38.    Each payment by Collier deposited about $2.97 million of interest into the trust accounts and between $800,000-$900,000 toward the annuity. As Collier has been aware since Congress approved the land exchange in 1988, all these funds directly benefit American Indian education.

39.    As noted above, however, Collier did not make the December 2012 payment. It has also not paid its December 2013 payment. On information and belief, Collier's failure to pay is not due to financial hardship, but because Collier decided it is no longer in its own pecuniary interest to continue making payments.

40.    In a letter dated January 7, 2013, Collier informed Interior that, due to the decline in value of the remaining collateral (the fifteen-acre Indian School site), it would no longer meet its payment obligations. In essence, because Collier obtained a release

of the valuable Downtown Lots without fulfilling its reciprocal obligation to add collateral to offset the loss in market value, Collier put itself in a position for unfair financial gain by ceasing its payment on its debt.

41. Interior thereafter demanded that Collier make the outstanding payments and add government-backed securities to the Trust Estate as required under article 6.3 of the Deed of Trust. Although Collier expressed a desire to negotiate a solution, it has offered no options or promise of future payments.

42. In April 2013, Interior again demanded that Collier make the payments due and add securities to supplement the collateral value of the Trust Estate. Collier has rebuffed those requests.

43. The Deed of Trust provides that the debt is nonrecourse, which purportedly shields Collier and its principals from personal liability for any deficiency in paying off the debt it owes the United States. *See* Deed of Trust, arts. 1.1, 9.1.

44. But the nonrecourse provision does not allow Collier to walk away from its other obligations, such as the one to maintain adequate collateral for the debt. The Deed of Trust expressly provides other remedies if Collier defaults on its obligations.

45. The Transfer Agreements provide that, should Collier fail to pay any amount when due, the United States may, after providing thirty days' notice, demand and declare the remaining principal and interest due. The United States may foreclose upon the collateral, accept a deed in lieu of foreclosure, or sell any remaining real property collateral for the purpose of satisfying in whole or part the outstanding amount due. The sole right and interest in the annuity also vests in the United States upon

default. Notwithstanding the nonrecourse nature of the debt, which is aimed at shielding Collier's individual partners and investors from personal liability, the Deed of Trust also expressly allows Interior, upon default, to "[c]ommence an action to foreclose the lien of this Deed of Trust as a mortgage, appoint a receiver, *or specifically enforce any of the covenants hereof.*" Deed of Trust, art. 3.2(b) (emphasis added).

46. Collier also expressly acknowledged that the United States has no adequate remedy at law with respect to the collateralization of Collier's obligations to the United States. The Payment Agreement is the umbrella agreement between the parties to the land exchange. Article 1.1 provides that the Payment Agreement encompasses the attached exhibits, which include the form of the Deed of Trust that the parties executed. Article 1.1, in subdivision (v), also specifically acknowledges the Deed of Trust, and further states that the terms of the parties' agreement "shall become effective only when, and shall apply only to the period after, the closing of the Land Exchange." In the next paragraph of the Payment Agreement, "[t]he parties recognize that the Land Exchange, *the collateralization of [Collier's] obligations to the United States* and other outstanding matters between the parties *are a unique and complex arrangement and agree that money damages for a breach by [Collier] of any of its promises in this Agreement would not be an adequate remedy.*" Payment Agreement, Art. 1.2 (emphasis added). This recognition that money damages are inadequate to remedy a breach relating to collateral dovetails with the right Collier granted in the Deed of Trust for specific enforcement of its covenants.

47. The Deed of Trust expressly allows the United States to decide which

remedies it will pursue. Foreclosure is one option for a default, but Collier agreed in the Deed of Trust that Interior may exercise "every power or remedy given by any of the Trust Fund Documents . . . concurrently or independently" and that Interior is authorized to "pursue inconsistent remedies." Deed of Trust, art. 3.1.

48. These alternatives include obtaining specific performance of Collier's obligation to provide supplemental collateral up to 130% of the Release Level Amount in order to assure that the United States has adequate security to satisfy the debt and that Indian education programs will not be deprived of their funding.

49. Specific performance of article 6.3 of the Deed of Trust would require Collier to add U.S. Government-backed securities as supplemental collateral in an amount to be determined based upon the market value of the Indian School property that remains under lien and the amount of collateral required by the terms of the Deed of Trust.

50. Another alternative remedy available to the United States is the equitable remedy of constructive trust. As alleged further below, if Collier does not provide supplemental collateral for the remaining debt, a constructive trust should be imposed on Collier's interests in the Downtown Lots released by the United States in reliance upon Collier's representations regarding the value of the remaining collateral and Collier's promise to perform its reciprocal obligation to provide additional security for the debt to prevent Collier from being unjustly enriched by its opportunistic breach of the agreement it made with the United States, particularly in light of the public purpose to which Collier's payments were dedicated.

# COUNT I
### (Specific Performance of Collier's Obligation to Supplement Collateral)

51. The United States alleges and incorporates by reference the allegations contained in paragraphs 1 through 50 of this Complaint as if they were repeated here in full.

52. Collier agreed in the Deed of Trust to a covenant to provide additional collateral as security for the existing debt when certain conditions exist. Those conditions now exist. The United States has demanded that Collier provide the supplemental collateral, but Collier has not performed.

53. The terms of the Deed of Trust are certain and fair; the collateral required is only an amount sufficient to assure that the United States can recover the debt owed if Collier stops making the payments it agreed to make.

54. The United States has acted equitably throughout the performance of the contract and is also acting to protect the beneficiaries – the Indian education trust funds – that are funded by Collier's debt payments with Collier's knowledge and full endorsement.

55. Specific performance of the obligation to add collateral will impose no hardship upon Collier beyond doing what it already willingly promised to do: maintain the collateral value if the United States released any of the liens it held on Collier's property. The United States released the two Downtown Lots from the liens, and Collier has benefited from that unencumbered status. Requiring Collier to perform its reciprocal obligation to add collateral imposes no personal liability on Collier but merely places the

parties on an equitable footing in light of the debt payments Collier has promised to make.

56. No adequate remedy at law exists.

57. The Court should order Collier to provide supplemental collateral to the United States in accordance with the terms of the Deed of Trust.

## COUNT II
### (Unjust Enrichment)

58. The United States alleges and incorporates by reference the allegations contained in paragraphs 1 through 57 of this Complaint as if they were repeated here in full.

59. The United States has conferred benefits upon Collier in the form of the lien releases the United States granted for the Downtown Lots in 1998 and 2007 in reliance upon Collier's representations regarding the value of the remaining collateral and Collier's promise to perform its reciprocal obligation to add collateral as needed to assure the United States that such releases would not operate to its detriment.

60. Collier has benefited from those lien releases at the expense of the United States, which no longer holds sufficient collateral to fully secure Collier's remaining debt. By Collier's own admission, the remaining lien on the Indian School parcel is inadequate to secure the debt.

61. It would be unjust to allow Collier to continue to reap the benefit of the released liens when the United States is left without sufficient means to collect the debt that the released property was meant to secure. The Court should impose a constructive

trust on all of Collier's interest in the Downtown Lot released from lien in 2007, to assure satisfaction of the presently unsecured balance of Collier's debt.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America demands judgment against Defendant Collier requiring:

1. That Defendant provide U.S. Government-backed securities in an amount sufficient to provide adequate security for the debt, which the parties agreed in the Deed of Trust is 130% of the Release Level Amount;

2. That a constructive trust be imposed upon Collier's interests in the Downtown Lots to provide adequate security for the remaining debt that Collier owes the United States for the land swap, as specified by the terms of the Deed of Trust;

3. Such other and further relief to which the United States is entitled, including any attorney fees and costs as provided by law.

Dated: January 28, 2014                    Respectfully submitted,

                                           STUART F. DELERY
                                           Assistant Attorney General

                                           J. CHRISTOPHER KOHN
                                           Director

                                           JOHN T. STEMPLEWICZ
                                           Senior Trial Counsel

                                            /s/Michael J. Quinn
                                           MICHAEL J. QUINN (D.C. Bar No. 401376)
                                           JESSICA S. WANG (CA Bar No. 278300)
                                           Trial Attorneys
                                           Commercial Litigation Branch

```
 1                                          Civil Division
                                            P.O. Box 875
 2                                          Ben Franklin Station
                                            Washington, D.C. 20044-0875
 3                                          Telephone: (202) 307-0243
                                            Facsimile: (202) 514-9163
 4
 5   Of Counsel:
 6
     MICHAEL BERRIGAN
 7   JENNIFER TURNER
     SUSAN ELY
 8   Office of the Solicitor
     U.S. Department of the Interior
 9   1849 C Street, NW
     Washington, D.C. 20240
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
```