# TRUST FUND PAYMENT AGREEMENT BETWEEN
## THE UNITED STATES OF AMERICA
## AND BARRON COLLIER COMPANY

**made as of**

**December** 1992

EXHIBIT 1 to COMPLAINT (Page 1 of 135)

TRUST FUND PAYMENT AGREEMENT BETWEEN
THE UNITED STATES OF AMERICA
AND BARRON COLLIER COMPANY

## Table of Contents

|  | Page |
|---|---|
| RECITAL . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| ARTICLE 1 - TRUST FUND PAYMENT AGREEMENT . . . . . . . . . . | 4 |
| ARTICLE 2 - CONVEYANCE OF TITLE . . . . . . . . . . . . . . | 6 |
| ARTICLE 3 - PROMISSORY NOTE . . . . . . . . . . . . . . . . | 7 |
| ARTICLE 4 - DEED OF TRUST (WITH ASSIGNMENT OF RENTS AND SECURITY AGREEMENT) . . | 8 |
| ARTICLE 5 - ANNUITY . . . . . . . . . . . . . . . . . . . . | 9 |
| ARTICLE 6 - REPRESENTATIONS OF THE PARTIES . . . . . . . . . | 11 |
| ARTICLE 7 - SPECIFIC PERFORMANCE RIGHT OF UNITED STATES . . . | 14 |
| ARTICLE 8 - DEFAULT; REMEDIES . . . . . . . . . . . . . . . | 14 |
| ARTICLE 9 - MISCELLANEOUS PROVISIONS . . . . . . . . . . . . | 15 |

## List of Exhibits

Exhibit

A   Description of Property to Be Delivered by Barron
    Collier Company
B   Property Descriptions
C   Form of Promissory Note
D   Form of Deed of Trust

i

EXHIBIT 1 to COMPLAINT (Page 2 of 135)

## Table of Defined Terms

| Term | Page |
|------|------|
| Agreement | 1 |
| Annuity | 10 |
| Annuity Company | 10 |
| Annuity Contract | 4 |
| Arizona Property | 1 |
| BCC | 1 |
| City | 3 |
| City Ordinance | 3 |
| Closing Date | 6 |
| Collier | 1 |
| Deed of Trust | 4 |
| Development Agreement | 3 |
| Event of Default | 10 |
| Exchange Agreement | 1 |
| Florida Property | 1 |
| Land Exchange | 1 |
| Notice of Default | 14 |
| Obligations | 11 |
| parties | 1 |
| Promissory Note | 4 |
| Ratifying Legislation | 1 |
| Secretary | 2 |
| Terms of the Exchange | 2 |
| Trust Estate | 8 |
| United States | 1 |

EXHIBIT 1 to COMPLAINT (Page 3 of 135)

**TRUST FUND PAYMENT AGREEMENT BETWEEN
THE UNITED STATES OF AMERICA
AND BARRON COLLIER COMPANY**

THIS TRUST FUND PAYMENT AGREEMENT (this "**Agreement**") is made December _18th_ 1992 between the United States of America, acting through the Secretary of the Department of the Interior (the "**United States**") and Barron Collier Company ("**BCC**"), a partnership organized under the laws of the State of Florida. The United States and BCC are collectively referred to in this Agreement as the "**parties**." BCC, together with Collier Enterprises and Collier Development Corporation, respectively a partnership and a corporation organized under the laws of the State of Florida, are collectively referred to in this Agreement as "**Collier**."

## RECITAL

On May 12, 1988, the United States and Collier entered into an agreement (the "**Exchange Agreement**") for the exchange (the "**Land Exchange**") of real property owned by Collier in Collier County, Florida (approximately 108,000 acres of land referred to herein as the "**Florida Property**") for real property owned by the United States in Maricopa County, Arizona (approximately 68 acres of land referred to herein as the "**Arizona Property**"). On November 18, 1988, by Public Law No. 100-696 (the "**Ratifying Legislation**") the Exchange Agreement was ratified and confirmed and the Land Exchange was authorized in accordance with the

1

EXHIBIT 1 to COMPLAINT (Page 4 of 135)

Exchange Agreement and the Ratifying Legislation (collectively the **"Terms of the Exchange"**).

By the Terms of the Exchange, and in connection with the acquisition of title to the Exchange Lands (as such term is defined in the Ratifying Legislation), Trust Fund Payments (as such term is defined in the Ratifying Legislation) are required to be made to the United States for deposit by the United States into the Arizona InterTribal Trust Fund or the Navajo Trust Fund, and the Secretary of the Interior (the **"Secretary"**), after consultation with the InterTribal Council of Arizona and the Navajo Tribe, is authorized to elect, and after completing such consultation has elected, to receive the Trust Fund Payments for deposit into the Arizona InterTribal Trust Fund or the Navajo Trust Fund in the form of annual payments over a period of thirty years, and to execute a corresponding Trust Fund Payment Agreement. Under the Ratifying Legislation, closing of the Land Exchange shall not occur unless a Trust Fund Payment Agreement has been executed.

On December 11, 1991, BCC on behalf of Collier accepted the offer of the United States, as contained in the Terms of the Exchange, to proceed with the Land Exchange, subject to the condition that the parties agree on and execute a mutually acceptable Trust Fund Payment Agreement. The parties have extended the date of closing of the Land Exchange several times. By an Extension Agreement of December 3, 1992, the parties extended the date for execution of the Trust Fund Payment Agreement to December 18, 1992.

2

EXHIBIT 1 to COMPLAINT (Page 5 of 135)

On December 11, 1991, the City of Phoenix, Arizona (the "City") and BCC entered into a Disposition and Development Agreement (the "Development Agreement") specifying the rights and obligations of the City and BCC with respect to designated properties in the City of Phoenix, Arizona. On October 7, 1992, the Council of the City of Phoenix passed Ordinance No. S21090 (the "City Ordinance") authorizing, among other things, the City Manager to execute an amendment to the Development Agreement permitting an extension under the Development Agreement of the deadline for closing of the Land Exchange.

In consequence of the Terms of the Exchange and the Development Agreement, BCC will be entitled to receive and retain part of the Arizona Property, and the City will be entitled to receive and retain part of the Arizona Property.

Also by the Terms of the Exchange, the United States will be entitled to receive and retain title to the Florida Property, which lands, upon acquisition by the United States, will become and be administered as parts of the National Wildlife Refuge System and the National Park System.

The Ratifying Legislation provides that the parties may make minor and technical amendments in land descriptions and instruments of conveyance, as set forth in the Exchange Agreement, upon thirty (30) days prior written notice to Congress. On May 12, 1992, the United States submitted to Congress minor and technical amendments in the land descriptions attached to the Exchange Agreement. Such land descriptions, as amended, describe the lands to be conveyed by Collier and

3

EXHIBIT 1 to COMPLAINT (Page 6 of 135)

received by the United States under the Terms of the Exchange, and describe the lands to be conveyed by the United States and received by BCC under the Terms of the Exchange.

The parties, in consideration of their mutual promises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

## AGREEMENT

### ARTICLE 1 - TRUST FUND PAYMENT AGREEMENT

1.1  The parties acknowledge that:  (i) this Agreement (together with the Exhibits to this Agreement) constitute the "Trust Fund Payment Agreement" as such term is used in the Ratifying Legislation; (ii) this Agreement provides a mechanism for consummation of the Land Exchange; (iii) the Promissory Note attached as Exhibit C to this Agreement (the **"Promissory Note"**), when delivered to the United States at the closing of the Land Exchange, will evidence the sole indebtedness without personal recourse of BCC to the United States in connection with the Land Exchange; (iv) this Agreement further provides for the creation of a security interest in certain properties and rights of BCC for the benefit of the United States and, as further security, provides a mechanism for annual deposits by BCC into an annuity fund (the **"Annuity Contract"**) pursuant to Article 5 of this Agreement; (v) the Deed of Trust (with Assignment of Rents and Security Agreement), with the exhibits attached thereto, attached as Exhibit D to this Agreement (the **"Deed of Trust"**) together with the Annuity Contract will evidence the security of the

4

**EXHIBIT 1 to COMPLAINT (Page 7 of 135)**

United States with respect to the requirements of BCC under the Promissory Note when delivered to the United States at the closing of the Land Exchange; and (vi) the parties intend to provide for the consummation of the Land Exchange through an escrow closing involving delivery to an escrow agent of the conveyance instruments and security agreements necessary to effectuate such escrow closing of the Land Exchange, which instruments and agreements shall become effective only when, and shall apply only to the period after, the closing of the Land Exchange.

1.2   The parties recognize that the Land Exchange, the collateralization of BCC's obligations to the United States and other outstanding matters between the parties are a unique and complex arrangement and agree that money damages for a breach by BCC of any of its promises in this Agreement would not be an adequate remedy. Accordingly, the parties agree that the United States may obtain specific performance to require closing of the Land Exchange with or without the escrow in accordance with the requirements of this Agreement.

1.3   The parties further acknowledge that:   (i) the terms of the Exchange Agreement survive the execution of this Agreement, except as such terms are amended or modified by the Ratifying Legislation and except as such terms respecting the payment of monetary consideration have been superseded by this Agreement pursuant to the Ratifying Legislation; and (ii) the requirements of BCC under this Agreement supersede paragraphs 13 and 14 of the Exchange Agreement respecting payment of monetary consideration

EXHIBIT 1 to COMPLAINT (Page 8 of 135)

to be made by Collier, and this Agreement establishes the sole rights and requirements of Collier with respect to payment of monetary consideration under this Agreement, the Exchange Agreement, and the Ratifying Legislation.

1.4  BCC agrees that prior to closing of the Land Exchange it will not agree to any amendment of the Development Agreement, without the prior consent of the United States.

## ARTICLE 2 - CONVEYANCE OF TITLE

2.1  Land Descriptions.  The parties mutually agree that the land descriptions attached to the Exchange Agreement, together with the amendments to those land descriptions submitted to Congress by the parties on May 12, 1992, and as modified in accordance with the Ratifying Legislation, are the land descriptions to be used for purposes of identifying the properties to be exchanged pursuant to the Exchange Agreement and this Agreement.

2.2  Closing.

2.2.1  The parties mutually agree, pursuant to paragraph 25(a) of the Exchange Agreement, to extend the date for closing of the Land Exchange (the "Closing Date") under the Exchange Agreement to December 18, 1996 if, no later than December 31, 1992, the Development Agreement is amended to permit an extension of the deadline for closing of the Land Exchange as described in the City Ordinance.

2.2.2  On the Closing Date, and in accordance with the Exchange Agreement, BCC shall convey to the United States all of

6

EXHIBIT 1 to COMPLAINT (Page 9 of 135)

the right, title and interest of Collier in and to the properties identified in Exhibit A hereof.

  **2.2.3** The United States, in exchange and on the Closing Date, and also in accordance with the Exchange Agreement shall convey fee simple title to the properties identified in Exhibit B-1 hereof.

  **2.2.4** The parties mutually agree that the closing of the Land Exchange under the Exchange Agreement shall take place on December 18, 1996. The parties mutually agree that, at any time after the Development Agreement is amended as described in paragraph 2.2.1, BCC may accelerate the Closing Date upon sixty (60) days prior notice to the United States.

  **2.2.5** The United States may accelerate the Closing Date upon sixty (60) days prior notice to BCC following: (i) the commencement of a bankruptcy proceeding against BCC which proceeding is not dismissed within ninety (90) days of its commencement; or (ii) the failure of BCC to submit a site plan to the City which, in the judgment of BCC, satisfies the requirements under the Development Agreement.

## ARTICLE 3 - PROMISSORY NOTE

  **3.1** On the Closing Date, BCC shall deliver, or cause to be delivered, to the United States the Promissory Note, fully executed by BCC, in the form of Exhibit C hereof providing for payment upon closing of the Land Exchange of Thirty-four Million Nine Hundred Thousand Dollars ($34.9 million) with interest thereon as described in the Promissory Note.

7

EXHIBIT 1 to COMPLAINT (Page 10 of 135)

3.2   The parties acknowledge that the Promissory Note
(subject to such application of the "Annuity" as defined below)
is secured by the Annuity, and the **"Trust Estate"** (as such term
is defined in the Deed of Trust), and that resort for payment of
the Promissory Note shall be solely against the Annuity and the
Trust Estate under the terms of the Deed of Trust, and without
personal recourse against BCC or any of the persons or entities
mentioned in the Promissory Note (whether for payment or for
deficiency after resort against the Annuity and the Trust
Estate).

## ARTICLE 4 - DEED OF TRUST
### (WITH ASSIGNMENT OF RENTS AND SECURITY AGREEMENT)

4.1   On the Closing Date, BCC shall deliver, or cause to be
delivered, to the United States the Deed of Trust, fully executed
by BCC, without personal recourse, conveying to the United
States, as security for the Promissory Note, a security interest
in all right, title, and interest of BCC in approximately
twenty-two and one-half acres of Phoenix, Arizona, land described
in the Deed of Trust and the Collateral Assignment attached as
Exhibit D to such Deed of Trust.

4.2   If, prior to the closing of the Land Exchange, the
Development Agreement terminates and is of no further effect, the
parties shall proceed with the closing of the Land Exchange;
provided, however, that at the closing of the Land Exchange the
United States shall convey to BCC all of the United States'
right, title and interest in and to the property described in

8

**EXHIBIT 1 to COMPLAINT (Page 11 of 135)**

Exhibit B-6 hereto rather than the property described in Exhibit B-1 hereto, and BCC shall execute and deliver to the United States a deed of trust substantially in the form of Exhibit D hereto conveying to the United States a security interest in the property described in Exhibit B-6 hereto.  The grant of a security interest described in the preceding sentence shall be in addition to the security interests (other than that which would otherwise have been given in the Development Agreement) contemplated in the preceding paragraph.  In this event, the City will receive the property described in Exhibit B-7 to this Agreement.

4.3  If, prior to the closing of the Land Exchange, BCC becomes entitled to money damages from the City as a result of an action taken by the City in contravention of the terms of the Development Agreement which action substantially impairs the value of the Development Agreement and the Development Agreement is not terminated, then such money damages, when received by BCC, shall be held and applied as Deposited Monies (as such term is defined in the Deed of Trust) under the Deed of Trust.  BCC shall appear in and contest any action or proceeding which, in the judgment of BCC, substantially impairs the value of the Development Agreement as security for the transactions contemplated under this Agreement.

## ARTICLE 5 - ANNUITY

5.1  No later than sixty (60) days prior to the Closing Date, BCC shall enter into an Annuity Contract in favor of the

9

EXHIBIT 1 to COMPLAINT (Page 12 of 135)

United States, effective on the Closing Date, with a reputable third-party financial institution (the **"Annuity Company"**) acceptable to the United States, which shall permit payments by BCC to the Annuity Company of thirty (30) annual payments, and which shall be sufficient, on the completion of such annual payments, to pay to the United States a lump sum of Thirty-Four Million Nine Hundred Thousand Dollars (the principal amount of the Promissory Note) on the maturity date of the Promissory Note thirty years from the Closing Date. The first such annual payment shall be due no earlier than the first anniversary of the closing of the Land Exchange. Prior to the Closing Date, BCC shall pay all costs and expenses of entering into the Annuity Contract, but shall not be required to fund the Annuity except in thirty (30) annual payments as provided in this Article 5. Prior to execution of the Annuity Contract by BCC, BCC shall provide the United States with a copy of the Annuity Contract for its review and approval, which approval shall not be unreasonably withheld.

5.2  The annual payments by BCC under the Annuity Contract shall be substantially equivalent in value but may vary according to interest rates; provided, however, that BCC shall have the right, in its sole discretion and at any time, to fund the annuity established under the Annuity Contract (the **"Annuity"**) in its entirety. The Annuity Contract shall be without personal recourse against BCC or its successors-in-interest but shall provide that upon a default by BCC under this Agreement or the Promissory Note or upon the occurrence of an **"Event of Default"**

10

**EXHIBIT 1 to COMPLAINT (Page 13 of 135)**

under the Deed of Trust which continues beyond any applicable curative or grace period and which remains uncured by BCC or the United States, or the failure of BCC to make any annual payment under the Annuity Contract, the rights and interests of BCC in the Annuity Contract shall be assigned to the United States. Such Annuity Contract shall further provide that upon said assignment, the United States may continue funding the Annuity according to its terms or may demand payment from the Annuity Company of the then fair value of the Annuity.  In either event, the United States shall reduce the **"Obligations"** (as such term is defined in the Deed of Trust) under the terms of the Deed of Trust by an amount equal to the then fair value of the Annuity. Upon said assignment of the Annuity to the United States, BCC shall have no further liability to the United States with respect to the Annuity or the Annuity Contract.

5.3  At maturity, the Promissory Note will be payable by the application of the Annuity.

## ARTICLE 6 - REPRESENTATIONS OF THE PARTIES

6.1  **Representations of BCC.**  BCC represents and warrants the following:

6.1.1  BCC is a general partnership duly organized, validly existing and qualified to do business in the State of Florida, and has complied with all filing and qualification requirements necessary to lawfully conduct business in the State of Arizona.  BCC has full power and authority to enter into this Agreement, and the execution, delivery, and consummation of this

11

**EXHIBIT 1 to COMPLAINT (Page 14 of 135)**

Agreement by BCC has been duly authorized by all necessary partnership action. The execution, delivery, and consummation of this Agreement by BCC is not prohibited by and does not conflict with any agreement of partnership of BCC or other constituent documents of BCC.

6.1.2 The execution, delivery, and consummation of this Agreement by BCC is not prohibited by and does not conflict with, or constitute a default under, any other agreements or instruments to which BCC is a party or is otherwise subject.

6.1.3 Except as asserted in the action captioned Inter Tribal Council of Arizona, Inc. et al. vs. Manuel Lujan et al., Civil Action No. 92-1890 PHX SMM, in the United States District Court for the District of Arizona, Phoenix Division, and which BCC believes is without merit and is opposing and defending against, BCC has received no notice as of the date of this Agreement asserting any noncompliance in any material respect by BCC with applicable statutes, rules, and regulations of the United States of America, the State of Arizona, the City, or of any other state or municipality or agency having jurisdiction over and with respect to the transactions contemplated in and by this Agreement, and BCC is not in default with respect to any judgment, order, injunction, or decree of any court, administrative agency, or other governmental authority in any respect material to the transactions contemplated in and by this Agreement.

12

EXHIBIT 1 to COMPLAINT (Page 15 of 135)

**6.1.4** BCC has full power and authority to assign its right, title, and interest in and to the Development Agreement to the United States.

**6.2 Representations of the United States.** The United States represents and warrants the following:

**6.2.1** The Secretary of the Interior is authorized by law to enter into this Agreement.

**6.2.2** The execution, delivery, and consummation of this Agreement by the United States is not prohibited by and does not conflict with any other agreements or instruments to which the United States is a party or is otherwise subject.

**6.2.3** Except as asserted in the action captioned _Inter Tribal Council of Arizona, Inc. et al. vs. Manuel Lujan et al._, Civil Action No. 92-1890 PHX SMM, in the United States District Court for the District of Arizona, Phoenix Division, and which the United States believes is without merit and is opposing and defending against, the United States has received no notice as of the date of this Agreement asserting any noncompliance in any material respect by the United States with applicable statutes, rules, and regulations of the United States of America, the State of Arizona, the City, or of any other state or municipality or agency having jurisdiction over and with respect to the transactions contemplated in and by this Agreement, and the United States is not in default with respect to any judgment, order, injunction, or decree of any court, administrative agency, or other governmental authority in any respect material to the transactions contemplated in and by this Agreement.

13

EXHIBIT 1 to COMPLAINT (Page 16 of 135)

## ARTICLE 7 - SPECIFIC PERFORMANCE RIGHT OF UNITED STATES

7.1  If BCC fails to deliver the Promissory Note or the Deed
of Trust, or take such actions as may be necessary to close the
Land Exchange as contemplated by this Agreement on the Closing
Date, the United States shall be entitled to obtain in an action
or proceeding in any court of competent jurisdiction a judgment
or order for specific performance thereof.  In addition, the
United States shall have all other remedies available at law or
in equity or under other provisions of this Agreement.

7.2  The requirement of BCC to enter into an Annuity
Contract is not a condition to the closing of the Land Exchange
and the failure by BCC to enter into the Annuity Contract prior
to the closing of the Land Exchange shall not limit the right of
the United States to seek specific performance as described in
this Article 7.

## ARTICLE 8 - DEFAULT; REMEDIES

8.1  A party shall be in default under this Agreement if it
fails to comply with any of the material terms or conditions of
this Agreement and such failure shall not be rectified or cured
within thirty (30) days after receipt by the defaulting party of
notice from the non-defaulting party ("Notice of Default").
After receipt by the defaulting party of a Notice of Default and
after the expiration of the thirty (30) day cure period under
this Agreement, the non-defaulting party may exercise any rights
or remedies provided in this Agreement.  The remedies in this
Agreement shall be in addition to any remedies upon the

14

EXHIBIT 1 to COMPLAINT (Page 17 of 135)

occurrence of an Event of Default under the Deed of Trust, assignment of collateral or any other remedy available to it at law or equity.

8.2  Either party may rescind any Notice of Default by executing and delivering to the defaulting party a written notice of such rescission.  The exercise by either party of such right of rescission shall not constitute a waiver of any default then existing or subsequently occurring, shall not impair the right of either party to execute and deliver, as provided above, other such notices of default and shall not otherwise affect any provision of this Agreement or the rights or remedies of the parties hereunder.

### ARTICLE 9 - MISCELLANEOUS PROVISIONS

9.1  **Binding Effect.**  This Agreement applies to, inures to the benefit of, and binds all parties hereto and their heirs, successors and assigns.

9.2  **Severability.**  If any provision of this Agreement should be held unenforceable, void or severable, either party may void this Agreement at its sole option.

9.3  **Notices.**  All notices, requests, and demands made hereunder to any party shall be in writing and shall be delivered by hand or sent by registered or certified mail, return receipt requested, postage prepaid, through the United States Postal Service to the addresses set forth in this Section 9.3 or such other address which the parties may provide to one another in accordance herewith.  Such notices, requests, and demands, if

15

EXHIBIT 1 to COMPLAINT (Page 18 of 135)

sent by mail, shall be deemed given three (3) days after deposit
in the United States mail, and if delivered by hand, shall be
deemed given when delivered.

If to BCC:

 Barron Collier Company
 4041 North Central Avenue
 Suite 820
 Phoenix, Arizona  85012

 and

 Barron Collier Company
 P.O. Box 413038
 Naples, Florida  33941-3038

If to the United States:

 Secretary of the Interior
 Department of the Interior
 18th and C Streets, N.W.
 Washington, D.C.  20240

 **9.4  Recording.**  This Agreement may be recorded for record
by either party or its agent.

 **9.5  Limitations on Personal Recourse.**  Notwithstanding
anything to the contrary contained in this Agreement or the
Promissory Note or elsewhere, neither BCC nor any affiliate of
BCC nor any partner of BCC (whether individually or as a trustee)
nor any legal representative, successor, heir, estate, or
assignee of any of them shall have any personal liability for the
payment of any sum which may be payable under the Promissory Note
or the Annuity, or for the performance or discharge of any
obligation of BCC under this Agreement, the Promissory Note, or
the Annuity.  In the enforcement of any of its rights under this
Agreement or the Promissory Note, the United States shall solely

16

**EXHIBIT 1 to COMPLAINT (Page 19 of 135)**

resort to, and proceed in rem against the Trust Estate (as such term is defined in the Deed of Trust) and the Annuity.

Resort for payments of amounts due under this Agreement or the Promissory Note shall be solely in rem against the Trust Estate (as such term is defined in the Deed of Trust) and the Annuity as provided by the terms and conditions of this Agreement. Additionally, upon the occurrence of an Event of Default of BCC as defined in this Agreement, neither BCC nor its affiliates, nor any officers, directors, shareholders, or partners thereof, individually or as trustees or other fiduciaries (nor any officers, directors, shareholders, or partners of any assignee of BCC) shall be personally liable for the payment of any deficiency resulting from the application of the proceeds of the sale or other disposition of the Trust Estate (as such term is defined in the Deed of Trust) or the Annuity to any amount due under the Promissory Note, and the United States shall not initiate any action or proceeding against any of them to collect the same.

**9.6  Governing Law.**  This Agreement shall be deemed to be a contract made under and for all purposes shall be governed by and construed in accordance with the laws of the State of Arizona.

**9.7  No Third-Party Beneficiaries.**  The parties do not intend to confer any benefit under this Agreement on any person, firm, or corporation other than the parties hereto.

**9.8  Parties Not to Sue.**  The parties mutually covenant and agree not to sue each other challenging the legal authority or capacity of the Secretary or BCC to enter into this Agreement or

EXHIBIT 1 to COMPLAINT (Page 20 of 135)

to effectuate any provision herein, _provided_, that nothing herein shall be construed to prevent any party from suing to enforce this Agreement or seeking any other available remedy for breach of this Agreement, consistent with the terms of this Agreement.

**9.9 Amendment.** The parties reserve the right, but only on their mutual written consent, to amend this Agreement prior to the Closing Date, _provided_, that no such amendment may provide for the extension of the Closing Date beyond December 18, 1996.

**9.10 Headings, Captions, and References.** The headings, captions, and tables used in this Agreement are solely for convenience of reference and are not part of this Agreement.

**9.11 Escrow.** The parties acknowledge that contemporaneously with the closing of the Land Exchange, BCC will convey to the City a portion of the lands acquired by BCC from the United States in exchange for rights with respect to certain other property in Phoenix, Arizona arising under the Development Agreement. It is the intent of the parties, in conjunction with the execution of this Agreement, to enter into an escrow agreement among the parties and the City to provide, pending closing, for holding the deeds and other documents necessary to complete the Land Exchange and the exchange authorized under the Development Agreement.

In the event the parties enter into such an escrow agreement, all documents required to be delivered on the closing of the Land Exchange by either party to the other (except for the Annuity Contract) shall be delivered to the escrow agent for delivery to the appropriate party on the closing of the Land

EXHIBIT 1 to COMPLAINT (Page 21 of 135)

Exchange.  The parties do not intend that such escrow agreement shall supersede this Agreement, except to the extent that such escrow agreement prescribes the time for delivery or recordation of such documents to or by the escrow agent.  In all other respects, the escrow agreement shall be deemed supplemental to this Agreement and a means of carrying out and consummating the transactions contemplated by this Agreement.

**9.12 Consents/Approvals.**  Each of the parties agrees that whenever its consent or approval is sought under the terms and conditions of this Agreement, it will not withhold such consent or approval arbitrarily or unreasonably.

**9.13 Counterparts.**  For the purpose of expediting execution of this Agreement, it may be signed in separate counterparts; each such counterpart shall be deemed to be an original instrument, which, when all have been so signed, shall constitute a single agreement.

**9.14 Conditional Extension of Agreement.**  If the Development Agreement is not amended as described in Section 2.2.1 of this Agreement, the parties agree, pursuant to paragraph 25(a) of the Exchange Agreement, that the date for closing of the Land Exchange under the Exchange Agreement shall be extended to January 19, 1993 for the purpose of negotiating a new Trust Fund Payment Agreement and Deed of Trust, and identifying any necessary additional collateral.  Failing such amendment to the Development Agreement, all of the provisions of this Agreement, other than this Section 9.14, shall become null, void and of no further effect.

19

EXHIBIT 1 to COMPLAINT (Page 22 of 135)

IN WITNESS WHEREOF, the parties have executed and
delivered this Agreement as of the date first above written.

Date: _____12-18-92_____

UNITED STATES OF AMERICA

By: _____
Manuel Luján, Jr.
Secretary of the Interior

Date: _____12-17-92_____

BARRON COLLIER COMPANY

By: _____
Barron Collier III

20

EXHIBIT 1 to COMPLAINT (Page 23 of 135)

STATE OF FLORIDA     )
                     :SS.:
COUNTY OF COLLIER    )

        The foregoing instrument was acknowledged before me
this __17__ day of __DECEMBER__, 1992, by Barron Collier III, as a
partner of Barron Collier Company, who is personally known to me.

_Anita M. Decoteau_
ANITA  M.  DECOTEAU

My Commission Expires:

NOTARY PUBLIC STATE OF FLORIDA
MY COMMISSION EXP JUNE 16, 1994
BONDED THRU GENERAL INS. UND.
AA 352849


DISTRICT OF COLUMBIA

        This instrument was acknowledged before me on the __18th__
day of __December__, 1992 by Manuel Lujan, Jr. as
Secretary of the Department of the Interior of the United States
of America.

My Commission Expires:

__4-14-97__.

21

**EXHIBIT 1 to COMPLAINT (Page 24 of 135)**

EXHIBIT A TO TRUST FUND PAYMENT AGREEMENT

The deeds to be delivered by BCC will be of the following described property:

### Exhibit A-1

### Big Cypress National Preserve Addition

(Collier Enterprises-
Paragraph 8(a))

TOWNSHIP 49 SOUTH, RANGE 32 EAST
TALLAHASSEE MERIDIAN

Section  1- All
         2- All
         3- All
         9- All
        10- All
        11- All
        12- All
        13- All
        14- All
        15- All
        21- All
        22- All
        23- All
        24- All
        25- All
        26- All
        27- All
        28- All
        33- All lying North of S.R. 84
        34- All lying North of S.R. 84
        35- All lying North of S.R. 84
        36- All lying North of S.R. 84

TOWNSHIP 49 SOUTH, RANGE 33 EAST
TALLAHASSEE MERIDIAN

Section  17- All
         18- All
         19- All
         20- The West 460 Acres
         30- All
         31- All of the West 1/2 lying North of S.R. 84

EXHIBIT 1 to COMPLAINT (Page 25 of 135)

- 2 -

TOWNSHIP 49 SOUTH RANGE 34 EAST
TALLAHASSEE MERIDIAN

Section    1-  All
           3-  All
           5-  All, lying East of the center line of the L-28
               Interceptor Canal;
           9-  All, lying North and East of the centerline of the
               L-28 Interceptor Canal;
          11-  All
          13-  All
          15-  All
          23-  All
          25-  All
          27-  All
          35-  All, lying North of SR 84

TOWNSHIP 50 SOUTH, RANGE 33 EAST
TALLAHASSEE MERIDIAN

Section    1-  All, lying South of SR 84
           2-  All, lying South of SR 84
           3-  All, lying South of SR 84
           4-  All, lying South of SR 84
           5-  All, lying South of SR 84
           6-  All, lying South of SR 84
           7-  All
           8-  All
           9-  All
          10-  All
          11-  All
          12-  All

TOWNSHIP 50 SOUTH, RANGE 34 EAST
TALLAHASSEE MERIDIAN

Section    7-  All of the West 384 Acres

EXHIBIT 1 to COMPLAINT (Page 26 of 135)

## Exhibit A-1

### Big Cypress National Preserve Addition Strip East of State Road 29

(Collier Enterprises -
Paragraph 8 (b))

TOWNSHIP 50 SOUTH, RANGE 30 EAST
TALLAHASSEE MERIDIAN

Section    20- The East 2,310 feet of the South 1/2 of the SE
1/4, lying East of SR 29
29- All, lying East of SR 29
32- All, lying East of SR 29, less the North 1/2 of
the North 1/2 of the North 1/2 of SW 1/4 and the
North 1/2 of the SE 1/4 and the North 1/2 of the
North 1/2 of the North 1/2 of the South 1/2 of the
SE 1/4 thereof.

TOWNSHIP 51 SOUTH, RANGE 30 EAST
TALLAHASSEE MERIDIAN

Section     5- All, lying East of SR 29
7- All, lying East of SR 29
8- All, lying East of SR 29 less lands described in
OR Book 158, Page 27.
17- All, lying East of SR 29
18- All, lying East of SR 29
19- All, lying East of SR 29
20- All, lying East of SR 29
30- The South 1/2 of the NE 1/4 and the SE 1/4 lying
East of SR 29 less the ACL right-of-way, except
lands described in:
(1) OR Book 115 Page 422, OR Book 115 Page 474
and OR Book 193 Page 402 and excepting OR Book 193 Page 403;
(2) OR Book 116 Page 19; OR Book 172 Page 200; OR
Book 225 Page 760; OR Book 225 Page 761; and excepting therefrom
OR Book 225 Page 762;
(3) OR Book 196, Page 722 and
(4) OR Book 228 Page 277
31- All the North 1/2 of the North 1/2 of the NE 1/4
lying East of SR 29 less ACL right-of-way and less
lands described in OR Book 118 Page 408; OR Book
185 Page 704; OR Book 196 Page 214

EXHIBIT 1 to COMPLAINT (Page 27 of 135)

- 2 -

TOWNSHIP 52 SOUTH, RANGE 30 EAST
TALLAHASSEE MERIDIAN

Section      7-   All of the West 1/2 and the NE 1/4, lying East of
                  SR 29 less the ACL right-of-way, and less lands
                  described in DB 7 Page 156; DB 9 Page 515; DB 10
                  Page 552; DB 5 Page 352; DB 21 Page 73; DB 21 Page
                  75

TOWNSHIP 53 SOUTH, RANGE 29 EAST
TALLAHASSEE MERIDIAN

Section      2-   All, lying East of SR 29 less the East 973.5 feet
                  of the NE 1/4 and less the ACL right-of-way.
            11-   The North 26 acres of the NE 1/4 lying East of SR
                  29.
            14-   All, lying East of SR 29 less Town of Everglades,
                  recorded in Plat Book 1, Page 87; and less the
                  North 858 feet of the NE 1/4 of the NE 1/4; less
                  road right-of-way recorded in OR Book 324, Page
                  404 and OR Book 1059, Page 542, Public Records of
                  Collier County, Florida.
            23-   All lying East of SR 29 except the Town of
                  Everglades as recorded in Plat Book 1, Page 87
                  (110 Acres)

**EXHIBIT 1 to COMPLAINT (Page 28 of 135)**

EXHIBIT A-1

Florida Panther National Wildlife Refuge Lands

(Collier Enterprises -
Paragraph 8(c))

TOWNSHIP 49 SOUTH, RANGE 29 EAST
TALLAHASSEE MERIDIAN

Section    13-  East 1/2, the North 3,835.42 feet

TOWNSHIP 49 SOUTH, RANGE 30 EAST
TALLAHASSEE MERIDIAN

Section    17-  All
           18-  All
           19-  All
           20-  All
           29-  All
           30-  All

EXHIBIT 1 to COMPLAINT (Page 29 of 135)

- 2 -

TOWNSHIP 53 SOUTH, RANGE 28 EAST
TALLAHASSEE MERIDIAN

Section    3-   the West 1/2 above mean highwater
           4-   All above mean highwater
           5-   All above mean highwater less the West 163.5 Acres

**EXHIBIT 1 to COMPLAINT (Page 30 of 135)**

Exhibit A-1

Ten Thousand Islands National Wildlife Refuge (uplands)

(Collier Enterprises -
Paragraph 8 (d))

TOWNSHIP 51 SOUTH, RANGE 27 EAST
TALLAHASSEE MERIDIAN

Section   31-  the South 107 acres of the East 1/2, above mean
               highwater
          32-  the South 134 acres, lying West of S.R. 92, above
               mean highwater

TOWNSHIP 52 SOUTH, RANGE 27 EAST
TALLAHASSEE MERIDIAN

Section    7-  All lying East of S.R. 92, above mean highwater
           8-  All lying East of S.R. 92, above mean highwater
          17-  All above mean highwater
          18-  All lying East of S.R. 92, above mean highwater
               less G.L. #14,
          19-  All above mean highwater less G.L. #2,
          20-  All above mean highwater
          21-  All above mean highwater
          28-  All above mean highwater
          29-  All above mean highwater
          30-  All above mean highwater
          31-  All above mean highwater
          33-  All above mean highwater

TOWNSHIP 52 SOUTH, RANGE 28 EAST
TALLAHASSEE MERIDIAN

Section    5-  All above mean highwater lying South and West of
               U.S. 41
           7-  All above mean highwater
           8-  All above mean highwater subject to U.S. 41 right-
               of-way recorded in OR Book 21, Page 226
           9-  the West 1/2 of Section 9, above mean highwater
               lying South of U.S. 41,
          17-  All above mean highwater
          18-  All above mean highwater
          19-  All above mean highwater
          20-  All above mean highwater
          21-  the West 1/2 above mean highwater
          28-  the West 1/2 above mean highwater
          29-  All above mean highwater
          30-  All above mean highwater
          32-  All above mean highwater
          33-  All above mean highwater
          34-  the West 1/2 above mean highwater

EXHIBIT 1 to COMPLAINT (Page 31 of 135)

Exhibit A-2

Big Cypress National Preserve Addition

(Barron Collier Company -
Paragraph 9(a))

TOWNSHIP 49 SOUTH, RANGE 33 EAST

Section
1- All
2- All
3- All
4- All
5- All
6- All
7- All, subject to pipeline right-of-way as recorded
in OR Book 181, Page 81, Public Records of Collier
County, Florida.
8- All, subject to pipeline right-of-way as recorded
in OR Book 181, Page 81, Public Records of Collier
County, Florida.
9- All, subject to pipeline right-of-way as recorded
in OR Book 181, Page 81, Public Records of Collier
County, Florida.
10- All, subject to pipeline rights-of-way as recorded
in OR Book 181, Page 81, Public Records of Collier
County, Florida.
11- All, subject to pipeline right-of-way as recorded
in OR Book 181, Page 81, Public Records of Collier
County, Florida.
12- All, subject to pipeline right-of-way as recorded
in OR Book 181, Page 81, Public Records of Collier
County, Florida.
13- All
14- All
15- All
20- All, less the West 460 acres thereof;
21- All
22- All
23- All
24- All
25- All
26- All
27- All
28- All
29- All
31- All of the East 1/2 lying North of SR 84
32- All, lying North of SR 84
33- All, lying North of SR 84
35- All, lying North of SR 84

EXHIBIT 1 to COMPLAINT (Page 32 of 135)

- 2 -

TOWNSHIP 49 SOUTH, RANGE 34 EAST

Section      5-  All, lying West of the center line of L-28
                 Interceptor Canal; subject to pipeline right-of-
                 way recorded in OR Book 181, Page 81, and subject
                 to an easement recorded in OR Book 238, Page 165,
                 Public Records of Collier County, Florida
             7-  All, subject to pipeline right-of-way recorded in
                 OR Book 181, Page 81, Public Records of Collier
                 County, Florida
             9-  All, lying South and west of the center line of L-
                 28 Interceptor Canal; subject to pipeline right-
                 of-way recorded in OR Book 181, Page 81; subject
                 to easements recorded in OR Book 238, Page 165, OR
                 Book 1103, Page 1618 and corrective easement
                 recorded in OR Book 1108, Page 2278, Public
                 Records of Collier County, Florida
            17-  All, subject to an easement recorded in OR Book
                 1103, Page 1618 and corrective easement recorded
                 in OR Book 1108, Page 2278
            19-  All
            21-  All, subject to an easement recorded in OR Book
                 1103, Page 1618 and corrective easement recorded
                 in OR Book 1108, Page 2278, Public Records of
                 Collier County, Florida
            29-  All, subject to an easement recorded in OR Book
                 1103, Page 1618 and corrective easement recorded
                 in OR Book 1108, Page 2278, Public Records of
                 Collier County, Florida
            31-  All, lying North of SR 84
            33-  All, lying North of SR 84, subject to an easement
                 recorded in OR Book 1103, Page 1618 and corrective
                 easement recorded in OR Book 1108, Page 2278,
                 Public Records of Collier County, Florida


TOWNSHIP 50 SOUTH, RANGE 34 EAST

Section      1-  All, lying South of SR 84, subject to an easement
                 as recorded in OR Book 238, Page 165, Public
                 Records of Collier County, Florida
             2-  All, lying South of SR 84
             3-  All, lying South of SR 84
             4-  All, lying South of SR 84
             5-  All, lying South of SR 84
             6-  All, lying South of SR 84
             7-  All of the East 263 Acres
             8-  All
             9-  All
            10-  All

EXHIBIT 1 to COMPLAINT (Page 33 of 135)

- 3 -

```
11-   All
12-   All
```

EXHIBIT 1 to COMPLAINT (Page 34 of 135)

Exhibit A-2

Big Cypress National Preserve Addition Strip East of State Road 29

(Barron Collier Company - Paragraph 9(b))

TOWNSHIP 50 SOUTH, RANGE 30 EAST

Section   8- All lying East of SR 29
         17- All lying East of SR 29
         20- All lying East of SR 29, less the East 2,310 foot of the South 1/2 of the SE 1/4

TOWNSHIP 51 SOUTH, RANGE 30 EAST

Section   29- All
         30- All that part of the North 1/2 of the NE 1/4, lying East of SR 29
         31- All lying East of SR 29, except that part of the North 1/2 of the North 1/2 of the NE 1/4, lying East of SR 29
         32- The West 1/2 of the West 1/2

TOWNSHIP 52 SOUTH, RANGE 30 EAST

Section   6- All, lying East of SR 29, subject to CR 837 right-of-way as recorded in OR Book 32, Page 504 and 505
         18- All, lying East of SR 29, less lands described in Deed Book 7, Page 155 and Deed Book 24, Page 524 and subject to Lee County Electric Co-op easement recorded in OR Book 353, Page 861
         19- All, lying East of SR 29 subject to Lee County Electric Co-op easement recorded in OR Book 353, Page 861
         30- All, lying East of SR 29 less lands described in OR Book 353 Page 864 subject to Lee County Electric Co-op easement recorded in OR Book 353, Page 861
         31- All of the West 1/2

TOWNSHIP 52 SOUTH, RANGE 29 EAST

Section   35- All lying East of SR 39 and North of US 41, less lands described in OR Book 353, Page 864, subject to Lee County Electric Co-op easement recorded in OR Book 353, Page 861
         36- All lying East of SR 29.

EXHIBIT 1 to COMPLAINT (Page 35 of 135)

- 2 -

TOWNSHIP 53 SOUTH, RANGE 29 EAST

Section    1-    All

            2-    The East 973.5 feet of the NE 1/4, lying East of SR 29

           11-    The NE 1/4, lying East of SR 29, less the North 26 acres of the NE 1/4, lying East of SR 29 and less the Town of Everglades recorded in Plat Book 1, Page 87, and the SE 1/4, less the East 1/2 of the West 1/2 of the SE 1/4, lying South of the river, and less the Town of Everglades as recorded in Plat Book 1, Page 87

          12-    All

          13-    All, less the South 1/2 of the SE 1/4, less lands described in OR Book 202, Page 573, and less lands described in OR Book 750, Page 1199, subject to County Road right-of-way recorded in OR Book 324, Page 404

          14-    The North 858 feet of the NE 1/4 of the NE 1/4

          24-    All that part described as follows:

               (1)    That part of the NW 1/4 of the NW 1/4 described in OR Book 133, Page 213 and OR Book 202, Page 576

               (2)    The South 1/2 of the NW 1/4, less lands described in OR Book 133, Page 215 and OR Book 202, Page 573

               (3)    The NE 1/4, less the NW 1/4 of the NE 1/4

               (4)    All of the South 1/2 thereof.

EXHIBIT 1 to COMPLAINT (Page 36 of 135)

## EXHIBIT A-2

## FLORIDA PANTHER NATIONAL WILDLIFE REFUGE LANDS

(Barron Collier Company -
Paragraph 9(c))

TOWNSHIP 49 SOUTH, RANGE 29 EAST
TALLAHASSEE MERIDIAN

Section 12- N 1/2 SE 1/4 NE 1/4, E 1/2 SW 1/4 NE 1/4, SW 1/4
SW 1/4 NE 1/4, NW 1/4 SE 1/4, NW 1/4 SW 1/4 SE
1/4, S 1/2 NE 1/4 SW 1/4, N 1/2 SE 1/4 SW 1/4, N
1/2 SW 1/4 SE 1/4 SW 1/4, SW 1/4 SW 1/4, S 1/2 NW
1/4 SW 1/4, NW 1/4 NE 1/4 SW 1/4 SE 1/4

TOWNSHIP 49 SOUTH, RANGE 30 EAST
TALLAHASSEE MERIDIAN

Section 5- All that portion lying north of the South 6,200
feet being measured at right angles to the South
section line, and lying West of the East 700 feet
measured at right angles to the East section line
lying northerly of the South 6,200 feet and lying
East of SR 29 right-of-way recorded in Deed Book
9, Page 226, Public Records of Collier County,
Florida and all lying west of SR 29 except that
portion conveyed to Atlantic Coast Line Railroad
as recorded in Deed Book 4, Page 360, Public
Records of Collier County, Florida, and less the
South 6,200 feet being measured at right angles to
the South section line.

Section 6- All of the south 816.65 feet

Section 7- NW 1/4, N 1/2 NE 1/4, W 1/2 SW 1/4 NE 1/4, SE 1/4
NE 1/4, E 1/2 NE 1/4 SE 1/4

Section 8- All that portion lying East of SR 29 recorded in
Deed Book 9, Page 227, Public Records of Collier
County, Florida, less the North 3,800 feet, and
all of the NW 1/4 lying West of SR 29 except that
portion conveyed to Atlantic Coast Line Railroad
as recorded in Deed Book 4, Page 360, Public
Records of Collier County, Florida.

Section 9- All land lying South of the North 3,800 feet of
the W 1/2 less the E 1/2 E 1/2 thereof.

**EXHIBIT 1 to COMPLAINT (Page 37 of 135)**

## Exhibit A-2

### Ten Thousand Islands National Wildlife Refuge (uplands)

(Barron Collier Company -
Paragraph 9 (d))

TOWNSHIP 51 SOUTH, RANGE 27 EAST
TALLAHASSEE MERIDIAN

Section    31- The east 1/2, above mean highwater less the South
               107 acres thereof
           32- All, above mean highwater lying West of SR 92,
               less the South 134 acres thereof; subject to
               County Road right-of-way recorded in OR Book 854,
               Page 1550
           32- All, above mean highwater lying East of SR 92,
               excepting all oil, gas and mineral rights reserved
               in deed recorded in OR Book 598, Page 546

TOWNSHIP 52 SOUTH, RANGE 27 EAST
TALLAHASSEE MERIDIAN

Section     1- All above mean highwater lying south and West of
               U.S. 41
            2- All above mean highwater
            5- All above mean highwater lying East of SR 92
           11- All above mean highwater
           12- All above mean highwater
           13- All above mean highwater
           14- All above mean highwater
           15- All above mean highwater
           22- All above mean highwater
           23- All above mean highwater
           24- All above mean highwater
           25- All above mean highwater
           26- All above mean highwater
           27- All above mean highwater
           34- All above mean highwater
           35- All above mean highwater
           36- All above mean highwater

TOWNSHIP 52 SOUTH, RANGE 28 EAST
TALLAHASSEE MERIDIAN

Section     6- All above mean highwater lying South and West of
               U.S. 41
           31- All above mean highwater

TOWNSHIP 53 SOUTH, RANGE 27 EAST
TALLAHASSEE MERIDIAN

Section     1- That portion known as Dismal Key above mean
               highwater

EXHIBIT 1 to COMPLAINT (Page 38 of 135)

- 2 -

TOWNSHIP 53 SOUTH, RANGE 28 EAST
TALLAHASSEE MERIDIAN

Section    5-   The West 163.5 acres above mean highwater
            6-   All above mean highwater
            7-   All above mean highwater
            8-   All of the West 1/2 above mean highwater
         17-   All of the West 1/2 above mean highwater
         18-   All above mean highwater
         19-   All above mean highwater
         20-   All of the West 1/2 above mean highwater
         20-   All that part known as Round Key, lying in the
                  East 1/2 above mean highwater
         29-   All of the West 1/2 above mean highwater
         30-   All above mean highwater
         31-   All above mean highwater
         32-   All of the West 1/2 above mean highwater

EXHIBIT 1 to COMPLAINT (Page 39 of 135)

Exhibit A-1

Ten Thousand Islands National Wildlife Refuge
(lands below the mean highwater mark)

(Collier Enterprises -
Paragraph 8 (e))

TOWNSHIP 51 SOUTH, RANGE 27 EAST
TALLAHASSEE MERIDIAN

Section 31- The South 107 acres of the East 1/2 below mean
highwater
32- The South 134 acres, lying West of S.R. 92 below
mean highwater

TOWNSHIP 52 SOUTH, RANGE 27 EAST
TALLAHASSEE MERIDIAN

Section 7- All lying East of S.R. 92, below mean highwater
8- All lying East of S.R. 92, below mean highwater
17- All below mean highwater
18- All lying East of S.R. 92, below mean highwater
less G.L. #14,
19- All below mean highwater less G.L. #2,
20- All below mean highwater
21- All below mean highwater
28- All below mean highwater
29- All below mean highwater
30- All below mean highwater
31- All below mean highwater
33- All below mean highwater

TOWNSHIP 52 SOUTH, RANGE 28 EAST
TALLAHASSEE MERIDIAN

Section 5- All below mean highwater lying South and West of
U.S. 41,
7- All below mean highwater
8- All below mean highwater subject to U.S. 41 right-
of-way recorded in OR Book 21, Page 226
9- the West 1/2 of Section 9, below mean highwater
lying South of U.S. 41
17- All below mean highwater
18- All below mean highwater
19- All below mean highwater
20- All below mean highwater
21- the West 1/2 below mean highwater
28- the West 1/2 below mean highwater
29- All below mean highwater
30- All below mean highwater
32- All below mean highwater
33- All below mean highwater
34- the West 1/2 below mean highwater

EXHIBIT 1 to COMPLAINT (Page 40 of 135)

- 2 -

TOWNSHIP 53 SOUTH, RANGE 28 EAST
TALLAHASSEE MERIDIAN

Section     3-   the West 1/2 below mean highwater
            4-   All below mean highwater
            5-   All below mean highwater less the West 163.5 Acres

**EXHIBIT 1 to COMPLAINT (Page 41 of 135)**

Exhibit A-2

Ten Thousand Islands National Wildlife Refuge
(lands below the mean highwater mark)

(Barron Collier Company -
Paragraph 9 (e))

TOWNSHIP 51 SOUTH, RANGE 27 EAST
TALLAHASSEE MERIDIAN

Section   31-   The East 1/2, below mean highwater less the South
                107 acres thereof
          32-   All, below mean highwater lying West of SR 92,
                less the South 134 acres thereof; subject to
                County Road right-of-way recorded in OR Book 854,
                Page 1550
          32-   All, below mean highwater lying East of SR 92,
                excepting all oil, gas and mineral rights reserved
                in deed recorded in OR Book 598, Page 546

TOWNSHIP 52 SOUTH, RANGE 27 EAST
TALLAHASSEE MERIDIAN

Section    1-   All below mean highwater lying South and West of
                U.S. 41
           2-   All below mean highwater
           5-   All below mean highwater lying East of SR 92
          11-   All below mean highwater
          12-   All below mean highwater
          13-   All below mean highwater
          14-   All below mean highwater
          15-   All below mean highwater
          22-   All below mean highwater
          23-   All below mean highwater
          24-   All below mean highwater
          25-   All below mean highwater
          26-   All below mean highwater
          27-   All below mean highwater
          34-   All below mean highwater
          35-   All below mean highwater
          36-   All below mean highwater

TOWNSHIP 52 SOUTH, RANGE 28 EAST
TALLAHASSEE MERIDIAN

Section    6-   All below mean highwater lying South and West of
                U.S. 41
          31-   All below mean highwater

**EXHIBIT 1 to COMPLAINT (Page 42 of 135)**

- 2 -

TOWNSHIP 53 SOUTH, RANGE 27 EAST
TALLAHASSEE MERIDIAN

Section    1-  That portion known as Dismal Key below mean
               highwater

TOWNSHIP 53 SOUTH, RANGE 28 EAST
TALLAHASSEE MERIDIAN

Section    5-  The West 163.5 acres below mean highwater
           6-  All below mean highwater
           7-  All below mean highwater
           8-  All of the West 1/2 below mean highwater
          17-  All of the West 1/2 below mean highwater
          18-  All below mean highwater
          19-  All below mean highwater
          20-  All of the West 1/2 below mean highwater
          20-  All that part known as Round Key, lying in the
               East 1/2 below mean highwater
          29-  All of the West 1/2 below mean highwater
          30-  All below mean highwater
          31-  All below mean highwater
          32-  All of the West 1/2 below mean highwater

EXHIBIT 1 to COMPLAINT (Page 43 of 135)

EXHIBIT B TO TRUST FUND PAYMENT AGREEMENT

## LIST OF PROPERTY DESCRIPTION EXHIBITS

1.  The deed(s) to be delivered by the United States to BCC
    will be of the property described in Exhibit B-1.

2.  The deed(s) to be delivered by the United States to the
    City, as agreed upon by the City and BCC in the
    Development Agreement, will be of the property
    described in Exhibit B-2 (excluding rights-of-way also
    to be conveyed by the United States to the City).

3.  In consequence of the Terms of the Exchange and the
    Development Agreement, BCC and the City, respectively,
    will be entitled to receive and retain the following
    respective parts of the property described in the above
    paragraph 1:

    To Be Conveyed by the United States and Retained
    by BCC ("Uptown Site"):

    See Exhibit B-3

    To Be Conveyed by BCC Pursuant to the Development
    Agreement and Retained by the City:

    See Exhibit B-4

4.  In consequence of the terms of the Development
    Agreement, BCC will be entitled to receive certain
    rights and interest in and to the property described in
    Exhibit B-5 ("Downtown Site") and to assign said rights
    and interest to the United States as evidenced by the
    Deed of Trust, and the Collateral Assignment and UCC
    Financing Statement(s) attached thereto.

5.  If, prior to the closing of the Land Exchange, the
    Development Agreement terminates and is of no further
    effect, the deeds to be delivered by the United States
    to BCC and the City, respectively, will be of the
    following described property:

    To Be Conveyed by the United States to BCC:

    See Exhibit B-6

    To Be Conveyed by the United States to the City:

    See Exhibit B-7

1

**EXHIBIT 1 to COMPLAINT (Page 44 of 135)**

Exhibit B-1
Page 1

## LEGAL DESCRIPTION OF UNITED STATES
### CONVEYANCE TO BCC

A parcel of land in the southeast quarter of Section 20, Township 2 North, Range 3 East, Gila and Salt River Meridian, City of Phoenix, County of Maricopa, State of Arizona, more particularly described in accordance with a survey plat approved March 22, 1988 and filed with the Bureau of Land Management, as follows:

Beginning at the 1/4 section corner of sections 20 and 29, located within the intersection of Central Avenue and Indian School Road.

Thence:  North 00 degrees 10 minutes 38 seconds East along the north-south centerline of section 20, 1352.74 feet, to the southwest corner of the property described in the quitclaim deed dated November 20, 1959, and recorded in Docket 3273, Page 412, of the Maricopa County Records.

Thence:  South 89 degrees 49 minutes 22 seconds East 550.00 feet, along the south line to the southeast corner of the said property.

Thence:  North 00 degrees 10 minutes 38 seconds East, along the east line of said property and along the east boundary of the properties recorded in Docket 3423, Page 430, Docket 3423, Page 428 and Docket 1919, Page 10 in said county records, 1281.04 feet to a point on the east-west centerline of section 20.

Thence:  South 89 degrees 30 minutes 01 seconds East 1499.51 feet, along the said east-west centerline to the west boundary of the property described as Tract B in the quitclaim deed dated December 28, 1955, and recorded in Docket 1837, Page 436 in said county records.

Thence:  South 00 degrees 03 minutes 27 seconds West, along the said west boundary 577.41 feet to the southwest corner of said property.

Thence:  South 89 degrees 25 minutes 01 seconds East, 585.00 feet, along the south line to the southeast corner of said property.

Thence:  South 00 degrees 03 minutes 27 seconds West, 30.28 feet, to the northerly line of the property transferred to the U.S. Veterans Administration by Executive Order No. 9854, dated May 16, 1947 (FR Vol.12, No.99, dated May 20, 1947).

Thence:  North 89 degrees 24 minutes 00 seconds West, 585.00 feet, along the northerly line, to the northwest corner of said property.

Thence:  South 00 degrees 03 minutes 27 seconds West, 1986 feet, along the westerly line of said property to a point located North 00 degrees 03 minutes 27 seconds East

**EXHIBIT 1 to COMPLAINT (Page 45 of 135)**

Exhibit B-1
Page 2

14.00 feet from the southwest corner of said property, being a point on the northerly right-of-way line of Indian School Road.

Thence:  North 89 degrees 24 minutes 00 seconds West, 642.23 feet, along the said northerly right-of-way line.

Thence:  South 00 degrees 03 minutes 27 seconds West, 47.00 feet, to a point on the line between sections 20 and 29.

Thence:  North 89 degrees 24 minutes 00 seconds West, along the said section line and within the said Indian School Road, 1412.84 feet, to the point of beginning.

Less and excepting therefrom the following three parcels of land:

That part of the Southeast quarter of Section 20, Township 2 North, Range 3 East, G&SRB&M, described as follows:
COMMENCING at the South quarter corner of said Section 20;
thence North 00 degrees 10 minutes 38 seconds East along the West line of said Southeast quarter a distance of 1352.74 feet;
thence South 89 degrees 49 minutes 22 seconds East a distance of 800.00 feet;
thence South 00 degrees 10 minutes 38 seconds West a distance of 474.96 feet to the POINT OF BEGINNING;
thence South 89 degrees 49 minutes 22 seconds East a distance of 538.00 feet;
thence North 45 degrees 00 minutes 00 seconds East a distance of 882.46 feet;
thence North 00 degrees 03 minutes 27 seconds East a distance of 575.36 feet;
thence North 89 degrees 49 minutes 22 seconds West a distance of 503.00 feet;
thence South 00 degrees 03 minutes 27 seconds West a distance of 109.36 feet;
thence North 89 degrees 49 minutes 22 seconds West a distance of 198.00 feet;
thence South 00 degrees 03 minutes 27 seconds West a distance of 412.00 feet;
thence North 89 degrees 49 minutes 22 seconds West a distance of 229.00 feet;
thence South 00 degrees 10 minutes 38 seconds West a distance of 290.00 feet;
thence North 89 degrees 49 minutes 22 seconds West a distance of 229.95 feet;

EXHIBIT 1 to COMPLAINT (Page 46 of 135)

thence South 00 degrees 10 minutes 38 seconds West a distance of 389.92 feet to the POINT OF BEGINNING.

Commencing at the 1/4 section corner of sections 20 and 29, located within the intersection of Central Avenue and Indian School Road, thence; South 89 degrees 24 minutes 00 seconds East along the section line, 1412.84 feet, thence; North 00 degrees 03 minutes 27 seconds East, 47.00 feet to the POINT OF BEGINNING, said point being a point on the northerly right-of-way line of Indian School Road.

Thence:  North 00 degrees 03 minutes 27 seconds East 780.00 feet, to a point.

Thence:  South 89 degrees 24 minutes 00 seconds East, 642.23 feet, to a point in the westerly line of the property transferred to the U.S. Veterans Administration by Executive Order No. 9854, dated May 16, 1947 (FR Vol.12, No.99, dated May 20, 1947).

Thence:  South 00 degrees 03 minutes 27 seconds West, 780.00 feet, along the westerly line of the said property, to a point located North 00 degrees 03 minutes 27 seconds East 14.00 feet from the southwest corner of said property being a point on the northerly right-of-way line of Indian School Road.

Thence:  North 89 degrees 24 minutes 00 seconds West, 642.23 feet, along the northerly right-of-way line to the point of beginning.  Containing 11.50 acres, more or less.

That part of the Southeast quarter of Section 20, Township 2 North, Range 3 East, G&SRB&M, described as follows:
COMMENCING at the Southeast corner of said Section 20;
thence North 89 degrees 24 minutes 00 seconds West along the South line thereof a distance of 618.00 feet;
thence continuing North 89 degrees 24 minutes 00 seconds West along said South line a distance of 642.23 feet;
thence North 00 degrees 03 minutes 27 seconds East a distance of 827.00 feet to the POINT OF BEGINNING;
thence North 45 degrees 19 minutes 44 seconds East a distance of 702.67 feet;
thence South 89 degrees 24 minutes 00 seconds East a distance of 143.00 feet;
thence South 00 degrees 03 minutes 27 seconds West a distance of 499.23 feet;

EXHIBIT 1 to COMPLAINT (Page 47 of 135)

Exhibit B-1
Page 4

thence North 89 degrees 24 minutes 00 seconds West a distance of 642.23 feet to the POINT OF BEGINNING.

Containing, after exceptions 71.84 acres, more or less.

**EXHIBIT 1 to COMPLAINT (Page 48 of 135)**

Exhibit B-2

## LEGAL DESCRIPTION OF PARK SITE
## CONVEYANCE FROM THE UNITED STATES
## TO THE CITY OF PHOENIX

That part of the Southeast quarter of Section 20, Township 2 North, Range 3 East, G&SRB&M, described as follows:

COMMENCING at the South quarter corner of said Section 20;

thence North 00 degrees 10 minutes 38 seconds East along the West line of said Southeast quarter a distance of 1352.74 feet;

thence South 89 degrees 49 minutes 22 seconds East a distance of 800.00 feet;

thence South 00 degrees 10 minutes 38 seconds West a distance of 474.96 feet to the POINT OF BEGINNING;

thence South 89 degrees 49 minutes 22 seconds East a distance of 538.00 feet;

thence North 45 degrees 00 minutes 00 seconds East a distance of 882.46 feet;

thence North 00 degrees 03 minutes 27 seconds East a distance of 575.36 feet;

thence North 89 degrees 49 minutes 22 seconds West a distance of 503.00 feet;

thence South 00 degrees 03 minutes 27 seconds West a distance of 109.36 feet;

thence North 89 degrees 49 minutes 22 seconds West a distance of 198.00 feet;

thence South 00 degrees 03 minutes 27 seconds West a distance of 412.00 feet;

thence North 89 degrees 49 minutes 22 seconds West a distance of 229.00 feet;

thence South 00 degrees 10 minutes 38 seconds West a distance of 290.00 feet;

thence North 89 degrees 49 minutes 22 seconds West a distance of 229.95 feet;

thence South 00 degrees 10 minutes 38 seconds West a distance of 389.92 feet to the POINT OF BEGINNING.  Containing 20.00 acres; more or less.

**EXHIBIT 1 to COMPLAINT (Page 49 of 135)**

Exhibit B-3

## LEGAL DESCRIPTION OF UPTOWN SITE

That part of the Southeast Quarter of Section 20, Township 2 North, Range 3 East, Gila and Salt River Meridian, Maricopa County, Arizona, per the survey officially filed with the Bureau of Land Management March 23rd, 1988, described as follows:

COMMENCING at the southwest corner of said Southeast Quarter; thence N 00°10'38"E 1,152.74 feet to a line that is 200.00 feet south of the south line of a parcel of land described in Docket 3273, page 412, Records of Maricopa County; thence S 89°49'22"E 70.00 feet along said line to the east line of the west 70.00 feet of said Southeast Quarter and the POINT OF BEGINNING; thence S 00°10'38"W 1,063.25 feet along a said east line; thence S 44°36'41"E 32.65 feet to the north line of the south 67.00 feet of said Southeast Quarter; thence S 89°24'00"E 608.18 feet along said north line; thence N 00°10'38"E 839.69 feet; thence N 44°49'22"W 355.28 feet; thence N 89°49'22"W 379.94 feet to the POINT OF BEGINNING.

Parcel contains 15.04 acres.

**EXHIBIT 1 to COMPLAINT (Page 50 of 135)**

Exhibit B-4
Page 1

## LEGAL DESCRIPTION OF
## ADDITIONAL PARK SITE AND RIGHTS-OF-WAY TO BE
## CONVEYED FROM BCC TO THE CITY OF PHOENIX

That part of the Southeast quarter of Section 20, Township 2 North, Range 3 East, G&SRB&M, described as follows:

BEGINNING at the South quarter corner of said Section 20, being identical with the intersection of the monument lines of Central Avenue and Indian School Road;

thence North 00 degrees 10 minutes 38 seconds East along the North-South midsection line of said Section 20 a distance of 1352.74 feet to the Southwest corner of the property described in that Quit-Claim deed dated November 20, 1959, and recorded in Docket 3273, page 412, records of Maricopa County, Arizona;

thence South 89 degrees 49 minutes 22 seconds East along the South line of said property a distance of 550.00 feet to the Southeast corner thereof;

thence North 00 degrees 10 minutes 38 seconds East along the East line of said property, and along the East line of the properties described in the instruments recorded in Docket 3423, page 430, Docket 3423, page 428 and Docket 1919, page 10, respectively, records of said County, a distance of 1281.04 feet to the Northeast corner of the property described in said Docket 1919, page 10, being a point in the East-West midsection line of said Section 20;

thence South 89 degrees 30 minutes 01 second East along said East-West midsection line a distance of 1499.51 feet to the West line of the property described as Tract B in that Quit-Claim Deed dated December 28, 1955, and recorded in Docket 1837, pages 436-443, records of said County;

thence South 00 degrees 03 minutes 27 seconds West along said West line a distance of 577.41 feet (577.30 feet, record) to the Southwest corner of said Tract B;

thence South 89 degrees 25 minutes 01 seconds East 585.00 feet along the south line of said Tract B to the West line of the East 33.00 feet of said Southeast Quarter;

thence South 00 degrees 03 minutes 27 seconds West 30.28 feet along said West line to the Northeast corner of the property transferred to the U.S. Veterans Administration by Executive Order No. 9854 issued May 16, 1947 (FR Vol. 12, No. 99, dated May 20, 1947);

thence North 89 degrees 24 minutes 00 seconds West 585.00 feet along the North line to the Northwest corner of said U.S. Veterans Administration property;

thence South 00 degrees 03 minutes 27 seconds West 1986.00 feet along the West line of said U.S. Veterans Administration property to a point, designated herein as Point "A", in the North line of the South 47 feet of said Southeast quarter of Section 20;

thence North 89 degrees 24 minutes 00 seconds West along last said North line a distance of 642.23 feet;

thence South 00 degrees 03 minutes 27 seconds West 47.00 feet to the South line of said Southeast quarter of Section 20;

thence North 89 degrees 24 minutes 00 seconds West 1412.84 feet along last said South line to said South quarter corner of Section 20 and the POINT OF BEGINNING;

EXCEPT that part thereof lying within Parcels "A", "A-A", "B", and "C", all of which are described hereinbelow.

EXHIBIT 1 to COMPLAINT (Page 51 of 135)

Exhibit B-4
Page 2

PARCEL "A"
    BEGINNING at said Point "A" described hereinabove;
    thence North 00 degrees 03 minutes 27 seconds East, along the West line of said U.S. Veterans Administration property, to a point, designated herein as Point "B", which bears North 00 degrees 03 minutes 27 seconds East a distance of 827.00 feet from a point in the South line of said Southeast quarter of Section 20;
    thence North 89 degrees 24 minutes 00 seconds West a distance of 642.23 feet;
    thence South 00 degrees 03 minutes 27 seconds West to said North line of the South 47 feet;
    thence South 89 degrees 24 minutes 00 seconds East along said North line a distance of 642.23 feet to the POINT OF BEGINNING;

PARCEL "A-A"
    BEGINNING at said Point "B" described hereinabove;
    thence North 89 degrees 24 minutes 00 seconds West a distance of 642.23 feet;
    thence North 45 degrees 19 minutes 44 seconds East a distance of 702.67 feet;
    thence South 89 degrees 24 minutes 00 seconds East a distance of 143.00 feet to a point in the West line of said U.S. Veterans Administration property;
    thence South 00 degrees 03 minutes 27 seconds West along said West line a distance of 499.23 feet to the POINT OF BEGINNING.

PARCEL "B"
    COMMENCING at the South quarter corner of said Section 20;
    thence North 00 degrees 10 minutes 38 seconds East along the West line of said Southeast quarter a distance of 1352.74 feet;
    thence South 89 degrees 49 minutes 22 seconds East a distance of 800.00 feet;
    thence South 00 degrees 10 minutes 38 seconds West a distance of 474.96 feet to the POINT OF BEGINNING;
    thence South 89 degrees 49 minutes 22 seconds East a distance of 538.00 feet;
    thence North 45 degrees 00 minutes 00 seconds East a distance of 882.46 feet;
    thence North 00 degrees 03 minutes 27 seconds East a distance of 575.36 feet;
    thence North 89 degrees 49 minutes 22 seconds West a distance of 503.00 feet;
    thence South 00 degrees 03 minutes 27 seconds West a distance of 109.36 feet;
    thence North 89 degrees 49 minutes 22 seconds West a distance of 198.00 feet;
    thence South 00 degrees 03 minutes 27 seconds West a distance of 412.00 feet;
    thence North 89 degrees 49 minutes 22 seconds West a distance of 229.00 feet;
    thence South 00 degrees 10 minutes 38 seconds West a distance of 290.00 feet;
    thence North 89 degrees 49 minutes 22 seconds West a distance of 229.95 feet;
    thence South 00 degrees 10 minutes 38 seconds West a distance of 389.92 feet to the POINT OF BEGINNING.

**EXHIBIT 1 to COMPLAINT (Page 52 of 135)**

Exhibit B-4
Page 3   -

## PARCEL "C"

That part of the Southeast Quarter of Section 20, Township 2 North, Range 3 East, Gila and Salt River Meridian, Maricopa County, Arizona, per the survey officially filed with the Bureau of Land Management March 23rd, 1988, described as follows:

COMMENCING at the southwest corner of said Southeast Quarter; thence N 00°10'38"E 1,152.74 feet to a line that is 200.00 feet south of the south line of a parcel of land described in Docket 3273, page 412; thence S 89°49'22"E 70.00 feet along said line to the east line of the west 70.00 feet of said Southeast Quarter and the POINT OF BEGINNING; thence S 00°10'38"W 1,063.25 feet along a said east line; thence S 44°36'41"E 32.65 feet to the north line of the south 67.00 feet of said Southeast Quarter; thence S 89°24'00"E 608.18 feet along said north line; thence N 00°10'38"E 839.69 feet; thence N 44°49'22"W 355.28 feet; thence N 89°49'22"W 379.94 feet to the POINT OF BEGINNING.

**EXHIBIT 1 to COMPLAINT (Page 53 of 135)**

Exhibit B-5
Page 1

DOWNTOWN SITE

LEGAL DESCRIPTION--BETWEEN WASHINGTON,
JEFFERSON, 1ST AND 3RD STREETS

Blocks 23, 24, 33 and 34, ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51;

TOGETHER WITH the alley right of way within said Blocks 24 and 33; and

TOGETHER WITH that part of Jefferson Street, as shown on said plat of ORIGINAL TOWNSITE OF PHOENIX, that lies between the Southerly prolongations of the East and West lines of said Block 23; and

TOGETHER WITH that part of Jefferson Street, as shown on said plat of ORIGINAL TOWNSITE OF PHOENIX, that lies between the Southerly prolongations of the East and West lines of said Block 24;

EXCEPT that part of the whole thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or radially, of the Northerly line of AMERICA WEST ARENA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 343 of Maps at page 45.

**EXHIBIT 1 to COMPLAINT (Page 54 of 135)**

Exhibit B-5
Page 2

**LEGAL DESCRIPTION OF**
**PUBLIC RIGHT OF WAY TO BE CLOSED**
**JEFFERSON STREET BETWEEN 1ST AND 3RD STREETS**

PART NO. 1:

That part of Jefferson Street as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51, lying between the Southerly prolongation of the West line of Block 24 in said ORIGINAL TOWNSITE OF PHOENIX and the line that is parallel with and 15 feet East of the monument line of First Street as shown on said plat;

TOGETHER WITH that part of Second Street as shown on, and dedicated by, said plat of ORIGINAL TOWNSITE OF PHOENIX, lying between the Westerly prolongations of the North and South lines of Lot 11 in said Block 33; and

TOGETHER WITH the alley within Block 33 in said ORIGINAL TOWNSITE OF PHOENIX which lies between the Southerly prolongations of the East line of Lot 1 and the West line of Lot 11 in said Block 33;

EXCEPT that part of the whole thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or radially, of the Northerly line of AMERICA WEST ARENA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 343 of Maps as page 45; and

EXCEPT that part of the whole thereof lying within 25 feet of the monument line of said Second Street.

PART NO. 2:

That part of Blocks 33 and 34, ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51, lying within a strip of land, 100 feet in width, the center line of which is described as follows:

BEGINNING at the intersection of the monument line of 1st Street with the monument line of Jefferson Street;

thence North 89 degrees 59 minutes 44 seconds East along said monument line of Jefferson Street (based on an assumed bearing of North 00 degrees 01 minutes 09 seconds West for said monument line of 1st Street) a distance of 60.00 feet to the point of curvature of a circular curve concave Southwesterly, having a radius of 716.20 feet;

thence Southeasterly along the arc of said curve through a central angle of 33 degrees 41 minutes 25 seconds a distance of 421.13 feet to the point of tangency;

thence South 56 degrees 18 minutes 51 seconds East a distance of 100.00 feet to the point of curvature of a circular curve concave Northeasterly, having a radius of 716.20 feet;

**EXHIBIT 1 to COMPLAINT (Page 55 of 135)**

Exhibit B-5
Page 3

thence Southeasterly along the arc of said curve through a central angle of 33 degrees 42 minutes 22 seconds a distance of 421.33 feet to the point of tangency and the terminus of the center line described herein;

EXCEPT that part thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or radially, of the Northerly line of AMERICA WEST ARENA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 343 of Maps at page 45.

**EXHIBIT 1 to COMPLAINT (Page 56 of 135)**

Exhibit B-5
Page 4

## LEGAL DESCRIPTION OF
## PUBLIC RIGHT OF WAY TO BE CLOSED
## JEFFERSON STREET BETWEEN 2ND AND 3RD STREET
## AND THE ALLEYS IN BLOCK 24

That portion of Jefferson Street as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51, lying between the line that extends from the Southeast corner of Lot 2, Block 24 in said ORIGINAL TOWNSITE OF PHOENIX to the Northeast corner of Lot 1, Block 33 in said ORIGINAL TOWNSITE OF PHOENIX and the line that extends from the Southwest corner of Lot 18 in said Block 24 to the Northwest corner of Lot 11 in said Block 33;

TOGETHER WITH all of the alley within said Block 24 which is bound by the Northerly prolongation of the East line of said Lot 2, by the Easterly prolongation of the South line of said Lot 18 and by the Westerly prolongation of the North line of Lot 5 in said Block 24.

**EXHIBIT 1 to COMPLAINT (Page 57 of 135)**

Exhibit B-5
Page 5

LEGAL DESCRIPTION OF
PUBLIC RIGHT OF WAY TO BE CLOSED
2ND STREET BETWEEN WASHINGTON AND (NEW) JEFFERSON STREETS

That portion of Second Street lying between the monument lines of Washington Street and Madison Street, all as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51;

EXCEPT that part thereof lying within 50 feet of the monument line of said Washington Street; and

EXCEPT that part thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or radially, of the Northerly line of AMERICA WEST ARENA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 343 of Maps at page 45; and

EXCEPT that part thereof lying within 25 feet of the monument line of said Second Street to a height of 18 feet measured vertically from the crown of the pavement of Second Street.

**EXHIBIT 1 to COMPLAINT (Page 58 of 135)**

Exhibit B-5
Page 6

## LEGAL DESCRIPTION OF
## PUBLIC RIGHT OF WAY TO BE CLOSED
## 2ND STREET BETWEEN WASHINGTON AND JEFFERSON STREETS

That portion of Second Street lying between the monument lines of Washington Street and Jefferson Street, all as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51;

EXCEPT that part thereof lying within 50 feet of the monument line of said Washington Street; and

EXCEPT that part thereof lying within 50 feet of the monument line of said Jefferson Street; and

EXCEPT that part thereof lying within 25 feet of the monument line of said Second Street.

**EXHIBIT 1 to COMPLAINT (Page 59 of 135)**

Exhibit B-5
Page 7

LEGAL DESCRIPTION OF
PUBLIC RIGHT OF WAY TO BE CLOSED
3RD STREET BETWEEN WASHINGTON AND (NEW) JEFFERSON STREETS

That portion of Third Street, above a height of 18 feet measured vertically from the crown of the pavement of Third Street, lying between the monument lines of Washington Street and Madison Street, all as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder or Maricopa County, Arizona, in Book 2 of Maps at page 51;

EXCEPT that part thereof lying within 50 feet of the monument line of said Washington Street; and

EXCEPT that part thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or radially, of the Northerly line of AMERICA WEST ARENA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 343 of Maps at page 45, and the Easterly continuation thereof.

**EXHIBIT 1 to COMPLAINT (Page 60 of 135)**

Exhibit B-5
Page 8

## LEGAL DESCRIPTION OF PUBLIC RIGHT OF WAY
## TO BE CLOSED 1ST STREET BETWEEN
## WASHINGTON AND JEFFERSON STREETS

The East 35.00 feet of First Street lying between the monument lines of Washington Street and Jefferson Street, all as shown on and dedicated by the plat of ORIGINAL TOWNSITE OF PHOENIX, as recorded in Book 2 of Maps at Page 51, records of Maricopa County, Arizona;

TOGETHER WITH the West 43.00 feet of the East 78.00 feet of First Street lying 18.00 feet above the existing road surface and lying between the monument lines of Washington Street and Jefferson Street as shown on the plat of ORIGINAL TOWNSITE OF PHOENIX, as recorded in Book 2 of Maps at Page 51, records of Maricopa County, Arizona;

EXCEPT that part thereof lying within 50 feet of the monument line of said Washington Street; and

EXCEPT that part thereof lying with 50 feet of the monument line of said Jefferson Street.

EXHIBIT 1 to COMPLAINT (Page 61 of 135)

Exhibit B-6
Page 1

## LEGAL DESCRIPTION OF ALTERNATE PROPERTY TO BE
## CONVEYED FROM THE UNITED STATES
## TO THE BARRON COLLIER COMPANY

A parcel of land in the southeast quarter of Section 20, Township 2 North, Range 3 East, Gila and Salt River Meridian, City of Phoenix, County of Maricopa, State of Arizona, more particularly described in accordance with a survey plat approved march 22, 1988 and filed with the Bureau of Land Management, as follows:

Beginning at the 1/4 section corner of sections 20 and 29, located within the intersection of Central Avenue and Indian School Road.

THENCE, North 00 degrees 10 minutes 38 seconds East along the north-south centerline of section 20, 1352.74 feet, to the southwest corner of the property described in the quitclaim deed dated November 20, 1959, and recorded in Docket 3273, Page 412, of the Maricopa County Records.

THENCE, South 89 degrees 49 minutes 22 seconds East 550.00 feet, along the south line to the southeast corner of the said property.

THENCE, North 00 degrees 10 minutes 38 seconds East, along the east line of said property and along the east boundary of the properties recorded in Docket 3423, Page 430, Docket 3423, Page 428 and Docket 1919, Page 10 in said county records, 1281.04 feet to a point on the east-west centerline of section 20.

THENCE, South 89 degrees 30 minutes 01 seconds East 1499.51 feet, along the said east-west centerline to the west boundary of the property described as Tract B in the quitclaim deed dated December 28, 1955, and recorded in Docket 1837, Page 436 in said county records.

THENCE, South 00 degrees 03 minutes 27 seconds West, along the said west boundary 577.41 feet to the southwest corner of said property.

THENCE, South 89 degrees 25 minutes 01 seconds East, 585.00 feet, along the south line to the East line of said Southeast Quarter;

THENCE, South 00 degrees 03 minutes 27 seconds West, 30.28 feet, along the said East line to the Northerly line and its Easterly prolongation, of the property transferred to the U.S. Veterans Administration by Executive Order No. 9854, dated May 16, 1947 (FR Vol.12, No.99, dated May 20, 1947).

THENCE, North 89 degrees 24 minutes 00 seconds West, 585.00 feet, along the northerly line, to the northwest corner of said property.

THENCE, South 00 degrees 03 minutes 27 seconds West, 1986 feet, along the westerly line of said property to a point on the northerly right of way line of Indian School Road.

**EXHIBIT 1 to COMPLAINT (Page 62 of 135)**

Exhibit B-6
Page 2

THENCE, North 89 degrees 24 minutes 00 seconds West, 642.23 feet, along the said northerly right of way line.

THENCE, South 00 degrees 03 minutes 27 seconds West, 47.00 feet, to a point on the line between sections 20 and 29.

THENCE, North 89 degrees 24 minutes 00 seconds West, along the said section line and within the said Indian School Road, 1412.84 feet, to the point of beginning.

LESS AND EXCEPTING THEREFROM the following three parcels of land:

Beginning at a point on the east-west centerline of section 20 at the northwest corner of the property described as Tract B in the quitclaim deed dated December 28, 1955, and recorded in Docket 1837, Page 436 of the Maricopa County Records.

THENCE, South 00 degrees 03 minutes 27 seconds West, 577.41 feet, along the westerly line of said property.

THENCE, North 89 degrees 45 minutes 25 seconds West, 1500.70 feet, to a point in the easterly line of the property described in the quitclaim deed dated April 23, 1956, and recorded in Docket 1919, Page 10 in said county records.

THENCE, North 00 degrees 10 minutes 38 seconds East, 584.12 feet, along the said easterly line to a point on the said east-west centerline of section 20.

THENCE, South 89 degrees 30 minutes 01 seconds East, 1499.51 feet, along the said east-west centerline, to the point of beginning. Containing 20.00 acres; more or less.

Commencing at the 1/4 section corner of sections 20 and 29, located within the intersection of Central Avenue and Indian School Road, thence, South 89 degrees 24 minutes 00 seconds East along the section line, 1412.84 feet, thence; North 00 degrees 03 minutes 27 seconds East, 47.00 feet to the point of beginning, said point being a point on the northerly right of way line of Indian School Road.

THENCE, North 00 degrees 03 minutes 27 seconds East 780.00 feet, to a point.

THENCE, South 89 degrees 24 minutes 00 seconds East, 642.23 feet, to a point in the westerly line of the property transferred to the U.S. Veterans Administration by Executive Order No. 9854, dated May 16, 1947 (FR Vol.12, No.99, dated May 20, 1947).

THENCE, South 00 degrees 03 minutes 27 seconds West, 780.00 feet, along the westerly line of the said property, to a point on the northerly right of way line of Indian School Road.

EXHIBIT 1 to COMPLAINT (Page 63 of 135)

Exhibit B-6
Page 3

THENCE, North 89 degrees 24 minutes 00 seconds West, 642.23 feet, along the northerly right of way line to the point of beginning.  Containing 11.50 acres, more or less.

That part of the Southeast quarter of Section 20, Township 2 North, Range 3 East, G&SRB&M, described as follows:

COMMENCING at the Southeast corner of said Section 20;

THENCE, North 89 degrees 24 minutes 03 seconds West along the South line thereof a distance of 618.00 feet;

THENCE, continuing North 89 degrees 24 minutes 00 seconds West along said South line a distance of 642.23 feet;

THENCE, North 00 degrees degrees 03 minutes 27 seconds East a distance of 827.00 feet to the POINT OF BEGINNING;

THENCE, North 45 degrees 19 minutes 44 seconds East a distance of 702.67 feet;

THENCE, South 89 degrees 24 minutes 00 seconds East a distance of 143.00 feet;

THENCE, South 00 degrees 03 minutes 27 seconds West a distance of 499.23 feet;

THENCE, North 89 degrees 24 minutes 00 seconds West a distance of 642.23 feet to the POINT OF BEGINNING. Containing 4.50 acres, more or less.

Containing, after exceptions 71.84 acres, more or less

**EXHIBIT 1 to COMPLAINT (Page 64 of 135)**

Exhibit B-7

## LEGAL DESCRIPTION OF NORTHERNMOST
## 20 ACRE PARK SITE

Beginning at a point on the east-west centerline of section 20 at the northwest corner of the property described as Tract B in the quitclaim deed dated December 28, 1955, and recorded in Docket 1837, Page 436 of the Maricopa County Records.

THENCE, South 00 degrees 03 minutes 27 seconds West, 577.41 feet, along the westerly line of said property.

THENCE, North 89 degrees 45 minutes 25 seconds West, 1500.70 feet, to a point in the easterly line of the property described in the quitclaim deed dated April 23, 1956, and recorded in Docket 1919, Page 10 in said county records.

THENCE, North 00 degrees 10 minutes 38 seconds East, 584.12 feet, along the said easterly line to a point on the said east-west centerline of section 20.

THENCE, South 89 degrees 30 minutes 01 seconds East, 1499.51 feet, along the said east-west centerline, to the point of beginning. Containing 20.00 acres; more or less.

**EXHIBIT 1 to COMPLAINT (Page 65 of 135)**

EXHIBIT C TO TRUST FUND PAYMENT AGREEMENT

[Form of Promissory Note]

**PROMISSORY NOTE**

$ 34,900,000.00                    ~~December~~ _18_, 199_2_

FOR VALUE RECEIVED, Barron Collier Company, a partnership organized under the laws of the State of Florida (referred to herein as "BCC"), promises to pay to the United States, or order, in lawful money of the United States of America, the Principal Amount defined below with interest thereon payable in the manner set forth below.

A.   Date of Payment.   Interest on the Principal Amount shall be payable in the form of thirty (30) consecutive annual interest payments (each an **"Annual Interest Payment"**).   The first Annual Interest Payment shall be due and payable on the first anniversary of the Closing Date under the Trust Fund Payment Agreement (the **"Agreement"**), and each succeeding Annual Interest Payment shall be due and payable on each succeeding anniversary of the first Annual Interest Payment.   The thirtieth and final Annual Interest Payment and the Principal Amount shall be due and payable on the twenty-ninth (29th) anniversary of the first Annual Interest Payment.

B.   Method of Payment.   Payment of the Principal Amount on maturity shall be solely by application of the Annuity (as defined in the Agreement).   Payment of the Annual Interest

1

**EXHIBIT 1 to COMPLAINT (Page 66 of 135)**

Payment shall be by certified check or wire transfer delivered to _____, and payable to the United States, for deposit by the United States into the Arizona InterTribal Trust Fund Account and the Navajo Trust Fund Account to be established in accordance with Pub. L. No. 100-696 (Nov. 18, 1988).

    C.   No Prepayment. Notwithstanding any provision of law, BCC agrees that it has no right under this Promissory Note to prepay any Annual Interest Payment or the Principal Amount under this Promissory Note; provided, however, that nothing in this paragraph shall be construed to alter or to limit the right of BCC to obtain any release and conveyance of the Trust Estate as may be provided for in the Agreement and the Deed of Trust, or to make any payment into the Annuity before such payment becomes due.

    D.   No Personal Recourse. Notwithstanding anything to the contrary contained in this Promissory Note or the Trust Fund Payment Agreement or elsewhere, neither BCC nor any affiliate of BCC nor any partner of BCC (whether individually or as a trustee) nor any legal representative, successor, heir, estate, or assignee of any of them shall have any personal liability for the payment of any sum which may be payable under this Promissory Note or the Annuity, or for the performance or discharge of any obligation of BCC under this Promissory Note, the Annuity, or the Agreement. In the enforcement of any of its rights under this Promissory Note, the United States shall solely resort to, and proceed in rem against the Trust Estate and the Annuity.

2

EXHIBIT 1 to COMPLAINT (Page 67 of 135)

E.   Default.  Upon a default by BCC under this Promissory Note or the Agreement or the occurrence of an **"Event of Default"** of BCC (as such term is defined in the Deed of Trust), and the continuation of such default or Event of Default beyond any applicable curative or grace period, enforcement of this Promissory Note shall be in accordance with the terms of this Promissory Note, the Agreement, and the Deed of Trust.

F.   Acceleration.  Upon the failure of BCC to make any payment required of it under this Promissory Note within thirty (30) days after written demand therefor by the United States, the United States shall be entitled, at its option, to declare the entire principal and accrued interest owing on this Promissory Note to be immediately due and payable.

G.   Trust Fund Payment Agreement (the "Agreement").  Resort for payments of amounts due under this Promissory Note shall be solely in rem against the Trust Estate and Annuity as provided by the terms and conditions of the Agreement.  Additionally, upon the occurrence of an Event of Default of BCC as defined in the Agreement, neither BCC nor its affiliates, nor any officers, directors, shareholders, or partners thereof, individually or as trustees or other fiduciaries (nor any officers, directors, shareholders, or partners of any assignee of BCC) shall be personally liable for the payment of any deficiency resulting from the application of the proceeds of the sale or other disposition of the Trust Estate or Annuity to any amount due under this Promissory Note, and the United States shall not

3

EXHIBIT 1 to COMPLAINT (Page 68 of 135)

initiate any action or proceeding against any of them to collect the same.

H.   No Waiver.  No delay on the part of the United States in exercising any rights hereunder shall operate as a waiver of such rights.  Forbearance to exercise any right in favor of the United States provided herein shall not constitute a waiver of that right as to any subsequent failure.

I.   Governing Law.  This Promissory Note shall be governed by the laws of the State of Arizona.

J.   Definitions.  The following terms in this Promissory Note shall have the following meanings:

Annual Interest Payment means the annual interest on the Principal Amount, which interest shall be at the rate of eight and one-half percent (8.5%) per annum.

Annuity has the meaning given that term in the Trust Fund Payment Agreement.

Deed of Trust has the meaning given that term in the Trust Fund Payment Agreement.

Principal Amount means $34.9 million.

Promissory Note means this promissory note.

Trust Estate has the meaning given that term in the Deed of Trust.

Trust Fund Payment Agreement means the Trust Fund Payment Agreement of December /8, 1992 between Barron Collier Company, a partnership organized under the laws of the State of Florida, and the United States.

4

**EXHIBIT 1 to COMPLAINT (Page 69 of 135)**

K.   Counterparts.   For the purpose of expediting execution of this Promissory Note, it may be signed in separate counterparts; each such counterpart shall be deemed to be an original instrument, which, when all have been so signed, shall constitute a single agreement.

IN WITNESS WHEREOF, BCC has caused this Promissory Note to be signed by a general partner thereunto duly authorized as of the day and year first set forth above.

Date: _12-18-92_

Date: _12-17-92_

UNITED STATES OF AMERICA
By: _____
Manuel Lujan, Jr.
Secretary of the Interior

BARRON COLLIER COMPANY
By: _____
Barron Collier III

5

EXHIBIT 1 to COMPLAINT (Page 70 of 135)

STATE OF FLORIDA    )
                    :SS.:
COUNTY OF COLLIER   )

        The foregoing instrument was acknowledged before me this 17th day of _DECEMBER_ , 1992, by Barron Collier III, as a partner of Barron Collier Company, who is personally known to me.

_Anita M Decoteau_
ANITA  M. DECOTEAU

My Commission Expires:

NOTARY PUBLIC STATE OF FLORIDA
MY COMMISSION EXP JUNE 16, 1994
BONDED THRU GENERAL INS. UND.
AA352849


DISTRICT OF COLUMBIA

        This instrument was acknowledged before me on the 18th day of _December_ , 1992 by Manuel Lujan, Jr. as Secretary of the Department of the Interior of the United States of America.

My Commission Expires:

4-14-97

6

**EXHIBIT 1 to COMPLAINT (Page 71 of 135)**

[EXHIBIT D TO TRUST FUND PAYMENT AGREEMENT]

When Recorded Return To:

_____ Recorder's Use

DEED OF TRUST

(With Assignment of Rents and Security Agreement)

among

THE UNITED STATES OF AMERICA (Beneficiary),
BARRON COLLIER COMPANY (Trustor), and
STEWART TITLE AND TRUST OF PHOENIX, INC. (Trustee)

EXHIBIT 1 to COMPLAINT (Page 72 of 135)

DEED OF TRUST

(With Assignment of Rents and Security Agreement)

among

THE UNITED STATES OF AMERICA (Beneficiary),
BARRON COLLIER COMPANY (Trustor), and
STEWART TITLE AND TRUST OF PHOENIX, INC. (Trustee)

## Table of Contents

ARTICLE 1 - OBLIGATIONS OF TRUSTOR . . . . . . . . . . .   4

ARTICLE 2 - AGREEMENTS OF TRUSTOR . . . . . . . . . . .   5
  2.1   Authority to Execute . . . . . . . . . . . . . .   5
  2.2   Payment and Performance of Obligations . . . . .   5
  2.3   Maintenance, Repair Alterations . . . . . . . .   5
  2.4   Required Insurance . . . . . . . . . . . . . . .   6
  2.5   Delivery of Policies - Payment of Premiums . . .   6
  2.6   Casualties:  Insurance Proceeds . . . . . . . .   7
  2.7   Assignment of Policies Upon Foreclosure . . . .   7
  2.8   Impositions . . . . . . . . . . . . . . . . . .   8
  2.9   Utilities . . . . . . . . . . . . . . . . . . .   9
  2.10  Actions Affecting Trust Estate . . . . . . . . .   9
  2.11  Actions by Trustee or Beneficiary . . . . . . .   9
  2.12  Eminent Domain . . . . . . . . . . . . . . . . .  10
  2.13  Additional Security . . . . . . . . . . . . . .  11
  2.14  Appointment of Successor Trustee . . . . . . . .  11
  2.15  Inspections; Books and Records . . . . . . . . .  11
  2.16  Liens and Encumbrances . . . . . . . . . . . . .  12
  2.17  Trustee's Powers . . . . . . . . . . . . . . . .  12
  2.18  Beneficiary's Powers . . . . . . . . . . . . . .  13
  2.19  Leasehold . . . . . . . . . . . . . . . . . . .  13
  2.20  Deposited Monies . . . . . . . . . . . . . . . .  13
  2.21  Zoning . . . . . . . . . . . . . . . . . . . . .  14

ARTICLE 3 - EVENTS OF DEFAULT; REMEDIES . . . . . . . .  15
  3.1   Events of Default . . . . . . . . . . . . . . .  15
  3.2   Acceleration Upon Default; Additional Remedies .  16
  3.3   Exercise of Power of Sale . . . . . . . . . . .  18
  3.4   Personal Property . . . . . . . . . . . . . . .  19
  3.5   Appointment of Receiver . . . . . . . . . . . .  19
  3.6   Remedies Not Exclusive . . . . . . . . . . . . .  20
  3.7   Request for Notice . . . . . . . . . . . . . . .  20

ARTICLE 4 - ASSIGNMENT OF RENTS . . . . . . . . . . . .  20
  4.1   Assignment of Rents . . . . . . . . . . . . . .  20
  4.2   Collection Upon an Event of Default . . . . . .  21
  4.3   Application of Rents . . . . . . . . . . . . . .  21

i

EXHIBIT 1 to COMPLAINT (Page 73 of 135)

4.4   Mortgagee in Possession . . . . . . . . . . . . . . .   22
4.5   Responsibilities on Assignment . . . . . . . . . . . .   22
4.6   No Obligation to Perform . . . . . . . . . . . . . . .   22

ARTICLE 5 - SECURITY AGREEMENT . . . . . . . . . . . . . . .   22
5.1   Creation of Security Interest . . . . . . . . . . . .   22
5.2   Trustor's Security Agreements . . . . . . . . . . . .   22
5.3   Use of Personal Property by Trustor . . . . . . . . .   23
5.4   Remedies Upon an Event of Default . . . . . . . . . .   23
5.5   Security Agreement . . . . . . . . . . . . . . . . . .   25

ARTICLE 6 - RELEASE AND RECONVEYANCE OF COLLATERAL . . . . .   25
6.1   Full Reconveyance by Trustee . . . . . . . . . . . . .   25
6.2   Trustor's Right to Partial Reconveyance . . . . . . .   26
6.3   Maintenance of Collateral Value . . . . . . . . . . .   27
6.4   Reconveyance for Public Purpose . . . . . . . . . . .   27
6.5   Cost of Reconveyance . . . . . . . . . . . . . . . . .   28

ARTICLE 7 - SUBSTITUTION OF COLLATERAL - SUBORDINATION . . .   28
7.1   Substitution of Collateral . . . . . . . . . . . . . .   28
7.2   Treatment of Substitute Collateral . . . . . . . . . .   28
7.3   Subordination . . . . . . . . . . . . . . . . . . . .   29

ARTICLE 8 - VALUATION . . . . . . . . . . . . . . . . . . .   29

ARTICLE 9 - MISCELLANEOUS . . . . . . . . . . . . . . . . .   30
9.1   No Recourse . . . . . . . . . . . . . . . . . . . . .   30
9.2   Change, Discharge, Termination, or Waiver . . . . . .   30
9.3   Trustor Waiver of Rights . . . . . . . . . . . . . . .   30
9.4   Notices . . . . . . . . . . . . . . . . . . . . . . .   31
9.5   Acceptance by Trustee . . . . . . . . . . . . . . . .   31
9.6   Captions and References . . . . . . . . . . . . . . .   31
9.7   Invalidity of Certain Provisions . . . . . . . . . . .   31
9.8   Subrogation . . . . . . . . . . . . . . . . . . . . .   32
9.9   Governing Law . . . . . . . . . . . . . . . . . . . .   32
9.10  Number and Gender . . . . . . . . . . . . . . . . . .   32
9.11  Counterparts . . . . . . . . . . . . . . . . . . . . .   32
9.12  Recording . . . . . . . . . . . . . . . . . . . . . .   32
9.13  Status of Title . . . . . . . . . . . . . . . . . . .   32
9.14  Integration . . . . . . . . . . . . . . . . . . . . .   32
9.15  Binding Effect . . . . . . . . . . . . . . . . . . . .   33
9.16  Consents/Approvals . . . . . . . . . . . . . . . . . .   33
9.17  Disclosure Pursuant to A.R.S. § 33-404 . . . . . . . .   33
9.18  Amendment . . . . . . . . . . . . . . . . . . . . . .   33

ii

EXHIBIT 1 to COMPLAINT (Page 74 of 135)

## Table of Defined Terms

**Page**

A.R.S. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Account Manager . . . . . . . . . . . . . . . . . . . . . . . . 13
Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Collateral Assignment . . . . . . . . . . . . . . . . . . . . . . 3
Condemnation Proceeds . . . . . . . . . . . . . . . . . . . . . 10
Deed of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Deposited Monies . . . . . . . . . . . . . . . . . . . . . . 7, 11
Deposited Monies Account . . . . . . . . . . . . . . . . . . . . 13
Envelope . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Envelope Multiplier . . . . . . . . . . . . . . . . . . . . . . 27
Envelope Value Multiplier . . . . . . . . . . . . . . . . . . 27, 1
Event of Default . . . . . . . . . . . . . . . . . . . . . . . . 15
Imposition . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Impositions . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Lien or Encumbrance . . . . . . . . . . . . . . . . . . . . . . 12
Liens and Encumbrances . . . . . . . . . . . . . . . . . . . . . 12
Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Permitted Exceptions . . . . . . . . . . . . . . . . . . . . 12, 1
Personal Property . . . . . . . . . . . . . . . . . . . . . . . . 3
Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Principal Amount . . . . . . . . . . . . . . . . . . . . . . . . 4
Promissory Note . . . . . . . . . . . . . . . . . . . . . . . . . 4
Release Envelope . . . . . . . . . . . . . . . . . . . . . . . . 26
Release Level Amount . . . . . . . . . . . . . . . . . . . . . . 26
Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Secured party . . . . . . . . . . . . . . . . . . . . . . . . . 25
Security agreement . . . . . . . . . . . . . . . . . . . . . . . 25
Site Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Substitute Collateral . . . . . . . . . . . . . . . . . . . . . 28
Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Trust Estate . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Trust Fund Documents . . . . . . . . . . . . . . . . . . . . . . 5
Trust Fund Payment Agreement . . . . . . . . . . . . . . . . . . 4
Trustee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Trustor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Uniform Commercial Code of Arizona . . . . . . . . . . . . . . . 23
United States government-backed securities . . . . . . . . . . . 26
Unreleased Property . . . . . . . . . . . . . . . . . . . . . . 26

**EXHIBIT 1 to COMPLAINT (Page 75 of 135)**

## List of Exhibits

Exhibit

| | |
|---|---|
| A-1 | Legal Description of Real Property |
| A-2 | Description of Interest in Development Agreement |
| B | Description of Personal Property |
| C | Permitted Exceptions |
| D | Collateral Assignment |
| E | Form of Deed in Lieu of Foreclosure |
| F | Calculation of Envelope Multiplier |
| G | Form of UCC Financing Statement |

**EXHIBIT 1 to COMPLAINT (Page 76 of 135)**

When Recorded Return To:

_____

                                                <u>Recorder's Use</u>

## DEED OF TRUST
### (With Assignment of Rents and Security Agreement)

### among

## THE UNITED STATES OF AMERICA (Beneficiary),
## BARRON COLLIER COMPANY (Trustor), and
## STEWART TITLE AND TRUST OF PHOENIX, INC. (Trustee)

THIS DEED OF TRUST (With Assignment of Rents and Security Agreement) (as it may be amended and modified from time to time, the **"Deed of Trust"**) is made this /8ᵗʰ day of December 1992, by and among the United States of America, acting through the Secretary of the Department of the Interior (the **"Beneficiary"**) whose mailing address is 18th and C Streets, N.W., Washington, D.C. 20240, Barron Collier Company, a partnership organized under the laws of the State of Florida (the **"Trustor"**) whose mailing address is Barron Collier Company, 4041 North Central Avenue, Suite 820, Phoenix, Arizona 85012 and Barron Collier Company, P.O. Box 413038, Naples, Florida 33941-3038, and Stewart Title and Trust of Phoenix, Inc. (**"Trustee"**) whose mailing address is 244 West Osborn Road, Phoenix, Arizona 85013. The United States and Barron Collier Company are collectively referred to in this Agreement as the **"parties."**

THIS DEED OF TRUST (and the Exhibits thereto) is executed on the date stated in the preceding paragraph for the purpose of its placement in escrow, and will be effective only when released from such escrow and delivered to the Beneficiary on the Closing of the Land Exchange between Trustor and the Beneficiary contemplated to occur on December 18, 1996 (unless an earlier date is elected by Trustor). Accordingly, all the requirements and obligations imposed by this Deed of Trust shall only be effective after, and shall only apply to, the period after, the release from such escrow of this Deed of Trust and its delivery to the Beneficiary on the Closing of the Land Exchange currently scheduled for December 18, 1996.

FOR GOOD AND VALUABLE CONSIDERATION, including the indebtedness herein recited and the trust herein created, the receipt of which is hereby acknowledged, Trustor hereby irrevocably grants, transfers, conveys, and assigns to Trustee, IN TRUST, WITH POWER OF SALE, for the benefit and security of Beneficiary, under and subject to the terms and conditions hereinafter set forth, including, but not limited to, provisions respecting release and substitution of collateral and

**EXHIBIT 1 to COMPLAINT (Page 77 of 135)**

reservations of rights of possession and use of the Trustor, except in event of default, all its right, title, and interest in and to that certain real property located in the County of Maricopa, State of Arizona, more particularly described in Exhibit A-1 attached hereto; and to the extent it constitutes a real property interest, all of Trustor's right, title and interest in and to the Disposition and Development Agreement by and between the City of Phoenix and Barron Collier Company dated as of December 11, 1991, as amended, (the **"Development Agreement"**) and described in Exhibit A-2 hereto.  The real property described in Exhibit A-1 and the real property subject to the Development Agreement is collectively referred to herein as the **"Premises"**, irrespective of whether Trustor's interest in the Development Agreement is realty or personalty;

TOGETHER WITH any and all existing buildings and other improvements now or hereafter erected on the Premises including, without limitation, fixtures, attachments, appliances, equipment, machinery, and other personal property attached to such buildings and other improvements (the **"Improvements"**), all of which shall be deemed and construed to be a part of the real property;

TOGETHER WITH all rents, issues, profits, damages, royalties, income and other benefits now or hereafter derived from the Premises and the Improvements (collectively the **"Rents"**), subject to the terms and provisions of Section 2.19 of this Deed of Trust with respect to leases and subleases of the Premises or Improvements, now or hereafter existing or entered into, or portions thereof, entered into by Trustor, and subject to the right, power, and authority hereinafter given to Trustor to collect and apply such Rents; and further subject to any right of the City of Phoenix, Arizona to receive any such Rents pursuant to the terms of the Development Agreement;

TOGETHER WITH all interests, estates, or other claims, both in law and in equity, which Trustor now has or may hereafter acquire in the Premises or the Improvements;

TOGETHER WITH all easements, rights-of-way, and other rights now owned or hereafter acquired by Trustor used in connection with the Premises or the Improvements or as a means of access thereto (including, without limitation, all rights pursuant to any trackage agreement and all rights to the nonexclusive use of common drive entries, and all tenements, hereditaments and appurtenances thereof and thereto) and all water and water rights and shares of stock evidencing same;

TOGETHER WITH all leasehold estate, right, title, and interest of Trustor in and to all leases or subleases covering the Premises or the Improvements or any portion thereof now or hereafter existing or entered into, and all right, title, and interest of Trustor thereunder including, without limitation, all rights of Trustor against guarantors thereof, all cash or

2

**EXHIBIT 1 to COMPLAINT (Page 78 of 135)**

security deposits, advance rentals, and deposits or payments of similar nature (collectively, the **"Leases"**);

TOGETHER WITH all right, title, and interest now owned or hereafter acquired by Trustor in and to any greater estate in the Premises or the Improvements (but not including any interest in portions of the Trust Estate reconveyed to the Trustor);

TOGETHER WITH all right, title, and interest of Trustor in the property and interests in property described on Exhibit B attached hereto and incorporated herein by reference, including, to the extent it does not constitute a real property interest, all right, title and interest of Trustor in the Development Agreement, and all proceeds thereof (such personal property and proceeds are referred to herein collectively as the **"Personal Property"**);

TOGETHER WITH all right, title, and interest of Trustor, now owned or hereafter acquired, in and to any land lying within the right-of-way of any street, open or proposed, adjoining the Premises, and any and all sidewalks, alleys, and strips and gores of land adjacent to or used in connection with the Premises;

TOGETHER WITH all the estate, interest, right, title, other claim, or demand, both in law and in equity (including, without limitation, claims or demands with respect to the proceeds of insurance in effect with respect thereto) that Trustor now has or may hereafter acquire in the Premises, the Improvements, the Personal Property, or any other part of the Trust Estate (as defined below), and any and all awards made for the taking by eminent domain, or by any proceeding of purchase in lieu thereof, of the whole or any part of the Trust Estate (including, without limitation, any awards resulting from a change of grade of streets and awards for severance damages) subject to the provisions of Section 2.20 of this Deed of Trust regarding "Deposited Monies" and the Trustor's right under Article 6 of this Deed of Trust to reconveyances of portions of the Trust Estate for public purposes;

TOGETHER WITH all right, title, and interest now owned or hereafter acquired by Trustor in, to, and under the Development Agreement as further evidenced by that certain Collateral Assignment executed by Trustor in favor of Beneficiary dated December 18, 1992 (**"Collateral Assignment"**) and attached hereto as Exhibit D and incorporated herein by reference.

TOGETHER WITH all proceeds of the foregoing.

The entire estate, property, right, title, and interest hereby conveyed to Trustee may hereafter be collectively referred to as the **"Trust Estate."**

3

EXHIBIT 1 to COMPLAINT (Page 79 of 135)

## ARTICLE 1 - OBLIGATIONS OF TRUSTOR

1.1  Obligations.  For the purpose of securing (in such order of priority as Beneficiary may elect) the following which are herein called the "Obligations", but which, together with any references to "agreements", "covenants", "requirements", or similar terms, are (notwithstanding anything herein or elsewhere to the contrary) only enforceable in rem against the Trust Estate, and never in personam against the Trustor or anyone who in any capacity whatever is part of or connected with the Trustor, or against any successor-in-interest to the Trustor (see Section 9.1 of this Deed of Trust):

(a)  Payment of indebtedness in the total principal amount of Thirty-four Million Nine Hundred Thousand and No/100ths Dollars ($34,900,000.00) (the "Principal Amount") with interest thereon, pursuant to that certain Trust Fund Payment Agreement between Trustor and Beneficiary dated as of the ____ day of December, 1992 (as it may be amended, modified, extended and revised from time to time) ("Trust Fund Payment Agreement") and the Promissory Note (the "Promissory Note") dated of even date herewith executed by Trustor;

(b)  Payment of all sums advanced by Beneficiary to protect the Trust Estate, with reasonable interest thereon;

(c)  Performance of every obligation of Trustor contained in the Annuity Contract (as such term is defined in the Trust Fund Payment Agreement);

(d)  Performance of every obligation of Trustor contained in the Trust Fund Documents (as defined below);

(e)  Performance of every obligation of Trustor contained in any agreement, document, or instrument now or hereafter executed by Trustor reciting that the obligations thereunder are secured by this Deed of Trust; and

(f)  For the benefit of Beneficiary, compliance with and performance of each and every provision of any declaration of covenants, conditions, and restrictions; any maintenance, easement, and party wall agreement; or any other agreement, document, or instrument by which the Trust Estate is bound or may be affected.

1.2  Trust Fund Documents.  This Deed of Trust, the Trust Fund Payment Agreement, the Promissory Note, the Collateral Assignment, and any other deeds of trust, mortgages, U.C.C. Financing Statements (the form of which is attached as Exhibit G to this Deed of Trust), agreements, guaranties, or other instruments given to evidence or further secure the payment and performance of any or all of the Obligations, as the foregoing

EXHIBIT 1 to COMPLAINT (Page 80 of 135)

may be amended, modified, extended, or renewed from time to time may hereinafter be collectively referred to as the **"Trust Fund Documents."**

## ARTICLE 2 - AGREEMENTS OF TRUSTOR

2.1  <u>Authority to Execute.</u>  Trustor represents that it has full power and authority to execute and deliver this Deed of Trust and that its statements and representations as set forth herein are true and correct.

2.2  <u>Payment and Performance of Obligations</u>.  Trustor shall pay when due and perform each of the Obligations.

2.3  <u>Maintenance, Repair Alterations</u>.  Trustor shall keep the Trust Estate in good condition and repair and shall not physically damage the Premises.  Trustor shall be permitted to demolish and remove any Improvements existing on the Trust Estate at the time of execution of this Deed of Trust, and Trustor shall be permitted to erect or demolish temporary structures on the Premises for the purpose of developing the Trust Estate. Notwithstanding any other provisions of this Deed of Trust, Trustor shall not be required to replace or repair any Improvements demolished pursuant to the preceding sentence. Trustor shall complete promptly and in a good and workmanlike manner any Improvement that may be constructed on the premises after the effective date of this Deed of Trust, and promptly restore in like manner any Improvements that, after this Deed of Trust becomes effective, may be damaged or destroyed from any cause whatsoever, and pay when due all claims for labor performed and materials furnished therefor.  Trustor shall comply with all Requirements (as defined below) and shall not suffer to occur or exist any violation of any Requirement.  Trustor shall perform its obligations under each Lease.

**"Requirement"** and **"Requirements"** mean, respectively, each and all obligations and requirements now or hereafter in effect by which Trustor or the Trust Estate are bound or which are otherwise applicable to the Trust Estate, construction of any Improvements on the Trust Estate, or operation, occupancy, or use of the Trust Estate (including, without limitation (i) such obligations and requirements imposed by common law or any law, statute, ordinance, regulation, or rule (federal, state, or local) other than changes in the zoning of the property comprising the Trust Estate, or such obligations or requirements that may be imposed after this Deed of Trust becomes effective if such obligations or requirements are challenged by the Trustor, and (ii) such obligations and requirements of, in, or in respect of (A) any consent, authorization, license, permit, or approval relating to the Trust Estate, other than changes in the zoning of the property comprising the Trust Estate, or such obligations or requirements that may be imposed after this Deed of Trust becomes

**EXHIBIT 1 to COMPLAINT (Page 81 of 135)**

effective if such obligations or requirements are challenged by the Trustor, (B) any condition, covenant, restriction, easement, or right-of-way reservation applicable to the Trust Estate, (C) any Lien or Encumbrance, (D) any other agreement, document, or instrument to which Trustor is a party or by which Trustor or the Trust Estate is bound or affected, and (E) any order, writ, judgment, injunction, decree, determination, or award of any arbitrator, other private adjudicator, court, government, or governmental authority (federal, state, or local) to which Trustor is a party or by which Trustor or the Trust Estate is bound or affected) other than changes in the zoning of the property comprising the Trust Estate, or such obligations or requirements that may be imposed after this Deed of Trust becomes effective if such obligations or requirements are challenged by the Trustor.

2.4  <u>Required Insurance</u>.  Trustor shall at all times provide, maintain, and keep in force or cause to be provided, maintained, and kept in force with respect to the Trust Estate, at no expense to the Trustee or Beneficiary, policies of insurance in forms and amounts and issued by companies reasonably satisfactory to Beneficiary covering such casualties, risks, perils, liabilities, and other hazards.  All such policies of insurance required by the terms of this Deed of Trust shall contain a provision naming the Trustee for the benefit of the Beneficiary as a named insured and an endorsement or agreement by the insurer that any loss shall be payable in accordance with the terms of such policy notwithstanding any act or negligence of Trustor or any party holding under Trustor that might otherwise result in forfeiture of said insurance and the further agreement of the insurer waiving all rights of setoff, counterclaim, or deductions against Trustor.

2.5  <u>Delivery of Policies - Payment of Premiums</u>.

(a)  All policies of insurance shall name Trustee for the benefit of Beneficiary as an additional insured in a form satisfactory to Beneficiary.  Trustor shall furnish Beneficiary with certificates of insurance for each required policy setting forth the coverage, the limits of liability, the name of the carrier, the policy number, and the period of coverage.  If Beneficiary consents, which consent shall not be unreasonably withheld, Trustor may provide any of the required insurance through blanket policies carried by Trustor and covering more than one location, or by policies procured by a tenant or other party holding under Trustor; provided, however, all such policies shall meet the requirements referred to in Section 2.4.  At least thirty (30) days prior to the expiration of each required policy, Trustor shall deliver to Beneficiary evidence reasonably satisfactory to Beneficiary of the payment of premium and the renewal or replacement or such policy continuing insurance in form as required by this Deed of Trust.  All

6

**EXHIBIT 1 to COMPLAINT (Page 82 of 135)**

such policies shall contain a provision that, notwithstanding any contrary agreement between Trustor and insurance company, such policies will not be canceled, allowed to lapse without renewal, surrendered, or materially amended, which term shall include any reduction in the scope or limits of coverage, without at least thirty (30) days prior written notice to Beneficiary.

(b)   In the event Trustor fails to obtain, maintain, or deliver to Trustee the policies of insurance with respect to the Trust Estate required by this Deed of Trust, Beneficiary may, at Beneficiary's election and with prior written notice to Trustor, but without any obligation so to do, procure such insurance or single-interest insurance for such risks covering Beneficiary's interest, and Trustor will pay all premiums thereon promptly upon demand by Beneficiary, and until such payment is made by Trustor, the amount of all such premiums shall bear reasonable interest.

2.6   <u>Casualties: Insurance Proceeds</u>.

(a)   Trustor shall give prompt written notice thereof to Beneficiary after the happening of any casualty to or in connection with the Trust Estate or any part thereof, whether or not covered by insurance. All proceeds of insurance shall be payable to Trustor, and Beneficiary hereby authorizes and directs any affected insurance company to make payment of such proceeds directly to Trustor. If Trustor receives any proceeds of insurance resulting from such casualty, Trustor shall hold such insurance proceeds as **"Deposited Monies"** (within the meaning of Section 2.20 of this Deed of Trust).

(b)   Trustor shall not be excused from repairing or maintaining the Trust Estate as provided in Section 2.3 hereof or restoring all damage or destruction to the Trust Estate, regardless of whether or not there are insurance proceeds available to Trustor or whether any such proceeds are sufficient in amount, and the application or release by Trustee acting on behalf of Beneficiary of any insurance proceeds shall not cure or waive any default or notice of default under this Deed of Trust or invalidate any act done pursuant to such default or notice of default.

2.7   <u>Assignment of Policies Upon Foreclosure</u>. In the event of foreclosure of this Deed of Trust as a mortgage, a sale under the power of sale, or any other transfer of title or assignment of the Trust Estate in extinguishment, in whole or in part, of the Obligations, all right, title, and interest of Trustor in and to all policies of insurance required by Section 2.4 shall inure to the benefit of and pass to the successor in interest to Trustor or the purchaser or grantee of the Trust Estate, to the

7

EXHIBIT 1 to COMPLAINT (Page 83 of 135)

extent such policies are assignable pursuant to the terms thereof.

2.8   Impositions.

(a)   Trustor shall pay, or cause to be paid, prior to delinquency, all real property taxes and assessments, general and special, and all other taxes and assessments of any kind or nature whatsoever (including, without limitation, nongovernmental levies or assessments such as maintenance charges, levies, or charges resulting from covenants, conditions, and restrictions affecting the Trust Estate) that are assessed or imposed upon the Trust Estate or become due and payable and that create, may create, or appear to create a lien upon the Trust Estate (the above are sometimes referred to herein individually as an **"Imposition"** and collectively as **"Impositions"**); provided, however, that if by law any Imposition is payable, or may at the option of the taxpayer be paid, in installments, Trustor may pay the same or cause it to be paid, together with any accrued interest on the unpaid balance of such Imposition, in installments as the same becomes due and before any fine, penalty, interest, or cost may be added thereto for the nonpayment of any such installment and interest.

(b)   If at any time after the date hereof there shall be assessed or imposed a fee, tax, or assessment on Beneficiary and measured by or based in whole or in part upon this Deed of Trust or the outstanding amount of the Obligations, then all such taxes, assessments, or fees shall be deemed to be included within the term "Impositions" as defined in Section 2.8(a), and Trustor shall pay and discharge the same as herein provided with respect to the payment of Impositions. If Trustor fails to pay such Impositions prior to a delinquency that continues for thirty (30) days after written notice thereof from Trustee or Beneficiary to Trustor, Beneficiary may, at its option, declare all or part of the Obligations immediately due and payable. If Trustor is prohibited by law from paying such Impositions, Beneficiary may, at its option, declare all or part of the Obligations due and payable on a date which is not less than six (6) months from the date such prohibition is imposed on Trustor.

(c)   Subject to the provisions of Section 2.8(d) and upon request by Beneficiary, Trustor shall deliver to Beneficiary within thirty (30) days after the date upon which any Imposition is due and payable to Trustor official receipts of the appropriate taxing authority, or other proof satisfactory to Beneficiary, evidencing the payment thereof.

(d)   Trustor shall have the right before any delinquency occurs to contest or object to the amount or

8

EXHIBIT 1 to COMPLAINT (Page 84 of 135)

validity of any Imposition by appropriate proceedings, but this shall not be deemed or construed in any way as relieving, modifying, or extending Trustor's covenant to pay any such Imposition at the time and in the manner provided in this Section 2.8 unless Trustor has given prior written notice to Beneficiary of Trustor's intent to so contest or object to an Imposition, and unless:  (i) Trustor shall demonstrate to Beneficiary's reasonable satisfaction that the proceedings to be initiated by Trustor shall conclusively operate to prevent the sale of the Trust Estate or any part thereof or interest therein to satisfy such Imposition prior to final determination of such proceedings; (ii) Trustor shall furnish a good and sufficient bond or surety as requested by and reasonably satisfactory to Beneficiary; or (iii) Trustor shall demonstrate to Beneficiary's reasonable satisfaction that Trustor has provided a good and sufficient undertaking as may be required or permitted by law to accomplish a stay of any such sale.

(e)    Trustor shall not initiate or suffer to occur or exist the joint assessment of any real and personal property included in the Trust Estate or any other procedure whereby the lien of real property taxes and the lien of personal property taxes shall be assessed, levied, or charged to the Trust Estate as a single lien.

2.9   <u>Utilities</u>.  Trustor shall pay when due all charges that are incurred by Trustor for the benefit of the Trust Estate or that may become a charge or lien against the Trust Estate for gas, electricity, water, sewer, or other services furnished to the Trust Estate.

2.10  <u>Actions Affecting Trust Estate</u>.  Trustor shall appear in and contest any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and shall pay all costs and expenses (including, without limitation, costs of evidence of title, litigation, and attorneys' fees) in any such action or proceeding in which Beneficiary or Trustee may appear.

2.11  <u>Actions by Trustee or Beneficiary</u>.  If Trustor fails to make any payment or to do any act as and in the manner provided in any of the Trust Fund Documents, Beneficiary and/or Trustee, each in its absolute and sole discretion, without obligation so to do, without releasing Trustor from any obligation, and with only such notice to or demand upon Trustor as may be reasonable under the then existing circumstances, but in no event exceeding thirty (30) days prior written notice, may make or do the same in such manner and to such extent as either may deem necessary or appropriate.  In connection therewith (without limiting their general powers, whether conferred herein, in another Trust Fund Document, or by law), Beneficiary and Trustee shall have and are

9

**EXHIBIT 1 to COMPLAINT (Page 85 of 135)**

hereby given the right, but not the obligation: (a) to enter upon
and take possession of the Trust Estate; (b) to make additions,
alterations, repairs and improvements to the Trust Estate that
they or either of them may consider necessary or appropriate to
keep the Trust Estate in good condition and repair; (c) to appear
and participate in any action or proceeding affecting or which
may affect the security hereof or the rights or powers of
Beneficiary or Trustee; (d) to pay, purchase, contest, or
compromise any Lien or Encumbrance (as defined in Section 2.16
below) or alleged Lien or Encumbrance, whether superior or junior
to this Deed of Trust; and (e) in exercising such powers, to pay
necessary expenses (including, without limitation, expenses of
employment of counsel or other necessary or desirable
consultants). Trustor shall, immediately upon demand therefor by
Beneficiary and Trustee or either of them, pay to Trustee for
benefit of Beneficiary an amount equal to all reasonable
respective costs and expenses incurred by them in connection with
the exercise by either Beneficiary or Trustee or both of the
foregoing rights (including, without limitation, costs of
evidence of title, court costs, appraisals, surveys and
receiver's, trustee's and attorneys' fees) together with
reasonable interest thereon from the date of such expenditures.

2.12 Eminent Domain.

(a) In the event that any proceeding or action be
commenced for the taking of the Trust Estate, or any part
thereof or interest therein, for public or quasi-public use
under the power of eminent domain, condemnation (including,
without limitation, inverse condemnation) or otherwise
(hereinafter collectively referred to as a "Taking"), or if
the same be taken or damaged by reason of any public
improvement or Taking, or should Trustor receive any notice
or other information regarding such Taking or damage,
Trustor shall give prompt written notice thereof to
Beneficiary. Trustor shall not be entitled without the
prior approval of Beneficiary (which approval will not be
unreasonably withheld) to make any compromise or settlement
in connection with such Taking, damage, or reduction in
value to the extent of the right, title, and interest of
Trustor therein. Beneficiary hereby authorizes all
compensation, awards, damages, rights of action, and
proceeds awarded to Trustor by reason of any such Taking or
damage, or received by Trustor as the result of a transfer
in lieu of a Taking, and including damages received by
Trustor from the City of Phoenix, Arizona as compensation
for a breach by the City of Phoenix, Arizona of the
Development Agreement, solely to the extent that such
damages are awarded as compensation for diminution in value
of the Trust Estate, (the "Condemnation Proceeds") to be
paid to Trustor. If Trustor receives any Condemnation
Proceeds, Trustor shall hold such Condemnation Proceeds as

10

EXHIBIT 1 to COMPLAINT (Page 86 of 135)

"**Deposited Monies**" (within the meaning of Section 2.20 of this Deed of Trust).

(b)     Trustor shall not be excused from repairing or maintaining the Trust Estate as provided in Section 2.3 or restoring all damage or destruction to the Trust Estate, regardless of whether or not there are Condemnation Proceeds available to Trustor or whether any such Condemnation Proceeds are sufficient in amount.  The application or release of the Condemnation Proceeds shall not cure or waive any default or notice of default hereunder or under any other Trust Fund Document or invalidate any act done pursuant to such default or notice of default.

2.13 <u>Additional Security</u>.  No other security now existing, or hereafter taken, to secure the obligations secured hereby shall be impaired or affected by the execution of this Deed of Trust.  All security for the Obligations from time to time shall be taken, considered, and held as cumulative.  Any taking of additional security, execution of partial releases of the security, or any extension of the time of payment of, or modification of other terms of, any of the Obligations shall not diminish the force, effect, or lien of this Deed of Trust and shall not affect or impair the requirement of any maker, guarantor, surety, or endorser for the payment or performance of any of the Obligations.  In the event Beneficiary at any time holds additional security for any of the Obligations, it may enforce the sale thereof or otherwise realize upon the same, at its option, either before, concurrently with, or after a sale or realization is made hereunder.  This Section 2.13 shall not be construed to restrict or prohibit the release and substitution of property held in the Trust Estate pursuant to Article 6 and 7 of this Deed of Trust.

2.14 <u>Appointment of Successor Trustee</u>.  Beneficiary may, from time to time, by a written instrument executed and acknowledged by Beneficiary, mailed to Trustor, and recorded in the county in which the Trust Estate is located and by otherwise complying with the provisions of applicable law, substitute a successor or successors to any Trustee named herein or acting hereunder, and such successor(s) shall, without conveyance from the Trustee's predecessor, succeed to all title, estate, rights, powers, and duties of such predecessor.

2.15 <u>Inspections; Books and Records</u>.  Beneficiary and its agents, representatives, officers, and employees are authorized to enter at any reasonable time upon or in any part of the Trust Estate for the purpose of inspecting the same and for the purpose of performing any of the acts Beneficiary is authorized to perform hereunder or under the terms of any of the Trust Fund Documents.  Beneficiary shall have the right to inspect Trustor's books and records relating to Trustor's rights and obligations under this Deed of Trust upon reasonable notice to Trustor.

11

**EXHIBIT 1 to COMPLAINT (Page 87 of 135)**

Beneficiary may also inquire of Trustor or any other person or entity as to Trustor's fulfillment of the obligations under the Development Agreement. Trustor shall have the right to inspect Beneficiary's and Trustee's books and records relating to Trustor's or Beneficiary's rights or obligations under this Deed of Trust upon reasonable notice to Beneficiary.

2.16 <u>Liens and Encumbrances</u>. Trustor shall not grant, shall not suffer to exist, and shall pay and promptly discharge, at Trustor's cost and expense, all Liens and Encumbrances and any claims thereof upon the Trust Estate, or any part thereof or interest therein. Trustor shall notify Beneficiary immediately in writing of any Lien or Encumbrance or claim thereof. Trustor shall have the right to contest in good faith the validity of any involuntary Lien or Encumbrance, <u>provided</u>, <u>that</u> Trustor shall first deposit with Beneficiary a lien discharge bond or other security satisfactory to Beneficiary in such amount as Beneficiary shall reasonably require, but not more than one hundred fifty percent (150%) of the amount of the claim, and <u>provided</u>, <u>further</u>, that if Trustor loses such contest, Trustor shall thereafter diligently proceed to cause such Lien or Encumbrance to be removed and discharged. If Trustor shall fail to remove and discharge any Lien or Encumbrance or claim thereof, then, in addition to any other right or remedy of Beneficiary, Beneficiary may, after only such notice to Trustor as may be reasonable under the then existing circumstances, but shall not be obligated to, discharge the same, either by paying the amount claimed to be due, or by procuring the discharge of such Lien or Encumbrance by depositing in a court a bond or the amount claimed or otherwise giving security for such claim, or by procuring such discharge in such manner as is or may be prescribed by law. Trustor shall, immediately upon demand therefor by Beneficiary, pay to Beneficiary an amount equal to all costs and expenses incurred by Beneficiary in connection with the exercise by Beneficiary of the foregoing right to discharge any Lien or Encumbrance or claim thereof, together with reasonable interest thereon from the date of each such expenditure. Such costs and expenses shall be secured by this Deed of Trust. **"Lien or Encumbrance"** and **"Liens and Encumbrances"** in respect of the Trust Estate shall mean, respectively, each and all of the following (except for a Lien or Encumbrance to which Beneficiary consents, and no such consent shall be unreasonably withheld or delayed by Beneficiary): mortgages, deeds of trust, pledges, security agreements and assignments as security, whether voluntarily or involuntarily created and regardless of whether prior or subordinate to the Trust Estate, except for the **"Permitted Exceptions"** (as such term is defined in Exhibit C attached hereto and incorporated herein by reference).

2.17 <u>Trustee's Powers</u>. At any time, or from time to time, without liability therefor and without notice, upon written request of Beneficiary and presentation of this Deed of Trust and without affecting the requirement of any person for payment of

12

EXHIBIT 1 to COMPLAINT (Page 88 of 135)

the Obligations or the effect of this Deed of Trust upon the remainder of said Trust Estate, Trustee may (a) reconvey any part of said Trust Estate, (b) consent in writing to the making of any map or plat thereof, (c) join in granting any easement thereon, or (d) join in any extension agreement or any agreement subordinating the lien or charge hereof.

2.18 <u>Beneficiary's Powers</u>.  Without affecting the requirement of any person for the payment of the Obligations herein mentioned, and without affecting the lien or charge of this Deed of Trust upon any portion of the Trust Estate not then or theretofore released as security for the Obligations, Beneficiary may, from time to time and without notice: (a) release any person from such requirement; (b) extend the Obligations; (c) grant other indulgences; (d) release or reconvey, or cause to be released or reconveyed, at any time at Beneficiary's option any parcel portion or all of the Trust Estate; (e) take or release any other or additional security or any guaranty for any Obligation herein mentioned; or (f) make compositions or other arrangements with debtors in relation thereto.

2.19 <u>Leasehold</u>.  If any leasehold estate constitutes a portion of the Trust Estate, Trustor agrees not to amend, modify, extend, renew, or terminate such leasehold estate, any interest therein, or the lease granting such leasehold estate without the prior written consent of Beneficiary, which consent shall not unreasonably be withheld by Beneficiary.  Consent to one amendment, modification, extension, or renewal shall not be deemed to be a waiver of the right to require consent to other, future, or successive amendments, modifications, extensions, or renewals.  Trustor agrees to perform all obligations and agreements under said leasehold and shall not take any action or omit to take any action which would effect or permit the termination of said leasehold in violation of such lease. Trustor agrees to promptly notify Beneficiary in writing with respect to any default or alleged default by any party thereto and to deliver to Beneficiary copies of all notices, demands, complaints, or other communications received or given by Trustor with respect to any such default or alleged default.  Beneficiary shall have the option to cure any such default and to perform any or all of Trustor's obligations thereunder.  All sums expended by Beneficiary in curing any such default shall be secured hereby and shall be immediately due and payable without demand or notice and shall bear reasonable interest from date of expenditure.

2.20 <u>Deposited Monies</u>.

(a) All Deposited Monies held by Trustor shall be held as part of the Trust Estate in one separate, segregated account (the **"Deposited Monies Account"**) with an established financial institution (**"Account Manager"**) acceptable to the Beneficiary.  Any Deposited Monies shall not be commingled

13

**EXHIBIT 1 to COMPLAINT (Page 89 of 135)**

with any other funds.  The Account Manager shall be prohibited from making any disbursements from the Deposited Monies Account until consent for such disbursement is provided by Beneficiary pursuant to paragraph (b) of this Section 2.20.  The Account Manager shall invest the Deposited Monies held by it in "United States Government-backed Securities" (as such term is defined in Article 6 of this Deed of Trust) as may be specified by Beneficiary, and upon and in accordance with the written request of Trustor convert into cash all or any of such investments.  Unless an Event of Default shall have occurred and be continuing, all interest and profits on Deposited Monies shall be immediately paid to Trustor.  Any Deposited Monies not disbursed or paid in the manner or for the purposes set forth in this Deed of Trust shall be applied toward the payment of the Obligations.

(b)  Subject to the consent of Beneficiary, which consent shall not be unreasonably withheld, any Deposited Monies at any time held by Trustor shall be used, at Trustor's election, to reimburse it, or to pay the cost of replacing, renewing, repairing or rebuilding all or any part of the Trust Estate in respect of which such Deposited Monies were paid.  Prior to any such reimbursement or payment, the Trustor shall provide to Beneficiary (i) a certificate of Trustor (A) stating that it has determined to replace, renew, repair or rebuild such part of the Trust Estate, (B) describing in reasonable detail the work done or to be done and property purchased or to be purchased by way of the replacement, renewal, repair or rebuilding of the affected part of the Trust Estate; and (C) stating the approximate amount required for such purposes and, if such an amount exceeds One Hundred Thousand Dollars ($100,000), providing evidence reasonably satisfactory to Beneficiary that the amount of Deposited Monies then held by Trustor, together with other available sums, will be sufficient for such purposes, and (ii) a written undertaking by Trustor that it has performed or will perform such replacement, renewal, repair or rebuilding as set forth in such certificate.

2.21  Zoning.  After submission by Trustor to the City of Phoenix, Arizona of Trustor's initial site plan applicable to the Trust Estate, Trustor shall not, without the prior consent of Beneficiary, seek or consent to any modification of such site plan which would result in a reduction from the initial site plan of the total permitted square footage and hotel development under the site plan of ten (10) or more percent.

14

EXHIBIT 1 to COMPLAINT (Page 90 of 135)

## ARTICLE 3 - EVENTS OF DEFAULT; REMEDIES

3.1 <u>Events of Default</u>. Each of the following shall constitute an event of default (**"Event of Default"**) under this Deed of Trust:

(a) Failure to pay any monies due hereunder or under the Promissory Note or under other Trust Fund Documents within thirty (30) days after written notice by Beneficiary of such failure is received or deemed received by Trustor;

(b) Failure to comply with any of the agreements made by or requirements of Trustor in this Deed of Trust or in any of the other Trust Fund Documents within thirty (30) days after written notice by Beneficiary of such failure is received or deemed received by Trustor or such longer period as may be applicable under any of the Trust Fund Documents;

(c) The commencement of any action or proceeding which seeks as one of its remedies the dissolution of Trustor which is not withdrawn or dismissed within ninety (90) days after its commencement;

(d) If any Governmental Authority, or any court at the instance thereof, shall take possession of all or a substantial part of the property of, or assume control over, the affairs or operations of, or a receiver or trustee shall be appointed over all or a substantial part of, or a writ or order of attachment or garnishment shall be issued or made against all or a substantial part of the property of the Trust Estate;

(e) If Trustor shall admit in writing its inability to pay its debts as they mature, or make an assignment for the benefit of creditors; or Trustor shall apply for, or consent to, the appointment of any receiver, trustee or similar officer for Trustor, or for all or any substantial part of Trustor's property; or Trustor shall institute (by petition, application, answer, consent, or otherwise) any bankruptcy, insolvency, reorganization, arrangement, readjustment of debts, dissolution, liquidation, or similar proceedings relating to Trustor under the laws of any jurisdiction;

(f) If a receiver, trustee, or similar officer shall be appointed for Trustor and for all or any substantial part of its property without the application or consent of Trustor and such appointment shall continue undischarged for a period of ninety (90) days; or any bankruptcy, insolvency, reorganization, arrangements, readjustment of debt, dissolution, liquidation, or similar proceedings shall be instituted (by petition, application, or otherwise) against Trustor, and shall remain undismissed for a period of ninety (90) days;

15

**EXHIBIT 1 to COMPLAINT (Page 91 of 135)**

(g)  If any written representation or warranty made by or with respect to Trustor in any of the Trust Fund Documents shall be materially misleading when made or renewed;

(h)  All or any part of the Trust Estate is attached, levied upon, or otherwise seized by legal process, and such attachment, levy, or seizure is not quashed, stayed, or released within ninety (90) days of the date thereof;

(i)  The occurrence of any transfer, conveyance, or encumbrance of the Trust Estate, other than a Permitted Exception;

(j)  The failure to enter into the Annuity Contract as described in the Trust Fund Payment Agreement; and

(k)  The occurrence and continuation beyond any curative or grace period of any Event of Default, as such term is defined in any other Trust Fund Document.

3.2  Acceleration Upon Default: Additional Remedies.  Upon the occurrence of an Event of Default, Beneficiary may, at its option, declare all or any part of the Obligations immediately due and payable without any presentment, demand, protest, or notice of any kind, except for notice of acceleration by Beneficiary to Trustor.  Beneficiary may, in addition to the exercise of any or all of the remedies specified in Section 5.4:

(a)  Either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of its security, enter upon and take possession of the Trust Estate, or any part thereof, in its own name or in the name of Trustee, and do any acts that it deems necessary or desirable to preserve the value, marketability, or rentability of the Trust Estate, or any part thereof or interest therein; increase the income therefrom or protect the security thereof; and, with or without taking possession of the Trust Estate, sue for or otherwise collect the Rents or any part thereof, including, without limitation, those past due and unpaid, and apply the same, less costs and expenses of operation and collection (including, without limitation, attorneys' fees) upon the Obligations, all in such order as Beneficiary may determine.  The entering upon and taking possession of the Trust Estate, the collection of such Rents, and the application thereof as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done in response to such default or pursuant to such notice of default and, notwithstanding the continuance in possession of all or any portion of the Trust Estate or the collection, receipt, and application of Rents, Trustee or Beneficiary shall be entitled to exercise every

16

EXHIBIT 1 to COMPLAINT (Page 92 of 135)

right provided for in any of the Trust Fund Documents or by law upon occurrence of any Event of Default, including, without limitation, the right to exercise the power of sale;

(b)   Commence an action to foreclose the lien of this Deed of Trust as a mortgage, appoint a receiver, or specifically enforce any of the covenants hereof;

(c)   Exercise the power of sale herein contained and deliver to Trustee a written statement of breach, notice of default, and election to cause Trustor's interest in the Trust Estate to be sold;

(d)   Exercise all other rights and remedies provided herein, in any Trust Fund Document or other document or agreement now or hereafter securing or guarantying all or any portion of the Obligations, or by law, including, without limitation, the rights and remedies provided in A.R.S. Section 33-702.B; or

(e)   Elect, subject to applicable laws, to receive the Trust Estate pursuant to a Deed in Lieu of Foreclosure (in the form attached hereto as Exhibit E), duly executed by Trustor, conveying the Trust Estate to Trustee for the benefit of Beneficiary in the following manner, in which case Trustor shall deliver to Beneficiary:

(i)   a Deed in Lieu of Foreclosure duly executed and acknowledged by Trustor, in recordable form, conveying Trustor's interest in the Premises to Trustee for the benefit of Beneficiary;

(ii) a bill of sale, duly executed and acknowledged by Trustor conveying to Trustee Trustor's interest in the Personal Property and Trustor's remaining interest in the Trust Estate;

(iii) assignments, duly executed and acknowledged by Trustor conveying to Trustee all of Trustor's interests in the Development Agreement; and

(iv) any and all other instruments deemed necessary by Beneficiary for transfer and conveyance of all Trust Estate assets.

At the closing of the conveyance under this Section 3.2(e) Beneficiary shall deliver to Trustor a duly executed release and satisfaction of all liability of Trustor under this Deed of Trust and the Promissory Note, and the canceled Deed of Trust and the canceled Promissory Note shall be returned to Trustor.

**EXHIBIT 1 to COMPLAINT (Page 93 of 135)**

Trustor acknowledges and agrees that the conveyance of the Trust Estate to Beneficiary under this Section 3.2(e) shall be an absolute conveyance of all Trustor's right, title, and interest in and to the Trust Estate, and is not intended as a mortgage or a security instrument of any kind, and that after such conveyance Trustor shall have no further interest (including rights of redemption) or claims in and to the Trust Estate, or to the proceeds that may be derived therefrom, of any kind whatsoever.

Trustor hereby agrees to refrain from objecting or in any way opposing Beneficiary's right to receive title and interest to the Trust Estate under this Section 3.2(e) before any regulatory body or judicial forum in which the validity or consequences of this Section 3.2(e) are subject to challenge; provided, however, that Trustor shall retain the right to challenge whether the Event of Default precipitating the conveyance under this Section 3.2(e) actually occurred. Any conveyance of the Trust Estate under this Section 3.2(e) shall not be construed as an admission or evidence of an Event of Default by Trustor under this Deed of Trust.

Beneficiary shall, subject to the conditions of this Section 3.2(e), accept the absolute conveyances described in Section 3.2(e) of this Deed of Trust in full satisfaction of the Promissory Note and all obligations respecting the Trust Estate or this Deed of Trust.

3.3  Exercise of Power of Sale.  If Beneficiary elects to exercise the power of sale herein contained, Beneficiary shall notice Trustee and shall deposit with Trustee this Deed of Trust and the Promissory Note and such receipts and evidence of expenditures made and secured hereby as Trustee may require.

(a)  Upon receipt of such statement and notice from Beneficiary, Trustee shall cause to be recorded, published, and delivered to Trustor such Notice of Sale as then required by law. Trustee shall, without demand on Trustor, after lapse of such time as may then be required by law and after recordation of such Notice of Sale and Notice of Sale having been given as required by law, sell the Trust Estate at the time and place of sale fixed by it in said Notice of Sale, either as a whole or in separate lots or parcels or items as Trustee shall deem expedient, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States payable at the time of sale. Trustee shall deliver to such purchaser or purchasers thereof its good and sufficient deed or deeds conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including, without

18

EXHIBIT 1 to COMPLAINT (Page 94 of 135)

limitation, Trustor, Trustee, or Beneficiary, may purchase at such sale.

(b)   After deducting all costs, fees, and expenses of Trustee and of this Trust, including, without limitation, Trustee's fees and reasonable attorneys' fees, and costs of evidence of title in connection with sale, Trustee shall apply the proceeds of sale in the following priority, to payment of:

First, all sums expended under the terms of the Trust Fund Documents, not then repaid, with reasonable accrued interest;

Second, all sums due under the Promissory Note;

Third, all other sums, then secured hereby; and

Fourth, the remainder, if any, to the Trustor or other person or persons legally entitled thereto or as provided in A.R.S. Section 33-812 or any similar or successor statute.

(c)   Subject to A.R.S. Section 33-810.B, Trustee may postpone sale of all or any portion of the Trust Estate by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement or subsequently noticed sale, and without further notice make such sale at the time fixed by the last postponement, or may, in its discretion, give a new notice of sale.

3.4   Personal Property.   It is the express understanding and intent of the parties that as to any personal property interests subject to Chapter 9 of the Uniform Commercial Code of Arizona, Beneficiary, upon an Event of Default, may proceed under such Uniform Commercial Code of Arizona or may proceed as to both real and personal property interests in accordance with the provisions of this Deed of Trust and its rights and remedies in respect to real property, as specifically permitted under A.R.S. Section 47-9501.D, and treat both real and personal property interests as one parcel or package of security.

3.5   Appointment of Receiver.   Upon the occurrence and the continuation beyond any applicable grace or curative period of an Event of Default, Beneficiary, as a matter of right and on ten days prior written notice to Trustor or anyone claiming under Trustor, and without regard to the then value of the Trust Estate or the interest of Trustor therein, shall have the right to apply to any court having jurisdiction to appoint a receiver or receivers of the Trust Estate.   Any such receiver or receivers shall have all the usual powers and duties of receivers in like or similar cases and all the powers and duties of Beneficiary in case of entry as provided herein and shall continue as such and

19

EXHIBIT 1 to COMPLAINT (Page 95 of 135)

exercise all such powers until the later of the date of confirmation of sale of the Trust Estate or the date of expiration of any redemption period unless such receivership is sooner terminated.

3.6 <u>Remedies Not Exclusive</u>. Trustee and Beneficiary, and each of them, shall be entitled to enforce payment and performance of any and all of the Obligations and to exercise all rights and powers under the Trust Fund Documents and under the law now or hereafter in effect, notwithstanding some or all of the Obligations may now or hereafter be otherwise secured or guaranteed. Neither the acceptance of this Deed of Trust nor its enforcement, whether by court action or pursuant to the power of sale or other rights herein contained, shall prejudice or in any manner affect Trustee's or Beneficiary's right to realize upon or enforce any other security or guaranty now or hereafter held by Trustee or Beneficiary, it being agreed that Trustee and Beneficiary, and each of them, shall be entitled to enforce this Deed of Trust and any other security or any guaranty now or hereafter held by Beneficiary or Trustee in such order and manner as they, or either of them, may in their absolute discretion determine. No remedy herein conferred upon or reserved to Trustee or Beneficiary is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing under the law. Every power or remedy given by any of the Trust Fund Documents or by law to Trustee or Beneficiary, or to which either of them may be otherwise entitled, may be exercised, concurrently or independently, from time to time, and as often as may be deemed expedient by Trustee or Beneficiary and, to the extent permitted by law, either of them may pursue inconsistent remedies.

3.7 <u>Request for Notice</u>. Trustor hereby requests a copy of any notice of default and that any notice of sale hereunder be mailed to it at the address set forth in Section 9.4.

## ARTICLE 4 - ASSIGNMENT OF RENTS

4.1 <u>Assignment of Rents</u>. Trustor hereby absolutely and irrevocably assigns and transfers to Trustee for the benefit of Beneficiary all the Rents of the Trust Estate, and hereby gives to and confers upon Trustee and Beneficiary the right, power and authority to collect the Rents, subject to any right of the City of Phoenix, Arizona to receive any such Rents pursuant to the terms of the Development Agreement; <u>provided</u>, <u>however</u>, that Trustor shall have the right to collect such Rents and to retain and enjoy same, so long as an Event of Default shall not have occurred and be continuing beyond any applicable curative or grace period. Trustor irrevocably appoints Beneficiary and Trustee its true and lawful attorney-in-fact, at the option of Beneficiary at any time and from time to time, to demand,

20

EXHIBIT 1 to COMPLAINT (Page 96 of 135)

receive, and enforce payment, to give receipts, releases, and satisfactions, and to sue, in the name of Trustor or Beneficiary, for all Rents and apply the same to the payment of the Obligations in such order as Beneficiary shall determine. Trustor hereby authorizes and directs the lessees, tenants, and occupants to make all payments under the Leases directly to Trustee for the benefit of Beneficiary upon written demand by Beneficiary, without further consent of Trustor; provided, however, that Trustor shall have the right to collect such Rents and to retain and enjoy same, so long as an Event of Default shall not have occurred and be continuing beyond any applicable curative or grace period.

4.2  Collection Upon an Event of Default. Upon the occurrence of an Event of Default and its continuation beyond any applicable grace or curative period, Beneficiary or Trustee may, at any time without notice, either in person, by agent, or by a receiver appointed by a court, and without regard to the adequacy of any security for the Obligations, enter upon and take possession of the Trust Estate, or any part thereof, and, with or without such entry or taking possession, in its own name sue for or otherwise collect the Rents (including, without limitation, those past due and unpaid) and apply the same, less costs and expenses of operation and collection (including, without limitation, attorneys' fees) upon payment of the Obligations in such order as Beneficiary may determine.  The collection of such Rents, or the application of the Rents as aforesaid, shall not cure or waive any default or notice of default hereunder or invalidate any act done in response to such default or pursuant to such notice of default.  Trustor also hereby authorizes Beneficiary upon such entry, at its option, either in person, by agent, or by a receiver appointed by a court to take over and assume the management, operation, and maintenance of the Trust Estate and to perform all acts Beneficiary in its sole discretion deems necessary and proper and to expend such sums out of Rents as may be needed in connection therewith, in the same manner and to the same extent as Trustor theretofore could do (including, without limitation, the right to enter into new leases, to cancel, surrender, alter or amend the terms of, or renew existing leases, or to make concessions to tenants).  Except for matters arising out of Beneficiary's negligence, Trustor hereby releases all claims of any kind or nature against Beneficiary arising out of such management, operation, and maintenance, excepting the obligation of Beneficiary to account as hereinafter set forth.

4.3  Application of Rents. Upon such entry, Beneficiary shall, after payment of all property charges and expenses (including, without limitation, reasonable compensation to such managing agent as it may select and employ), and after the accumulation of a reserve by Trustee for its benefit to meet requisite amounts, credit the net amount of the Rents received by it to the Obligations, but the manner of the application of such net income and which items shall be credited shall be determined

**EXHIBIT 1 to COMPLAINT (Page 97 of 135)**

in the sole discretion of Beneficiary. Beneficiary shall not be accountable for more monies than Trustee actually receives from the Trust Estate; nor shall it be liable for failure to collect Rents. Beneficiary shall make reasonable efforts to collect Rents, reserving, however, within its own reasonable discretion, the right to determine the method of collection and the extent to which enforcement of collection of Rents shall be prosecuted and Beneficiary's judgment shall be deemed conclusive and reasonable.

4.4 <u>Mortgagee in Possession</u>. It is not the intention of the parties hereto that an entry by Beneficiary, or any person or entity acting on its behalf, upon the Premises under the terms of this instrument shall make Beneficiary a party in possession in contemplation of the law, except at the option of Beneficiary.

4.5 <u>Responsibilities on Assignment</u>. Trustor shall protect Beneficiary against any and all losses, liabilities, obligations, claims, demands, damages, penalties, judgments, costs, and expenses, including legal fees and expenses, howsoever and by whomsoever asserted, arising out of or in any way connected with this Assignment of Rents, all such losses, liabilities, obligations, claims, demands, damages, penalties, judgments, costs, and expenses to be deemed added to the indebtedness secured hereby and to be secured by any and all other instruments securing said indebtedness.

4.6 <u>No Obligation to Perform</u>. Nothing contained herein shall operate or be construed to obligate Beneficiary to perform any obligations of Trustor under any Lease (including, without limitation, any obligation arising out of any covenant of quiet enjoyment therein contained in the event the lessee under any such Lease shall have been joined as a party defendant in any action to foreclose and the estate of such lessee shall have been thereby terminated). Prior to actual entry into and taking possession of the Premises by Beneficiary, this assignment shall not operate to place upon Beneficiary any responsibility for the operation, control, care, management, or repair of the Trust Estate or any portion thereof, and the execution of this assignment by Trustor shall constitute conclusive evidence that all responsibility for the operation, control, care, management, and repair of the Trust Estate is and shall be that of Trustor, prior to such actual entry and taking of possession.

## ARTICLE 5 - SECURITY AGREEMENT

5.1 <u>Creation of Security Interest</u>. Trustor hereby grants, transfers and assigns to Beneficiary, a security interest in and to all of Trustor's right, title and interest in all the Personal Property, as further evidenced by the Collateral Assignment.

5.2 <u>Trustor's Security Agreements</u>. Trustor agrees as follows:

EXHIBIT 1 to COMPLAINT (Page 98 of 135)

(a)   The Personal Property has not been used or bought for personal, family or household purposes;

(b)   The tangible portion of the Personal Property will be kept on or at the Premises or Improvements;

(c)   At the request of Beneficiary, Trustor will join Beneficiary in executing one or more financing statements and fixture filings pursuant to the Uniform Commercial Code of Arizona as in effect in the State of Arizona (Arizona Revised Statutes (**"A.R.S."**)) Sections 47-1101 through 47-1107, as amended from time to time (**"Uniform Commercial Code of Arizona"**), in form satisfactory to Beneficiary and will pay the cost of recording and filing the same in all public offices wherever recording or filing is deemed by Beneficiary to be necessary or desirable;

(d)   Trustor will immediately notify Beneficiary in writing of any change in its place of business or the adoption or change of any trade name or fictitious business name, and will upon request of Beneficiary, execute any additional financing statements or other certificates necessary to reflect the adoption or change in trade name or fictitious business name; and

(e)   Trustor shall immediately notify Beneficiary of any claim against the Personal Property adverse to the interest of Beneficiary therein.

5.3   <u>Use of Personal Property by Trustor</u>.  Until the occurrence and continuation beyond any applicable grace or curative period of an Event of Default hereunder or under any other Trust Fund Document, Trustor may have possession of the Personal Property and use it in any lawful manner not inconsistent with this Deed of Trust and not inconsistent with any policy of insurance thereon.

5.4   <u>Remedies Upon an Event of Default</u>.

(a)   In addition to the remedies provided in Article 3 hereof, upon the occurrence and its continuation beyond any applicable grace or curative period of an Event of Default herein, Beneficiary may, at its option, do any one or more of the following:

(i)   Either personally, or by means of a court appointed receiver, take possession of all or any of the Personal Property and exclude therefrom Trustor and all others claiming under Trustor (except for all existing option agreements and amendments thereto), and thereafter hold, store, use, operate, manage, maintain and control, make repairs, replacements, alterations, additions, and improvements to and exercise all rights

23

**EXHIBIT 1 to COMPLAINT (Page 99 of 135)**

and powers of Trustor with respect to the Personal
Property or any part thereof.  In the event Beneficiary
demands, or attempts to take possession of the Personal
Property in the exercise of any rights under this Deed
of Trust, Trustor agrees to promptly turn over and
deliver possession thereof to Beneficiary;

(ii) Without notice to or demand upon Trustor,
make such payments and do such acts as Beneficiary may
deem necessary to protect its security interest in the
Personal Property (including, without limitation,
paying, purchasing, contesting, or compromising any
Lien or Encumbrance, whether superior or inferior to
such security interest) and in exercising any such
powers or authority to pay all expenses (including,
without limitation, litigation costs and reasonable
attorneys' fees) incurred in connection therewith;

(iii)    Require Trustor from time to time to
assemble the Personal Property, or any portion thereof,
at a place designated by Beneficiary and reasonably
convenient to both parties, and deliver promptly such
Personal Property to Beneficiary, or an agent or
representative designated by Beneficiary.  Beneficiary
and its agents and representatives shall have the right
to enter upon any or all of Trustor's premises and
property to exercise Beneficiary's rights hereunder;

(iv) Realize upon the Personal Property or any
part thereof as herein provided, or in any manner
permitted by law, and exercise any and all of the other
rights and remedies conferred upon Beneficiary by this
Deed of Trust, any other Trust Fund Document, or by
law, either concurrently or in such order as
Beneficiary may determine;

(v)  Sell or cause to be sold in such order as
Beneficiary may determine, as a whole or in such
parcels as Beneficiary may determine, the Personal
Property and the remainder of the Trust Estate;

(vi) Sell, lease, or otherwise dispose of the
Personal Property at public sale, upon terms and in
such manner as Beneficiary may determine.  Trustor may
be a purchaser at any sale; and

(vii) Exercise any remedies of a secured party
under the Uniform Commercial Code of Arizona or any
other applicable law.

(b)  Unless the Personal Property is perishable or
threatens to decline speedily in value or is of a type
customarily sold on a recognized market, Beneficiary shall

24

**EXHIBIT 1 to COMPLAINT (Page 100 of 135)**

give Trustor at least five (5) days prior written notice of the time and place of any public sale of the Personal Property or other intended disposition thereof to be made. Such notice may be mailed to Trustor at the address set forth herein.

(c)    The proceeds of any sale under Section 5.4(a)(vi) shall be applied as follows:

(i)    To the repayment of the reasonable costs and expenses of taking, holding, and preparing for the sale and the selling of the Personal Property (including, without limitation, costs of litigation and attorneys' fees) and the discharge of all Impositions, Liens and Encumbrances, and claims thereof, if any, on the Personal Property prior to the security interest granted herein (except any Impositions or Liens and Encumbrances subject to which such sale shall have been made);

(ii) To the payment of the Obligations in such order as Beneficiary shall determine; and

(iii) The surplus, if any, shall be paid to the Trustor or to whomsoever may be lawfully entitled to receive the same, or as a court of competent jurisdiction may direct.

Beneficiary shall have the right to enforce one or more remedies hereunder, successively or concurrently, and such action shall not operate to estop or prevent Beneficiary from pursuing any further remedy that it may have.  Any repossession or retaking or sale of the Personal Property pursuant to the terms hereof shall not limit Beneficiary's ability to exercise its other rights and remedies in accordance with the terms of this Deed of Trust.

5.5    <u>Security Agreement</u>.  This Deed of Trust constitutes and shall be deemed to be a **"security agreement"** for all purposes of the Uniform Commercial Code of Arizona and Beneficiary shall be entitled to all the rights and remedies of a **"secured party"** under such Uniform Commercial Code of Arizona.

## ARTICLE 6 - RELEASE AND RECONVEYANCE OF COLLATERAL

6.1    <u>Full Reconveyance by Trustee</u>.  Upon written request of Beneficiary stating that all Obligations have been satisfied in full, and upon surrender of this Deed of Trust and the Promissory Note to Trustee for cancellation and retention, and upon payment by Trustor of Trustee's fees, Trustee shall reconvey to Trustor or to the person or persons legally entitled thereto, without warranty, any portion of the Trust Estate then held hereunder.

25

**EXHIBIT 1 to COMPLAINT (Page 101 of 135)**

The recitals in such reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof.  The grantee in any reconveyance may be described as "the person or persons legally entitled thereto."

6.2  <u>Trustor's Right to Partial Reconveyance</u>.  At any time, and from time to time, upon request by the Trustor to Beneficiary and upon satisfaction of the condition specified in Section 6.2(b) of this Deed of Trust, the Trustee shall reconvey to the Trustor an Envelope or Envelopes held under the Trust Estate.

(a)  <u>Definitions</u>.  For purposes of this Article 6 and Article 7 of, and Exhibit F to, this Deed of Trust, the following terms shall have the following meanings:

**"Envelope"** means that part of the Trust Estate comprising a development envelope as described in a Site Plan for all or part of the Trust Estate.

**"Release Envelope"** means an Envelope subject to a pending request for reconveyance under this Section 6.2.

**"Unreleased Property"** means all property held in the Trust Estate including that interest in the Development Agreement corresponding to any Envelope, as well as any Release Envelope, but excluding United States Government-backed Securities and Deposited Monies.

**"Release Level Amount"** means:

(i)  the unpaid principal plus accrued interest on the Promissory Note; less

(ii)  the value of United States Government-backed Securities and Deposited Monies held in the Trust Estate, and further less, after the expiration of two years from the Closing Date (as such term is defined in the Trust Fund Payment Agreement);

(iii)  the fair value, at the time of the calculation, of the Annuity.

**"Site Plan"** means the site plan or site plans applicable to the real property described in Exhibit A-1 and Exhibit A-2 filed by the Trustor with, and approved by, the City.

**"United States Government-backed Securities"** means debt obligations issued, guaranteed, or backed by, the government of the United States of America.

- 26 -

**EXHIBIT 1 to COMPLAINT (Page 102 of 135)**

(b)   Conditions to Partial Reconveyance.   The Trustor's right to require, and the Beneficiary's obligation to cause, the reconveyance of a Release Envelope shall be subject to the following condition:   the fair value of the Unreleased Property less the value of the Release Envelope exceeds one hundred thirty percent (130%) of the Release Level Amount.

(c)   Value of Release Envelopes.   Notwithstanding the provisions of Article 8, the value of a Release Envelope shall be the amount equal to the fair value (as determined pursuant to Article 8) of all Unreleased Property multiplied by the "Envelope Multiplier" (as such term is defined in Exhibit F and incorporated herein) applicable to such Release Envelope.   The Site Plan to be used in calculating the Envelope Multiplier pursuant to this Section 6.2(c) shall be the Site Plan, including any amendments thereto, in effect at the time of reconveyance of the Release Envelope.

6.3   Maintenance of Collateral Value.

(a)   If, after a reconveyance of an Envelope, the fair value of the remaining Unreleased Property falls below one hundred thirty percent (130%) of the Release Level Amount, Trustor shall add to the Trust Estate United States Government-backed Securities sufficient in value to restore the fair value of the Unreleased Property to one hundred thirty percent (130%) of the Release Level Amount.

(b)   For purposes of this Section 6.3, the value of the Unreleased Property shall not be calculated to be less than the sum of the values of the Envelopes remaining as a part of the Unreleased Property, with the value of each Envelope to be an amount equal to Forty-five Million Three Hundred Seventy Thousand Dollars ($45,370,000) multiplied by the Envelope Multiplier for such Envelope.   Solely for the purpose of calculating the Envelope Multiplier pursuant to this Section 6.3(b), Envelopes which previously have been reconveyed to Trustor under this Article 6 shall be deemed to be held as Unreleased Property and included within the Site Plan, including any amendments thereto, in effect at the time of such calculation, which Site Plan shall be used for such calculation.

(c)   For purposes of this Deed of Trust, United States Government-backed Securities are to be valued at their market value.

6.4   Reconveyance for Public Purpose.   Upon the Request of Trustor, Beneficiary shall cause to be reconveyed to Trustor portions of the Trust Estate required for the creation of streets, driveways, rights-of-way, and easements as may be needed by Trustor suitably to develop the Trust Estate, or for other public purposes.

EXHIBIT 1 to COMPLAINT (Page 103 of 135)

6.5  <u>Cost of Reconveyance</u>.  On full reconveyance of the Trust Estate, Beneficiary shall pay all reasonable costs of preparing, executing, acknowledging, and recording the requisite reconveyance instruments.  On partial reconveyance, Trustor shall pay all reasonable costs for preparing, executing, acknowledging, and recording such instruments.

## ARTICLE 7 - SUBSTITUTION OF COLLATERAL - SUBORDINATION

7.1  <u>Substitution of Collateral</u>.  At any time and from time to time after the Closing Date (as such term is defined in the Trust Fund Payment Agreement) the Trustor shall be entitled to substitute other property for any Envelope (such property is referred to herein as **"Substitute Collateral"**).  Substitute Collateral shall be treated as part of the Trust Estate for all purposes of this Deed of Trust, including the reconveyance provisions of Article 6.  Beneficiary and Trustee shall accept as Substitute Collateral the following:

(i)  United States Government-backed Securities whose principal value amount is not less than 76.9 percent of the value of the Envelope for which the substitution is made; or

(ii)  other property interests, the value of which is not less than the value of the Envelope for which the substitution is made; <u>provided, however</u>, that the Beneficiary shall have consented to the character of such other property to be used as Substitute Collateral.

For purposes of this Section 7.1, the value of an Envelope shall be deemed to be an amount equal to Forty-five Million Three Hundred Seventy Thousand Dollars ($45,370,000) multiplied by the Envelope Multiplier for such Envelope.  Solely for the purpose of calculating the Envelope Multiplier pursuant to this Section 7.1, Envelopes which previously have been reconveyed to Trustor under Article 6 of this Deed of Trust shall be deemed to be held as Unreleased Property and included within the Site Plan, including any amendments thereto, in effect at the time of such calculation, which Site Plan shall be used for such calculation.

For purposes of Article 6 and Article 7 of this Deed of Trust, United States Government-backed Securities shall be valued at their market value.

7.2  <u>Treatment of Substitute Collateral</u>.  Substitute Collateral which is real property shall be treated as the Envelope for which it has been substituted for purposes of Article 6 and Article 7 of this Deed of Trust.  Solely for the purpose of calculating the Envelope Multiplier pursuant to Section 6.2(c) of 6.3(b), Substitute Collateral which has been

**EXHIBIT 1 to COMPLAINT (Page 104 of 135)**

provided in place of an Envelope shall be deemed subject to the
Site Plan applicable to the Envelope for which the substitution
was made.

7.3   _Subordination_.  Upon the request of Trustor,
Beneficiary, in its sole discretion, may subordinate its security
interest in any of the property held in the Trust Estate to any
permanent development or construction loan, the payment of which
is secured by a lien on such property.

## ARTICLE 8 - VALUATION

8.1  Except as specifically provided elsewhere in this Deed
of Trust, the value of any property required to be determined
under this Deed of Trust shall be determined in accordance with
this Article.

8.2  Upon no fewer than 90 days prior notice to the other
party, either party may, at its own expense, provide the other
party with notice describing the property proposed to be valued,
together with a statement proposing the value of the property
("proposed statement of value") and an appraisal supporting such
value from an M.A.I. certified appraiser.  Within 30 days after
submission of the proposed statement of value, the party to whom
the proposed statement of value is submitted shall notify the
other party whether it concurs in the proposed statement of
value.  Failure to respond to receipt of the proposed statement
of value shall be deemed to be concurrence in such statement.

8.3  If a party provides notification that it does not
concur in a proposed statement of value, the parties shall
attempt to reach agreement upon the value of the property through
good faith negotiations.  At any point in such negotiations,
either party may notify the other party that such negotiations
are not likely to result in agreement.  Within 60 days of such
notification, the party rejecting the proposed statement of value
shall obtain a second appraisal from an M.A.I. certified
appraiser and shall provide to the other party an alternative
statement of value together with the second appraisal.  The other
party may concur in the alternative statement of value, in which
event the costs of such appraisal shall be shared equally.  If
the other party does not concur in the alternative statement of
value, the party proposing the alternative statement of value
shall bear the costs of the second appraisal, and the parties
shall attempt to reach agreement on the value of the property by
good faith negotiations.

8.4  If either party notifies the other party that
negotiations are not likely to result in agreement, the
first two appraisers shall jointly name a third M.A.I. certified
appraiser who shall make a third appraisal of the property.  Such
third appraisal shall become final and binding thirty (30) days
after it is served on the parties, and the costs of such

**EXHIBIT 1 to COMPLAINT (Page 105 of 135)**

appraisal shall be shared equally by the parties, except that
either party may reject the third appraisal before it becomes
final by serving on the other party a written notice to that
effect, in which event the party rejecting the third appraisal
shall reimburse the other party for all attorney fees and
expenses (as such terms are defined in 5 U.S.C. § 504(b)(1)(A))
in connection with the valuation process which resulted in the
rejection of the third appraisal.

## ARTICLE 9 - MISCELLANEOUS

    9.1  <u>No Recourse</u>.  Notwithstanding anything to the contrary
contained in this Deed of Trust, the Promissory Note, the
Annuity, the Trust Fund Payment Agreement or any other of the
Trust Fund Documents or elsewhere, neither Trustor nor any
affiliate of Trustor, nor any partner of Trustor (whether
individually or as a trustee), nor any legal representative,
successor, heir, estate, or assignee of any of them shall have
any personal liability for the payment of any sum which may be
payable under any of such documents or for the performance or
discharge of any obligation under any of such documents.  In the
enforcement of any of their rights under this Deed of Trust or
any of such documents, the Trustee and Beneficiary shall solely
resort to, and proceed only <u>in rem</u> against, the Trust Estate.
Nor shall Trustor or its affiliates, or any officers, directors,
shareholders, or partners of any of them (nor the officers,
directors, shareholders, or partners of any assignee of Trustor)
be personally liable for the payment of any deficiency that may
result from the application of the proceeds of any sale or other
disposition of the Trust Estate to any amount due under this Deed
of Trust or any of such documents, and neither Beneficiary nor
Trustee shall initiate any action or proceeding against Trustor
or any of the above mentioned persons to collect any such
deficiency.

    9.2  <u>Change, Discharge, Termination, or Waiver</u>.  No
provision of this Deed of Trust may be changed, discharged,
terminated, or waived except in a writing signed by the parties
hereto against whom enforcement of the change, discharge,
termination, or waiver is sought.  No failure on the part of any
party to exercise and no delay by any party in exercising any
right or remedy under the Trust Fund Documents or under the law
shall operate as a waiver thereof.

    9.3  <u>Trustor Waiver of Rights</u>.  Trustor waives, to the
extent permitted by law, (a) the benefit of all laws now existing
or that may hereafter be enacted providing for any appraisement
before sale of any portion of the Trust Estate, and (b) all
rights of redemption, valuation, appraisement, stay of execution,
notice of election to mature or declare due the Obligations, and
marshaling in the event of foreclosure of the liens hereby
created.

**EXHIBIT 1 to COMPLAINT (Page 106 of 135)**

9.4   <u>Notices</u>.  All notices, requests, and demands made hereunder to any party shall be in writing and shall be delivered by hand or sent by registered or certified mail, return receipt requested, postage prepaid, through the United States Postal Service to the addresses set forth in this Section 9.4 or such other address which the parties may provide to one another in accordance herewith.  Such notices, requests, and demands, if sent by mail, shall be deemed given three (3) days after deposit in the United States mail, and if delivered by hand, shall be deemed given when delivered.

If to Trustor:

 Barron Collier Company
 4041 North Central Avenue
 Suite 820
 Phoenix, Arizona   85012

  and

 Barron Collier Company
 P.O. Box 413038
 Naples, Florida   33941-3038

If to Beneficiary:

 Secretary of the Interior
 Department of the Interior
 18th and C Streets, N.W.
 Washington, D.C.   20240

If to Trustee:

 Stewart Title and Trust of Phoenix, Inc.
 244 West Osborn Road
 Phoenix, Arizona   85013

9.5   <u>Acceptance by Trustee</u>.  Trustee accepts this trust when this Deed of Trust or a short form thereof, duly executed and acknowledged, is made a public record as provided by law.

9.6   <u>Captions and References</u>.  The headings at the beginning of each section of this Deed of Trust are solely for convenience of reference and are not part of this Deed of Trust.  Unless otherwise indicated, each reference in this Deed of Trust to a section or an exhibit is a reference to the respective section herein or exhibit hereto.

9.7   <u>Invalidity of Certain Provisions</u>.  If any provision of this Deed of Trust is unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect.  If the lien of this Deed of Trust is

EXHIBIT 1 to COMPLAINT (Page 107 of 135)

invalid or unenforceable as to any part of the debt, or if the lien is invalid or unenforceable as to any part of the Trust Estate, the unsecured or partially secured portion of the debt shall be completely paid prior to the payment of the remaining and secured or partially secured portion of the debt, and all payments made on the debt, whether voluntary or under foreclosure or other enforcement action or procedure, shall be considered to have been first paid on and applied to the full payment of that portion of the debt which is not secured or fully secured by the lien of this Deed of Trust.

9.8   Subrogation.   To the extent that proceeds of the Promissory Note are used to pay any outstanding lien, charge, or prior encumbrance against the Trust Estate, such proceeds shall be deemed to have been or to be advanced by Beneficiary at Trustor's request and Beneficiary shall be subrogated to any and all rights and liens held by any owner or holder of such outstanding liens, charges, and prior encumbrances, irrespective of whether said liens, charges, or encumbrances are released.

9.9   Governing Law.   This Deed of Trust shall be governed by and construed in accordance with the laws of the State of Arizona, without giving effect to conflict of laws principles.

9.10   Number and Gender.   In this Deed of Trust the singular shall include the plural and the masculine shall include the feminine and neuter gender and vice versa, if the context so requires.

9.11   Counterparts.   This document may be executed and acknowledged in counterparts, all of which executed and acknowledged counterparts shall together constitute a single document.   Signature and acknowledgment pages may be detached from the counterparts and attached to a single copy of this document to form physically one document.

9.12   Recording.   This Deed of Trust may be filed for record by either party or by an escrow agent pursuant to the terms of applicable escrow instructions.

9.13   Status of Title.   Trustor represents and warrants that it is the lawful owner of the Trust Estate free and clear of all Liens and Encumbrances, subject only to the Permitted Exceptions, and that Trustor has full right, power, and authority to convey and mortgage the same and to execute this Deed of Trust.

9.14   Integration.   The Trust Fund Documents contain the complete understanding and agreement of Trustor and Beneficiary and supersede all prior representations, warranties, agreements, arrangements, understandings, and negotiations.

32

**EXHIBIT 1 to COMPLAINT (Page 108 of 135)**

9.15 <u>Binding Effect</u>.  The Trust Fund Documents will be binding upon, and inure to the benefit of, Trustor, Trustee, and Beneficiary and their respective successors and assigns.

9.16 <u>Consents/Approvals.</u>  Beneficiary, Trustee, and Trustor agree that whenever its consent or approval is required under the terms and conditions of this Deed of Trust, it will not withhold such consent or approval arbitrarily or unreasonably.

9.17 <u>Disclosure Pursuant to A.R.S. § 33-404</u>.  The Beneficiary hereunder, the United States of America, acting through the Secretary of the Department of Interior, holds its interest as Beneficiary hereunder for the purposes of establishing and administering the Arizona InterTribal Trust Fund, and the Navajo Trust Fund, as provided for in Public Law No. 100-696, 102 Stat. 4579.  The beneficiaries of such trust funds are the member tribes of the Intertribal Council of Arizona as of January 1, 1988 and the members of such tribes and the Navajo tribe and its members.  The names and addresses of each party identified above may be obtained from the offices of the Secretary of the Department of Interior of the United States.

9.18 <u>Amendment</u>.  The parties reserve the right, but only on their mutual written consent, to amend this Deed of Trust prior to the Closing Date, as such term is defined in the Trust Fund Payment Agreement, <u>provided</u>, that no such amendment may provide for the extension of the Closing Date beyond December 18, 1996.

IN WITNESS WHEREOF, Trustor has executed this Deed of Trust as of the day and year first above written.

Date:  _12-18-92_

UNITED STATES OF AMERICA

By: _____ ,
Manuel Lujan, Jr.
Secretary of the Interior

Date:  _12-17-92_

BARRON COLLIER COMPANY

By: _____
Barron Collier III

EXHIBIT 1 to COMPLAINT (Page 109 of 135)

STATE OF FLORIDA        )
                        :SS.:
COUNTY OF COLLIER       )

        The foregoing instrument was acknowledged before me this 17th day of DECEMBER , 1992, by Barron Collier III, as a partner of Barron Collier Company, who is personally known to me.

_Anita M. Decoteau_
ANITA   M.   DECOTEAU

My Commission Expires:

NOTARY PUBLIC STATE OF FLORIDA
MY COMMISSION EXP JUNE 16, 1994
BONDED THRU GENERAL INS. UND.
AA352849


DISTRICT OF COLUMBIA

        This instrument was acknowledged before me on the 18th day of December , 1992 by Manuel Lujan, Jr. as Secretary of the Department of the Interior of the United States of America.


My Commission Expires:

    4-14-97

34

EXHIBIT 1 to COMPLAINT (Page 110 of 135)

<u>Exhibit A-1 To Deed of Trust</u>

## LEGAL DESCRIPTION OF REAL PROPERTY

That part of the Southeast Quarter of Section 20, Township 2 North, Range 3 East, Gila and Salt River Meridian, Maricopa County, Arizona, per the survey officially filed with the Bureau of Land Management March 23rd, 1988, described as follows:

COMMENCING at the southwest corner of said Southeast Quarter; thence N 00°10'38"E 1,152.74 feet to a line that is 200.00 feet south of the south line of a parcel of land described in Docket 3273, page 412, Records of Maricopa County; thence S 89°49'22"E 70.00 feet along said line to the east line of the west 70.00 feet of said Southeast Quarter and the POINT OF BEGINNING; thence S 00°10'38"W 1,063.25 feet along a said east line; thence S 44°36'41"E 32.65 feet to the north line of the south 67.00 feet of said Southeast Quarter; thence S 89°24'00"E 608.18 feet along said north line; thence N 00°10'38"E 839.69 feet; thence N 44°49'22"W 355.28 feet; thence N 89°49'22"W 379.94 feet to the POINT OF BEGINNING.

Parcel contains 15.04 acres.

**EXHIBIT 1 to COMPLAINT (Page 111 of 135)**

## Exhibit A-2 To Deed of Trust

### THE DEVELOPMENT AGREEMENT

Trustor irrevocably grants, transfers, conveys, and assigns to Trustee, in trust, with power of sale, for the benefit and security of Beneficiary, under and subject to the terms and conditions set forth in the Deed of Trust and the Collateral Assignment, including, but not limited to, provisions respecting release and substitution of collateral and reservations of rights of possession and use of the Trustor except in event of default, all of Trustor's right, title and interest in and to the Disposition and Development Agreement by and Between the City of Phoenix and Barron Collier Company dated as of December 11, 1991 (the "**Development Agreement**").

The term "**Premises**" when used in the Deed of Trust includes the following described real property:

### DOWNTOWN SITE

### LEGAL DESCRIPTION--BETWEEN WASHINGTON, JEFFERSON, 1ST AND 3RD STREETS

Blocks 23, 24, 33 and 34, ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51;

TOGETHER WITH the alley right of way within said Blocks 24 and 33; and

TOGETHER WITH that part of Jefferson Street, as shown on said plat of ORIGINAL TOWNSITE OF PHOENIX, that lies between the Southerly prolongations of the East and West lines of said Block 23; and

TOGETHER WITH that part of Jefferson Street, as shown on said plat of ORIGINAL TOWNSITE OF PHOENIX, that lies between the Southerly prolongations of the East and West lines of said Block 24;

EXCEPT that part of the whole thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or radially, of the Northerly line of AMERICA WEST ARENA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 343 of Maps at page 45.

**EXHIBIT 1 to COMPLAINT (Page 112 of 135)**

Exhibit A-2
Page 2

LEGAL DESCRIPTION OF
PUBLIC RIGHT OF WAY TO BE CLOSED
JEFFERSON STREET BETWEEN 1ST AND 3RD STREETS

PART NO. 1:

That part of Jefferson Street as shown on, and dedicated by,
the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat
of record in the office of the County Recorder of Maricopa
County, Arizona, in Book 2 of Maps at page 51, lying between the
Southerly prolongation of the West line of Block 24 in said
ORIGINAL TOWNSITE OF PHOENIX and the line that is parallel with
and 15 feet East of the monument line of First Street as shown on
said plat;

TOGETHER WITH that part of Second Street as shown on, and
dedicated by, said plat of ORIGINAL TOWNSITE OF PHOENIX, lying
between the Westerly prolongations of the North and South lines
of Lot 11 in said Block 33; and

TOGETHER WITH the alley within Block 33 in said ORIGINAL
TOWNSITE OF PHOENIX which lies between the Southerly
prolongations of the East line of Lot 1 and the West line of Lot
11 in said Block 33;

EXCEPT that part of the whole thereof that lies Southerly or
Southwesterly of the line that is parallel and/or concentric with
and 50 feet Northeasterly, as measured at right angles and/or
radially, of the Northerly line of AMERICA WEST ARENA, according
to the plat of record in the office of the County Recorder of
Maricopa County, Arizona, in Book 343 of Maps as page 45; and

EXCEPT that part of the whole thereof lying within 25 feet
of the monument line of said Second Street.

PART NO. 2:

That part of Blocks 33 and 34, ORIGINAL TOWNSITE OF PHOENIX,
according to the plat of record in the office of the County
Recorder of Maricopa County, Arizona, in Book 2 of Maps at page
51, lying within a strip of land, 100 feet in width, the center
line of which is described as follows:

BEGINNING at the intersection of the monument line of 1st
Street with the monument line of Jefferson Street;

thence North 89 degrees 59 minutes 44 seconds East along
said monument line of Jefferson Street (based on an assumed
bearing of North 00 degrees 01 minutes 09 seconds West for said
monument line of 1st Street) a distance of 60.00 feet to the
point of curvature of a circular curve concave Southwesterly,
having a radius of 716.20 feet;

thence Southeasterly along the arc of said curve through a
central angle of 33 degrees 41 minutes 25 seconds a distance of
421.13 feet to the point of tangency;

**EXHIBIT 1 to COMPLAINT (Page 113 of 135)**

Exhibit A-2
Page 3

thence South 56 degrees 18 minutes 51 seconds East a distance of 100.00 feet to the point of curvature of a circular curve concave Northeasterly, having a radius of 716.20 feet;

thence Southeasterly along the arc of said curve through a central angle of 33 degrees 42 minutes 22 seconds a distance of 421.33 feet to the point of tangency and the terminus of the center line described herein.

EXCEPT that part thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or radially, of the Northerly line of AMERICA WEST ARENA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 343 of Maps at page 45.

### LEGAL DESCRIPTION OF
### PUBLIC RIGHT OF WAY TO BE CLOSED
### JEFFERSON STREET BETWEEN 2ND AND 3RD STREET
### AND THE ALLEYS IN BLOCK 24

That portion of Jefferson Street as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51, lying between the line that extends from the Southeast corner of Lot 2, Block 24 in said ORIGINAL TOWNSITE OF PHOENIX to the Northeast corner of Lot 1, Block 33 in said ORIGINAL TOWNSITE OF PHOENIX and the line that extends from the Southwest corner of Lot 18 in said Block 24 to the Northwest corner of Lot 11 in said Block 33;

TOGETHER WITH all of the alley within said Block 24 which is bound by the Northerly prolongation of the East line of said Lot 2, by the Easterly prolongation of the South line of said Lot 18 and by the Westerly prolongation of the North line of Lot 5 in said Block 24.

### LEGAL DESCRIPTION OF
### PUBLIC RIGHT OF WAY TO BE CLOSED
### 2ND STREET BETWEEN WASHINGTON AND (NEW) JEFFERSON STREETS

That portion of Second Street lying between the monument lines of Washington Street and Madison Street, all as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51;

EXCEPT that part thereof lying within 50 feet of the monument line of said Washington Street; and

EXCEPT that part thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or

**EXHIBIT 1 to COMPLAINT (Page 114 of 135)**

Exhibit A-2
Page 4

radially, of the Northerly line of AMERICA WEST ARENA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 343 of Maps at page 45; and
EXCEPT that part thereof lying within 25 feet of the monument line of said Second Street to a height of 18 feet measured vertically from the crown of the pavement of Second Street.

## LEGAL DESCRIPTION OF
### PUBLIC RIGHT OF WAY TO BE CLOSED
### 2ND STREET BETWEEN WASHINGTON AND JEFFERSON STREETS

That portion of Second Street lying between the monument lines of Washington Street and Jefferson Street, all as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51;

EXCEPT that part thereof lying within 50 feet of the monument line of said Washington Street; and

EXCEPT that part thereof lying within 50 feet of the monument line of said Jefferson Street; and

EXCEPT that part thereof lying within 25 feet of the monument line of said Second Street.

## LEGAL DESCRIPTION OF
### PUBLIC RIGHT OF WAY TO BE CLOSED
### 3RD STREET BETWEEN WASHINGTON AND (NEW) JEFFERSON STREETS

That portion of Third Street, above a height of 18 feet measured vertically from the crown of the pavement of Third Street, lying between the monument lines of Washington Street and Madison Street, all as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder or Maricopa County, Arizona, in Book 2 of Maps at page 51;
EXCEPT that part thereof lying within 50 feet of the monument line of said Washington Street; and
EXCEPT that part thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or radially, of the Northerly line of AMERICA WEST ARENA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 343 of Maps at page 45, and the Easterly continuation thereof.

EXHIBIT 1 to COMPLAINT (Page 115 of 135)

Exhibit A-2
Page 5

## LEGAL DESCRIPTION OF PUBLIC RIGHT OF WAY
## TO BE CLOSED 1ST STREET BETWEEN
## WASHINGTON AND JEFFERSON STREETS

The East 35.00 feet of First Street lying between the monument lines of Washington Street and Jefferson Street, all as shown on and dedicated by the plat of ORIGINAL TOWNSITE OF PHOENIX, as recorded in Book 2 of Maps at Page 51, records of Maricopa County, Arizona;

TOGETHER WITH the West 43.00 feet of the East 78.00 feet of First Street lying 18.00 feet above the existing road surface and lying between the monument lines of Washington Street and Jefferson Street as shown on the plat of ORIGINAL TOWNSITE OF PHOENIX, as recorded in Book 2 of Maps at Page 51, records of Maricopa County, Arizona;

EXCEPT that part thereof lying within 50 feet of the monument line of said Washington Street; and

EXCEPT that part thereof lying with 50 feet of the monument line of said Jefferson Street.

**EXHIBIT 1 to COMPLAINT (Page 116 of 135)**

## Exhibit B to Deed of Trust

### DESCRIPTION OF PERSONAL PROPERTY

1.  All personal property (including, without limitation, all goods, supplies, equipment, furniture, furnishings, fixtures, machinery, inventory, and construction materials), located on or affixed to, at the time of execution of this Deed of Trust, the Premises or the Improvements, subject to Trustor's right to demolish as specified in Section 2.3 of this Deed of Trust;

2.  All other intangible property and rights relating to the Premises, the Improvements, the personal property described in Paragraph 1 above or the operation, occupancy, or use thereof, including, without limitation, all governmental and nongovernmental permits, licenses, and approvals relating to construction on or operation, occupancy, or use of the Premises or Improvements, all names under or by which the Premises or Improvements may at any time be operated or known, all rights to carry on business under any such names, or any variant thereof, all trade names and trademarks relating in any way to the Premises or the Improvements, and all good will in any way relating to the Premises or the Improvements;

3.  All proceeds from sale or disposition of any of the aforesaid collateral; and

4.  All of Trustor's right, title and interest in and to the Disposition and Development Agreement by and between the City of Phoenix and Barron Collier Company dated as of December 11, 1991.

As used in this Exhibit B the terms **"Trustor"**, **"Premises"**, **"Improvements"**, and **"Personal Property"** shall have the meanings set forth in the Deed of Trust to which this Exhibit B is attached.

1

**EXHIBIT 1 to COMPLAINT (Page 117 of 135)**

## Exhibit C to Deed of Trust

"**Permitted Exceptions**" means the following:

1.    Sale, transfer, or other disposition of any Personal Property that is consumed or worn out in ordinary usage and that is promptly replaced with similar items of equal or greater value.

2.    Liens and Encumbrances being contested in accordance with Section 1.15 of the Deed of Trust.

3.    Impositions being contested in accordance with Section 1.7(d) of this Deed of Trust.

4.    This Deed of Trust.

5.    Liens and Encumbrances to which the lien created by this Deed of Trust is subordinated pursuant to the terms of the Trust Fund Documents.

6.    Leases of the Trust Estate entered into by Trustor for the purpose of developing the Trust Estate.

7.    The items listed in Schedule B to the ALTA title insurance policy or policies issued by Stewart Title and Trust Company insuring Trustor as to any portion of the Trust Estate.

1

**EXHIBIT 1 to COMPLAINT (Page 118 of 135)**

[Exhibit D to Deed of Trust]

COLLATERAL ASSIGNMENT

This Collateral Assignment, made this /8ᵗʰ day of December, 1992, by and between Barron Collier Company, a general partnership duly organized and existing under the laws of the state of Florida, as Assignor ("BCC"), and the United States of America, acting through the Secretary of the Department of the Interior, as Assignee ("the United States").

RECITALS

1.  On May 12, 1988, the United States and BCC, Collier Enterprises and Collier Development Corporation ("Collier") entered into an agreement ("the Exchange Agreement") for the exchange ("the Land Exchange") of real property owned by Collier in Collier County, Florida for real property owned by the United States in Maricopa County, Arizona.  On November 18, 1988, by Public Law 100-696 ("the Ratifying Legislation") the Exchange Agreement was ratified and confirmed and the Land Exchange was authorized in accordance with the Exchange Agreement and the Ratifying Legislation (collectively "the Terms of the Exchange").

2.  On December 11, 1991, BCC on behalf of Collier accepted the offer of the United States, as contained in the Terms of the Exchange, to proceed with the Land Exchange, subject to the

**EXHIBIT 1 to COMPLAINT (Page 119 of 135)**

condition that the parties agree on and execute a mutually acceptable Trust Fund Payment Agreement.

3.   On December 11, 1991, the City of Phoenix, Arizona ("the City") and BCC entered into a Disposition and Development Agreement ("the Development Agreement") which was recorded in the Maricopa County Recorder's Office on January 15, 1992, under Recording Number 92-0024960, specifying the rights and obligations of the City and BCC with respect to designated properties in the City of Phoenix, Arizona.

4.   In consequence of the Terms of the Exchange and the Development Agreement, BCC will be entitled to receive and retain part of the Arizona property, and the City will be entitled to receive and retain part of the Arizona property.

5.   The property that BCC will receive from the United States is described in the Development Agreement.  In addition, the City of Phoenix has transferred certain of its right, title and interest to BCC in certain downtown Phoenix property ("the Downtown Property") under the terms of the Development Agreement, which property is described on Exhibit A attached hereto and by this reference incorporated herein, all of which rights are set out in the Development Agreement.

6.   By the Terms of the Exchange, trust fund payments are required to be made by BCC to the United States for deposit by the United States into the Arizona InterTribal Trust Fund or the Navajo Trust Fund.  By the Terms of the Exchange, BCC and the United States have entered into a Trust Fund Payment Agreement

- 2 -

EXHIBIT 1 to COMPLAINT (Page 120 of 135)

("the **Trust Fund Payment Agreement**") providing, <u>inter alia</u>, for the payments by BCC into the Trust Fund.

7.   BCC, pursuant to the provisions of the Trust Fund Payment Agreement, has executed simultaneously herewith a Promissory Note, without personal recourse, ("**the Promissory Note**") in the principal sum of $34,900,000 payable to the United States for payment into the Trust Fund, a copy of which Promissory Note is attached hereto as Exhibit B and by this reference incorporated herein.  The Promissory Note will be secured by a Deed of Trust executed by BCC simultaneously herewith ("**the Deed of Trust**") on the Uptown Property and all of BCC's right, title and interest in the Downtown Property together with security agreements on the personal property together with this Collateral Assignment.

8.   This Collateral Assignment is intended as an assignment without personal recourse of all of BCC's right, title and interest in the Downtown Property and of all of its right, title and interest in the Development Agreement to further secure performance by BCC of all of its obligations under the provisions of the Trust Fund Payment Agreement and Deed of Trust.

### COLLATERAL ASSIGNMENT

The parties agree as follows:

1.   As security for the payment of the Promissory Note, and to secure BCC's performance of all obligations of BCC under the provisions of the Trust Fund Payment Agreement and Deed of Trust, BCC hereby assigns to the United States without personal recourse

- 3 -

**EXHIBIT 1 to COMPLAINT (Page 121 of 135)**

a security interest in:  (i) all of the right, title and interest
that BCC presently has and may acquire in the Downtown Property;
and (ii) all of its right, title and interest in the Development
Agreement, which Development Agreement is incorporated herein by
reference and made a part hereof.

2.  BCC further assigns to the United States a security
interest, without personal recourse, in all development leases
made pursuant to the provisions of the Development Agreement to
which BCC or its successor-in-interest is a party, and in all
monies and claims for monies due or to become due BCC under any
leases, contracts, or other claims for monies which have been or
are now, or are hereafter, assigned by BCC to the United States,
together with all proceeds of the rights so assigned, together
with, without limitation, all other property rights that BCC may
now have or may acquire pursuant to the terms of the Development
Agreement.

3.  On the occurrence, and continuation beyond any
applicable grace or curative period, of a default under the
Promissory Note or the Trust Fund Payment Agreement or on "Event
of Default" under the Deed of Trust of BCC, the United States may
exercise all of the rights afforded the United States by the
Arizona Commercial Code, the law, this Collateral Assignment, the
Trust fund Payment Agreement, the Promissory Note and the Deed of
Trust.

4.  The security interest created pursuant to this
Collateral Assignment is subject to the terms of the Deed of

- 4 -

EXHIBIT 1 to COMPLAINT (Page 122 of 135)

Trust, including the provisions of the Deed of Trust permitting the release and substitution of collateral.

5.   For the purpose of expediting execution of this Collateral Assignment and related exhibits, each may be signed in separate counterparts; each such counterpart shall be deemed to be an original instrument, which, when all have been so signed, shall constitute a single agreement.

IN WITNESS WHEREOF, each party has executed this Collateral Assignment on the day and year first above set forth.

Date: _____12-18-92_____

UNITED STATES OF AMERICA

By: _____

Manuel Lujan, Jr.
Secretary of the Interior

Date: _____12-17-92_____

BARRON COLLIER COMPANY

By: _____

Barron Collier III

- 5 -

EXHIBIT 1 to COMPLAINT (Page 123 of 135)

STATE OF FLORIDA         )
                         :SS.:
COUNTY OF COLLIER.       )

The foregoing instrument was acknowledged before me this 17th day of DECEMBER , 1992, by Barron Collier III, as a partner of Barron Collier Company, who is personally known to me.

_____
ANITA M. DECOTEAU

My Commission Expires:

NOTARY PUBLIC STATE OF FLORIDA.
MY COMMISSION EXP JUNE 16, 1994
BONDED THRU GENERAL INS. UND.
AA352849

DISTRICT OF COLUMBIA

This instrument was acknowledged before me on the 18th day of December , 1992 by Manuel Lujan, Jr. as Secretary of the Department of the Interior of the United States of America.

_____

My Commission Expires:

4-14-97

- 6 -

EXHIBIT 1 to COMPLAINT (Page 124 of 135)

## CONSENT TO COLLATERAL ASSIGNMENT

The undersigned, City of Phoenix, does hereby consent to the foregoing Collateral Assignment and further agrees to recognize the Collateral Assignment as a valid assignment for security purposes of all property and rights described in said Collateral Assignment.

DATED: _____

City of Phoenix
a Municipal Corporation

By:   Frank A. Fairbanks
      City Manager


By:   _____
      David R. Garcia
      Deputy City Manager


STATE OF ARIZONA    )
                    )  ss.
County of Maricopa  )

I HEREBY CERTIFY that on the _____ day of _____, 1992, before me, the subscriber, a Notary Public of the State of Arizona, in and for the County of Maricopa aforesaid, personally appeared _____, Deputy City Manager of the City of Phoenix, and he acknowledged the foregoing Consent to Collateral Assignment to be the act and deed of said municipal corporation.

AS WITNESS, my hand and Notarial Seal.


_____
Notary Public


My Commission Expires:

_____

- 7 -

EXHIBIT 1 to COMPLAINT (Page 125 of 135)

EXHIBIT A

## LEGAL DESCRIPTION--BETWEEN WASHINGTON, JEFFERSON, 1ST AND 3RD STREETS

Blocks 23, 24, 33 and 34, ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51;

TOGETHER WITH the alley right of way within said Blocks 24 and 33; and

TOGETHER WITH that part of Jefferson Street, as shown on said plat of ORIGINAL TOWNSITE OF PHOENIX, that lies between the Southerly prolongations of the East and West lines of said Block 23; and

TOGETHER WITH that part of Jefferson Street, as shown on said plat of ORIGINAL TOWNSITE OF PHOENIX, that lies between the Southerly prolongations of the East and West lines of said Block 24;

EXCEPT that part of the whole thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or radially, of the Northerly line of AMERICA WEST ARENA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 343 of Maps at page 45.

## LEGAL DESCRIPTION OF PUBLIC RIGHT OF WAY TO BE CLOSED JEFFERSON STREET BETWEEN 1ST AND 3RD STREETS

PART NO. 1:

That part of Jefferson Street as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51, lying between the Southerly prolongation of the West line of Block 24 in said ORIGINAL TOWNSITE OF PHOENIX and the line that is parallel with and 15 feet East of the monument line of First Street as shown on said plat;

TOGETHER WITH that part of Second Street as shown on, and dedicated by, said plat of ORIGINAL TOWNSITE OF PHOENIX, lying between the Westerly prolongations of the North and South lines of Lot 11 in said Block 33; and

TOGETHER WITH the alley within Block 33 in said ORIGINAL TOWNSITE OF PHOENIX which lies between the Southerly prolongations of the East line of Lot 1 and the West line of Lot 11 in said Block 33;

EXCEPT that part of the whole thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or

**EXHIBIT 1 to COMPLAINT (Page 126 of 135)**

Exhibit A
Page 2

radially, of the Northerly line of AMERICA WEST ARENA, according
to the plat of record in the office of the County Recorder of
Maricopa County, Arizona, in Book 343 of Maps as page 45; and
     EXCEPT that part of the whole thereof lying within 25 feet
of the monument line of said Second Street.

PART NO. 2:

     That part of Blocks 33 and 34, ORIGINAL TOWNSITE OF PHOENIX,
according to the plat of record in the office of the County
Recorder of Maricopa County, Arizona, in Book 2 of Maps at page
51, lying within a strip of land, 100 feet in width, the center
line of which is described as follows:
     BEGINNING at the intersection of the monument line of 1st
Street with the monument line of Jefferson Street;
     thence North 89 degrees 59 minutes 44 seconds East along
said monument line of Jefferson Street (based on an assumed
bearing of North 00 degrees 01 minutes 09 seconds West for said
monument line of 1st Street) a distance of 60.00 feet to the
point of curvature of a circular curve concave Southwesterly,
having a radius of 716.20 feet;
     thence Southeasterly along the arc of said curve through a
central angle of 33 degrees 41 minutes 25 seconds a distance of
421.13 feet to the point of tangency;
     thence South 56 degrees 18 minutes 51 seconds East a
distance of 100.00 feet to the point of curvature of a circular
curve concave Northeasterly, having a radius of 716.20 feet;
     thence Southeasterly along the arc of said curve through a
central angle of 33 degrees 42 minutes 22 seconds a distance of
421.33 feet to the point of tangency and the terminus of the
center line described herein;
     EXCEPT that part thereof that lies Southerly or
Southwesterly of the line that is parallel and/or concentric with
and 50 feet Northeasterly, as measured at right angles and/or
radially, of the Northerly line of AMERICA WEST ARENA, according
to the plat of record in the office of the County Recorder of
Maricopa County, Arizona, in Book 343 of Maps at page 45.


**LEGAL DESCRIPTION OF
PUBLIC RIGHT OF WAY TO BE CLOSED
JEFFERSON STREET BETWEEN 2ND AND 3RD STREET
AND THE ALLEYS IN BLOCK 24**


     That portion of Jefferson Street as shown on, and dedicated
by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the
plat of record in the office of the County Recorder of Maricopa
County, Arizona, in Book 2 of Maps at page 51, lying between the
line that extends from the Southeast corner of Lot 2, Block 24 in
said ORIGINAL TOWNSITE OF PHOENIX to the Northeast corner of Lot
1, Block 33 in said ORIGINAL TOWNSITE OF PHOENIX and the line
that extends from the Southwest corner of Lot 18 in said Block 24
to the Northwest corner of Lot 11 in said Block 33;

**EXHIBIT 1 to COMPLAINT (Page 127 of 135)**

Exhibit A
Page 3

TOGETHER WITH all of the alley within said Block 24 which is bound by the Northerly prolongation of the East line of said Lot 2, by the Easterly prolongation of the South line of said Lot 18 and by the Westerly prolongation of the North line of Lot 5 in said Block 24.

## LEGAL DESCRIPTION OF
## PUBLIC RIGHT OF WAY TO BE CLOSED
## 2ND STREET BETWEEN WASHINGTON AND (NEW) JEFFERSON STREETS

That portion of Second Street lying between the monument lines of Washington Street and Madison Street, all as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51;

EXCEPT that part thereof lying within 50 feet of the monument line of said Washington Street; and

EXCEPT that part thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or radially, of the Northerly line of AMERICA WEST ARENA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 343 of Maps at page 45; and

EXCEPT that part thereof lying within 25 feet of the monument line of said Second Street to a height of 18 feet measured vertically from the crown of the pavement of Second Street.

## LEGAL DESCRIPTION OF
## PUBLIC RIGHT OF WAY TO BE CLOSED
## 2ND STREET BETWEEN WASHINGTON AND JEFFERSON STREETS

That portion of Second Street lying between the monument lines of Washington Street and Jefferson Street, all as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 2 of Maps at page 51;

EXCEPT that part thereof lying within 50 feet of the monument line of said Washington Street; and

EXCEPT that part thereof lying within 50 feet of the monument line of said Jefferson Street; and

EXCEPT that part thereof lying within 25 feet of the monument line of said Second Street.

**EXHIBIT 1 to COMPLAINT (Page 128 of 135)**

Exhibit A
Page 4

LEGAL DESCRIPTION OF
PUBLIC RIGHT OF WAY TO BE CLOSED
3RD STREET BETWEEN WASHINGTON AND (NEW) JEFFERSON STREETS

That portion of Third Street, above a height of 18 feet measured vertically from the crown of the pavement of Third Street, lying between the monument lines of Washington Street and Madison Street, all as shown on, and dedicated by, the plat of ORIGINAL TOWNSITE OF PHOENIX, according to the plat of record in the office of the County Recorder or Maricopa County, Arizona, in Book 2 of Maps at page 51;

EXCEPT that part thereof lying within 50 feet of the monument line of said Washington Street; and

EXCEPT that part thereof that lies Southerly or Southwesterly of the line that is parallel and/or concentric with and 50 feet Northeasterly, as measured at right angles and/or radially, of the Northerly line of AMERICA WEST ARENA, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, in Book 343 of Maps at page 45, and the Easterly continuation thereof.

LEGAL DESCRIPTION OF PUBLIC RIGHT OF WAY
TO BE CLOSED 1ST STREET BETWEEN
WASHINGTON AND JEFFERSON STREETS

The East 35.00 feet of First Street lying between the monument lines of Washington Street and Jefferson Street, all as shown on and dedicated by the plat of ORIGINAL TOWNSITE OF PHOENIX, as recorded in Book 2 of Maps at Page 51, records of Maricopa County;

TOGETHER WITH the West 43.00 feet of the East 78.00 feet of First Street lying 18.00 feet above the existing road surface and lying between the monument lines of Washington Street and Jefferson Street as shown on the plat of ORIGINAL TOWNSITE OF PHOENIX, as recorded in Book 2 of Maps at Page 51, records of Maricopa County, Arizona;

EXCEPT that part thereof lying within 50 feet of the monument line of said Washington Street; and

EXCEPT that part thereof lying with 50 feet of the monument line of said Jefferson Street.

**EXHIBIT 1 to COMPLAINT (Page 129 of 135)**

[Form of Promissory Note]

**PROMISSORY NOTE**

$ 34,900,000.00 _____ __, 199_

FOR VALUE RECEIVED, Barron Collier Company, a partnership organized under the laws of the State of Florida (referred to herein as **"BCC"**), promises to pay to the United States, or order, in lawful money of the United States of America, the Principal Amount defined below with interest thereon payable in the manner set forth below.

A.    Date of Payment.  Interest on the Principal Amount shall be payable in the form of thirty (30) consecutive annual interest payments (each an **"Annual Interest Payment"**).  The first Annual Interest Payment shall be due and payable on the first anniversary of the Closing Date under the Trust Fund Payment Agreement (the **"Agreement"**), and each succeeding Annual Interest Payment shall be due and payable on each succeeding anniversary of the first Annual Interest Payment.  The thirtieth and final Annual Interest Payment and the Principal Amount shall be due and payable on the twenty-ninth (29th) anniversary of the first Annual Interest Payment.

B.    Method of Payment.  Payment of the Principal Amount on maturity shall be solely by application of the Annuity (as defined in the Agreement).  Payment of the Annual Interest

1

**EXHIBIT 1 to COMPLAINT (Page 130 of 135)**

Payment shall be by certified check or wire transfer delivered to
_____, and payable to the United States,
for deposit by the United States into the Arizona InterTribal
Trust Fund Account and the Navajo Trust Fund Account to be
established in accordance with Pub. L. No. 100-696 (Nov. 18,
1988).

   C.   No Prepayment.  Notwithstanding any provision of law,
BCC agrees that it has no right under this Promissory Note to
prepay any Annual Interest Payment or the Principal Amount under
this Promissory Note; provided, however, that nothing in this
paragraph shall be construed to alter or to limit the right of
BCC to obtain any release and conveyance of the Trust Estate as
may be provided for in the Agreement and the Deed of Trust, or to
make any payment into the Annuity before such payment becomes
due.

   D.   No Personal Recourse.  Notwithstanding anything to the
contrary contained in this Promissory Note or the Trust Fund
Payment Agreement or elsewhere, neither BCC nor any affiliate of
BCC nor any partner of BCC (whether individually or as a trustee)
nor any legal representative, successor, heir, estate, or
assignee of any of them shall have any personal liability for the
payment of any sum which may be payable under this Promissory
Note or the Annuity, or for the performance or discharge of any
obligation of BCC under this Promissory Note, the Annuity, or the
Agreement.  In the enforcement of any of its rights under this
Promissory Note, the United States shall solely resort to, and
proceed in rem against the Trust Estate and the Annuity.

2

EXHIBIT 1 to COMPLAINT (Page 131 of 135)

E.  <u>Default</u>.  Upon a default by BCC under this Promissory Note or the Agreement or the occurrence of an **"Event of Default"** of BCC (as such term is defined in the Deed of Trust), and the continuation of such default or Event of Default beyond any applicable curative or grace period, enforcement of this Promissory Note shall be in accordance with the terms of this Promissory Note, the Agreement, and the Deed of Trust.

F.  <u>Acceleration</u>.  Upon the failure of BCC to make any payment required of it under this Promissory Note within thirty (30) days after written demand therefor by the United States, the United States shall be entitled, at its option, to declare the entire principal and accrued interest owing on this Promissory Note to be immediately due and payable.

G.  <u>Trust Fund Payment Agreement (the **"Agreement"**)</u>.  Resort for payments of amounts due under this Promissory Note shall be solely <u>in rem</u> against the Trust Estate and Annuity as provided by the terms and conditions of the Agreement.  Additionally, upon the occurrence of an Event of Default of BCC as defined in the Agreement, neither BCC nor its affiliates, nor any officers, directors, shareholders, or partners thereof, individually or as trustees or other fiduciaries (nor any officers, directors, shareholders, or partners of any assignee of BCC) shall be personally liable for the payment of any deficiency resulting from the application of the proceeds of the sale or other disposition of the Trust Estate or Annuity to any amount due under this Promissory Note, and the United States shall not

3

**EXHIBIT 1 to COMPLAINT (Page 132 of 135)**

initiate any action or proceeding against any of them to collect the same.

H. <u>No Waiver</u>. No delay on the part of the United States in exercising any rights hereunder shall operate as a waiver of such rights. Forbearance to exercise any right in favor of the United States provided herein shall not constitute a waiver of that right as to any subsequent failure.

I. <u>Governing Law</u>. This Promissory Note shall be governed by the laws of the State of Arizona.

J. <u>Definitions</u>. The following terms in this Promissory Note shall have the following meanings:

<u>Annual Interest Payment</u> means the annual interest on the Principal Amount, which interest shall be at the rate of eight and one-half percent (8.5%) per annum.

<u>Annuity</u> has the meaning given that term in the Trust Fund Payment Agreement.

<u>Deed of Trust</u> has the meaning given that term in the Trust Fund Payment Agreement.

<u>Principal Amount</u> means $34.9 million.

<u>Promissory Note</u> means this promissory note.

<u>Trust Estate</u> has the meaning given that term in the Deed of Trust.

<u>Trust Fund Payment Agreement</u> means the Trust Fund Payment Agreement of December __, 1992 between Barron Collier Company, a partnership organized under the laws of the State of Florida, and the United States.

4

EXHIBIT 1 to COMPLAINT (Page 133 of 135)

K.   Counterparts.  For the purpose of expediting execution of this Promissory Note, it may be signed in separate counterparts; each such counterpart shall be deemed to be an original instrument, which, when all have been so signed, shall constitute a single agreement.

IN WITNESS WHEREOF, BCC has caused this Promissory Note to be signed by a general partner thereunto duly authorized as of the day and year first set forth above.


Date: _____        UNITED STATES OF AMERICA

                                   By: _____
                                   Manuel Lujan, Jr.
                                   Secretary of the Interior


Date: _____        BARRON COLLIER COMPANY

                                   By: _____
                                   Barron Collier III


5

EXHIBIT 1 to COMPLAINT (Page 134 of 135)

STATE OF FLORIDA        )
                                    :SS.:
COUNTY OF COLLIER       )

          The foregoing instrument was acknowledged before me
this _____ day of _____, 1992, by Barron Collier III, as a
partner of Barron Collier Company, who is personally known to me.

                              _____

My Commission Expires:

_____

DISTRICT OF COLUMBIA

          This instrument was acknowledged before me on the _____
day of _____, 1992 by Manuel Lujan, Jr. as
Secretary of the Department of the Interior of the United States
of America.

                              _____

My Commission Expires:

_____

6

**EXHIBIT 1 to COMPLAINT (Page 135 of 135)**