

United States Department of the Interior
OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS
Office of Appraisal Services, One Arizona Center
400 East Van Buren Street, Suite 430
Phoenix, Arizona 85004-0663

TAKE PRIDE IN AMERICA

IN REPLY REFER TO:
Appraisal Services

JUL 24 2007

MEMORANDUM

TO: David Moran, Office of Solicitor
Division of Indian Affairs

FROM: Acting Regional Appraiser, Western Regional Office

SUBJECT: Transmittal of Appraisal Review

We have completed the *Appraisal Review* identified as:

WESTERN REGIONAL
ASSIGNED NUMBER

H50-2007-00001

If you have any questions, please contact our office at (602) 379-4398.

Enclosure

OFFICE OF THE SPECIAL TRUSTEE
OFFICE OF APPRAISAL SERVICES

RESERVATION: N/A
REQUEST #: H50-2007-00001

# TECHNICAL APPRAISAL REVIEW REPORT

Appraisal Review of: Collier Indian School Land – 15.04 Acres

Prepared by: Walter Winius JR, MAI AZ Cert. #30421
Walter "Tres" Winius, III, MAI AZ Cert. #30429
Integra Realty Resources
Winius Realty Analysts - Phoenix
5225 North Central Avenue, Suite 235
Phoenix, AZ 85012
602 266-5599

As a result of my review, I am of the opinion that this appraisal report is acceptable for use in collateral release negotiations. I have not formed a separate opinion of value and neither accept nor reject the appraisers' value conclusion.

## SUBJECT

The report concludes a value of $48 million as the fee simple, as is value of the 15.04 acre Indian School property. The Reviewer considers the appraisal to be compliant with USPAP and recommends its approval for use in negotiations regarding collateral release. However, due to the complexity of the appraisal problem with many variables potentially impacting value in the context of recent market volatility and dramatic price variations exhibited by the sales data, as well as the number of projects in the pipeline and the change in financial condition of several of the key players in the condominium marketplace, the reviewer is unable, within the strict time

constraints of this review, to form a corroborating opinion as to value. Accordingly, the reviewer neither accepts nor rejects the value conclusion.

**Background:** The subject 15.04 acres is a portion of 71 acres of land acquired by Barron Collier Company (BCC) in January 1993 in conjunction with a complex land exchange with the Department of the Interior which acquired 108,000 acres of Florida Everglades land. The City of Phoenix acquired a 20 acre park site in the transaction from DOI and BCC re-conveyed the remainder of the 71 acres of the former Indian School property to the city for use as a public park with BCC receiving development rights in two key downtown locations as well as title to the remaining 15.04 acres at the northeast corner of Indian School and Central, the subject of this appraisal. As part of the transaction, DOI received a $34.9 million dollar note secured by the subject 15.04 acres and the two aforementioned development parcels. As provided for in governing documents, in December of 1997; BCC applied for release of one of the downtown sites based on an appraisal indicating that the value of the remaining two parcels exceeded the required 130% of the note balance. The previously released site is now improved with the Collier Center, a mixed use project anchored by Bank of America that just sold for $177 million.

This appraisal is intended to provide documentation to the effect that the current value of the subject 15.04 acre Indian School site – by itself – now exceeds 130% of the current loan balance (including accrued interest). The parcel for which collateral release is now being requested is a 7 acre downtown site north of Chase Ballpark that is committed to the Cityscape project. The plan for the Cityscape site includes two 37 story towers with hotel and residential as primary uses with lower level retail. This is arguably one of the most ripe for development parcels in the city in anticipation of the new civic center completion and light rail system coming late next year.

Two earlier appraisals were presented to OAS in March. These appraisals were not accompanied by a formal statement of value for collateral release purposes and were considered preliminary. We discussed the appraisals with Gary Dubrock of BCC and were asked to meet with Integra (Winius) principals to address any specific appraisal requirements and/or issues that needed to be addressed. The present appraisal addresses all of the issues previously raised.

This report was presented to me on June 28, 2007 and sent via FED EX on the 27th to Secretary Kempthorne accompanied by a formal "Statement of Value". DOI has 30 days in which to notify BCC that it either concurs with the value or that it intends to seek a second opinion. Failure to notify equates to concurrence with the statement of value and the collateral release.

## Section 1: Appraisal Report Summary

a. *Owner of Record.*
The owner of the property is the Barron Collier Company.

b. *Estate Appraised.*
The interest appraised is the fee simple ownership interests of the 15.04 acre subject parcel.

c. *Legal Description.*

That part of the Southeast Quarter of Section 20, Township 2 North, Range 3 East, Gila and Salt River Meridian, Maricopa County, Arizona, per the survey officially filed with the Bureau of Land Management March 23rd, 1988, described as follows:

COMMENCING at the southwest corner of said Southeast Quarter; thence N 00°10'38"E 1,152.74 feet to a line that is 200.00 feet south of the south line of a parcel of land described in Docket 3273, page 412; thence S 89°49'22"E 70.00 feet along said line to the east line of the west 70.00 feet of said Southeast Quarter and the POINT OF BEGINNING; thence S 00°10'38"W 1,063.25 feet along a said east line; thence S 44°36'41"E 32.65 feet to the north line of the south 67.00 feet of said Southeast Quarter; thence S 89°24'00"E 608.18 feet along said north line; thence N 00°10'38"E 839.69 feet; thence N 44°49'22"W 355.28 feet; thence N 89°49'22"W 379.94 feet to the POINT OF BEGINNING.

Parcel contains 15.04 acres.

d. *Property Characteristics*

The subject is an urban infill parcel located in the heart of the Central Avenue corridor at the corner of Indian School Road. It is a vacant, level, and mostly rectangular site and fronts on the northerly side of Indian School

Road for approximately 600 feet and on the easterly side of Central Avenue for nearly 1,100 feet. Immediately east and under construction is a new light rail system that when completed in late 2008, will link mid-town (aka downtown north) with downtown Phoenix and the ASU campus in Tempe to the southeast. The subject will be served by a station. All utilities are available to the site.

e. *Larger Parcel Determination.*
Entire site (detailed larger parcel analysis was not considered relevant to this appraisal assignment.)

f. *Extraordinary Assumption and/or Hypothetical Conditions.*
None noted, however, appraisers assume that the 1994 approved plan which calls for mostly office development can be changed to predominantly residential uses, in which the reviewer concurs.

g. *Highest and Best Use.*
Development consistent with approved FAR but with a use mix consistent with current market forces.

h. *Date of the Appraisal Report.*
June 25, 2007

i. *Date of Appraisal.*
June 12, 2007

j. *Appraiser.*
Walter Winius JR, MAI AZ Cert. #30421
Walter "Tres" Winius. III, MAI AZ Cert. #30429

k. *Value Estimate(s).*
**$48,000,000**

Section 2: Appraisal Review Process

a. *Client and Intended Users.*
The client and intended user named in the report is the Honorable Dirk Kempthorne, Secretary of the United States Department of the Interior.

b. *Intended Use.*
The intended use is for collateral/asset valuation purposes.

c. *Purpose of the Review Assignment.*
To judge the appraisal report's compliance with the Uniform Appraisal Standards for Federal Land Acquisitions (UASFLA) and the Uniform Standards of Professional Appraisal Practice (USPAP) and to develop a credible opinion of the adequacy of the data and appropriateness of the analysis of the data relative to the final conclusions. The review statement will be used by the Secretary of the Interior and his representatives, to assess the adequacy of the appraisal as a management tool for use in asset/collateral value and collateral release negotiations.

d. *Scope of the Review.*
The review of the subject appraisal report is a field review which included an inspection of the subject property and selected comparable sales used in the report. I have not re-verified the comparable sales employed for the report. A new sales search was not conducted, however sales from recent reports were also considered as were business news publications available and market reports on metro Phoenix. The scope of this review includes analysis for essential elements, scrutiny of the report for sufficiency of fact, adequacy of analysis, appraisal methodology employed, technical competency, mathematical accuracy, and a cohesive, logical presentation. Information relied upon consists of all information contained in the subject appraisal report and also sales information from other recent reports.

This review is being prepared in accordance with Standard Rule 3 of the Uniform Standards of Professional Appraisal Practice. The Review Appraiser has the benefit of information and recent appraisals on file and is sufficiently familiar with the subject's neighborhood and sales data in the market area, to be considered competent and qualified to undertake this review. The appraisers were interviewed at length by the reviewer prior to completing this assignment, and in the context of a discussion of their previous appraisal of the subject property for Barron Collier Company dated June 28, 2006. Comments and suggestions made at that time were incorporated into the present report.

Section 3: Reviewer's Analysis, Comments, and Conclusions

The purpose of this section is to report the reasoning and provide support for the reviewer's conclusions and explain discrepancies and disagreements. This section is written to support my review under the standards found in UASFLA Part C and USPAP SR 3-2(d), and discusses the various non-compliances and the potential impact on value, if any.

a. *Adequacy of Area and Property Description, and Sales Presentation.*
The descriptive and sales presentations are adequate to very good. The property is clearly identified with ample supporting documentation. Some 21 sales of office, condominium and mixed use land sales were presented along with 6 sales of smaller commercial properties and 5 hotel land sales, all considered relevant and well documented.

b. *Adequacy and Appropriateness of Appraiser's Larger Parcel Determination.*
A three test yellow book larger parcel analysis was not considered relevant to the assignment.

c. *The Highest and Best Use Conclusion.*
The appraisers concluded that a mixed use development was the Highest and &Best Use for the property. This conclusion is consistent with reported zoning, the surrounding area and my knowledge of the market area.

d. *Sales History and Inspection of the Subject Property.*
The property was acquired by the Barron Collier Company in 1993 as outlined in the Background section above. The property was last inspected by the appraisers on June 12, 2007, the date of value. The appraisers noted that according to Barron Collier Company, KB Homes had made an offer of $57,000,000 for the subject. However, that transaction never materialized and no earnest money was forfeited.

e. *History/Improvements.*
The subject 15.04 acres formerly contained a portion of the improvements of the Phoenix Indian School which was founded in 1891 and closed by the Dept. of the Interior in 1990. The improvements have since been demolished and the site is currently vacant. The Indian School and Central frontages are improved with sidewalks and landscaping. All utilities are available to the site. Under construction along the easterly side of the property at Central Ave is a new light rail system slated for a late 2008 completion.

f. *Adequacy and Appropriateness of the Valuation Approaches Selected.*
The appraisers used the sales approach both to value the property as a single entity and to value components of the mixed use scenario to be developed over time consistent with his opinion of highest and best use. The latter analysis utilized a discounted flow methodology in order to account for the absorption of the mixed use components over time.

g. Sales Approach: 5 sales were selected in the valuation of the 15.04 acres in total. These sales ranged in size from 3.34 acres to 8.84 acres with a pending sale of a 27 acre parcel also included. The sales prices ranged from 38.54 per sq. ft. for the 27 acre mixed use development parcel at Tempe Town Lake to $97.95 per sq. ft. for a 6 acre site at the corner of McDowell and Central at the northerly edge of the downtown area. Four of the selected sales were significantly smaller than the subject's 15 acre size while one was significantly larger at 27+ acres. The appraisers recognized this deficiency in available market information due to the fact that the subject is an infill parcel of unusual size and approvals for almost 1.9 million sq. ft. of building area. Most of the available sales data consisted of smaller parcels acquired for a specific purpose where the buyer is anticipating a relatively short development time frame. Therefore, in addition to the sales approach, the appraisers employed an "Income Approach" which while based on sales data, considered the development time frame necessary for the entire 1.88 million sq. ft. of build-out area to which the subject is entitled. That analysis will be addressed under the "Income Approach" below.

The application of the sales approach is considered to be adequate and reasonable. Adjustments to the sales were primarily time, size and use/entitlements. Of the five sales selected, only two were located within the Central/Downtown North corridor. One (Sale 3) was to Toll Brothers at $52.97/SF in November 2005, more than double the price paid by the seller 6 months earlier while the other was to a Las Vegas/Israeli development group, at $97/SF, the latter also being a "flip" of a June 2005 transaction at $49/SF. While such sales provide a classic opportunity for paired sales analyses to establish time adjustments, it is this reviewer's opinion that such sales have nothing to do with appreciation over time and everything to do with entrepreneurial skill in locating an opportunity and capitalizing on it. The Toll Brothers acquisition was the talk of the town having received

approvals for two landmark 50 story towers that would permanently alter the Phoenix skyline. A year later, however, a small office building and parking lot on the site are still operating and Toll Brothers stock has plummeted after over $100 million in real estate write downs with more anticipated. To their credit, the appraisers did not apply a quantitative time adjustment based on a "paired sales" analysis. However, most of the sales received positive time adjustments and most also received positive "entitlement" and "FAR" adjustments. With respect to the time adjustments, it is arguable that the central corridor between downtown and Camelback (the light rail route), has continued to appreciate. However, some market analysts argue that the market peaked in 2005. It is worth noting here that both Toll Brothers who bid up the asking price in their November 2005 acquisition and KB Homes who reportedly made an offer on the subject in the same time frame, have seen their stocks plummet after taking large write-downs in their real estate holdings and, it would appear, are no longer viable bidders in this marketplace.

With regard to the entitlement adjustments, it is acknowledged that the subject has been approved for 1.88 million square feet of building area. However, the actual approved plan includes 1.5 million sq. ft. of office space which is no longed consider feasible within a reasonable development time frame. The appraisers have favored the subject as to entitlements and FAR (Floor Area Ratio) in their adjustment process. The reviewer does not argue that the subject would easily qualify for similar entitlements and FAR coverage consistent with the appraisers' well supported highest and best use development scenario. In fact, there is a recent positively received zone change request in the immediate area that conclusively supports this conclusion. However, the subject's approved plan is obsolete and will need to go through the process again. While there is little doubt as to the favorable outcome, the reviewer is of the opinion that another appraiser considering the same data might well conclude that the entitlement adjustment in most cases is nil. With respect to FAR (approved floor area ratio), it appears that the most recent estimate of approved FAR for the 27 acre Tempe parcel is superior rather than inferior to the subject. Recently published documents also cite the purchase price as $42.5 million, or $35.61 per sq. ft. payable in phases with the remainder seller financed at 8%. The $46 million price quoted in the appraisal may reflect total buyer investment as of the projected closing, however, this may call into question the "entitlement" adjustment as the project appears now to be fully entitled and closing is scheduled to coincide with the groundbreaking of Phase I.

The overall conclusion from the sales approach of $52,000,000 or $80 per Sq. Ft., appears to be supported and not unreasonable based on the appraisers' interpretation of the data, nonetheless, it is considered that another appraiser focusing on The Tempe Town Lake transaction as the most comparable in terms of a phased development over time, might reach a significantly different conclusion.

b. *Income Approach.*
The appraisers enlisted the services of an architectural firm to create a development scenario of the subject consistent with its current highest and best use. The plan depicts 8 components consisting of a large office building with retail, two smaller offices, three condominium buildings with ground floor retail and a common area with restaurant space. Extensive sales support was provided for each property type. Comments above regarding time and entitlement adjustments apply to this analysis as well. The appraisers concluded a value for each component and then created a development model to reflect the absorption of the entire project over time. In projecting absorption, the appraisers simply divided the total square footage by the development time period and projects an equal absorption over the time period. While not entirely realistic from a physical standpoint, it is considered that this method provides an adequate projection of absorption over time versus the more awkward and somewhat speculative placement of specific components in the development time line. In any case, the 8 component concept plan is not intended as a definitive plan but rather as a physical example of a development that would fit the site within the allowable FAR.

Key parameters used in the development projection include Revenue attributable to absorbed space of $82.97 per sq. ft.. Marketing costs of 1.75%, Administrative at 1.25%, Commissions of 3%, an absorption period of 24 months and a 1.00% per month revenue inflation factor.

The appraisers applied discount rates of 15% to 20% (including developer profit) to the resulting projection and concluded a value range ranging from $45,500,000 to $48,000,000. The following OAS development model duplicates and verifies the appraisers' analysis, the minor difference being the monthly compounding in the revenue adjustment below.

Land Value Residual

| | |
|---|---|
| General & Admin Costs | 1.25% |
| Marketing Costs | 1.75% |
| Sales Commission | 3.00% |
| Inflation Factor | 1.00% /mo |
| Sellout Period | 24 months |

Inflation Adjustment Y/N

| | | TOTALS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| INCOME: | | | | | | | | | | |
| Absorption (SF) | | 491857 | 81893 | 81893 | 81893 | 81893 | 81893 | 81893 | 81893 | 81893 |
| Remaining | | | 573249 | 491357 | 409464 | 327571 | 245678 | 163784 | 81893 | 0 |
| REVENUE Y | 82.97 | $60,488,002 | $6,795,000 | $7,000,895 | $7,213,029 | $7,431,501 | $7,656,778 | $7,888,784 | $8,127,822 | $8,374,109 |
| | | | $82.97 | $85.49 | $88.08 | $90.75 | $93.50 | $96.33 | $99.25 | $102.26 |
| EXPENSES: | | | | | | | | | | |
| SELLING EXPENSES | | | | | | | | | | |
| COMMISSIONS | 3.00% | $1,814,640 | $203,850 | $210,027 | $216,391 | $222,948 | $229,703 | $236,664 | $243,835 | $251,223 |
| MARKETING | 1.75% | $1,058,540 | $118,913 | $122,516 | $126,228 | $130,053 | $133,994 | $138,054 | $142,237 | $146,547 |
| TOTAL | | $2,873,180 | $322,763 | $332,543 | $342,619 | $353,001 | $363,697 | $374,717 | $386,072 | $397,770 |
| INFRASTRUCTURE | "Already in Place" | | | | | | | | | |
| ROAD/SITE WORK | $0 | $0 | 0 | 0 | $0 | $0 | $0 | $0 | $0 | $0 |
| ENGINEERING | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| ADMIN & OVERHEAD | | | | | | | | | | |
| OVERHEAD | 1.25% | $756,100 | $84,938 | $87,511 | $90,163 | $92,895 | $95,710 | $98,610 | $101,598 | $104,676 |
| REAL EST TAXES | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| CONTINGENCIES | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| TOTAL | | $756,100 | $84,938 | $87,511 | $90,163 | $92,895 | $95,710 | $98,610 | $101,598 | $104,676 |
| DEVELOPER PROFIT | 0.00% | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| TOTAL DEVELOPMENT EXPENSES | | $3,629,280 | $407,700 | $420,054 | $432,782 | $445,896 | $459,407 | $473,327 | $487,669 | $502,446 |
| UNLEVERAGED NET CASH FLOW | | $56,858,722 | $6,387,300 | $6,580,842 | $6,780,248 | $6,985,606 | $7,197,370 | $7,415,457 | $7,640,153 | $7,871,657 |

| UNLEVERAGED VALUATION | | | | |
|---|---|---|---|---|
| | 15.00% | $48,070,000 RD | $3,196,146 /AC | $73.37 /SF |
| | 17.50% | $46,808,000 | $3,112,036 /AC | $71.44 /SF |
| | 20.00% | $45,585,000 | $3,030,919 /AC | $69.58 /SF |

There are a number of variables in the appraisers' projection that, if modified, could materially affect the value conclusion. First is the projected absorption time frame of 24 months. The developer of the 27 acre mixed use Pier II project at Tempe Town Lake is on record stating that absorption for that project is anticipated to be 7 years. Secondly, as noted above the sales data included properties that have already enjoyed recent and dramatic appreciation, and, which were further adjusted positively in the sales analysis. Given this history, some appraisers might be reluctant to assume continued double digit annual appreciation. Also, there is no provision in the projection for any hard costs associated with common features, access drives, etc. Lastly, there is no provision for real estate taxes in the model. While the subject taxes are low currently with an assessment of approximately $6 million, we note that the 3.3 acre Toll Brothers site has been re-assessed for its $7.7 million purchase price for FY2008.

The following model shows the effect on value of eliminating the revenue inflation factor and extending the absorption period to 48 months but makes no other adjustments to the appraisers' expense projections:

OFFICE OF THE SPECIAL TRUSTEE
OFFICE OF APPRAISAL SERVICES

RESERVATION: N/A
REQUEST #: H50-2007-00001

Land Value Residual

| | |
|---|---|
| *General & Admin Costs* | 1.25% |
| *Marketing Costs* | 1.75% |
| *Sales Commission* | 3.00% |
| *Inflation Factor* | 0.00% /mo |
| *Sellout Period* | 40 months |

| Inflation Adjustment: N/A | | TOTALS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| INCOME: | | | | | | | | | | |
| Absorption (SF) | | 491357 | 81893 | 81893 | 81893 | 81893 | 81893 | 81893 | 81893 | 81893 |
| Remaining | | | 573249 | 491357 | 409464 | 327571 | 245678 | 163785 | 81893 | 0 |
| REVENUE | $2.97 | $54,360,000 | $6,795,000 | $6,795,000 | $6,795,000 | $6,795,000 | $6,795,000 | $6,795,000 | $6,795,000 | $6,795,000 |
| EXPENSES: | | | | | | | | | | |
| SELLING EXPENSES | | | | | | | | | | |
| COMMISSIONS | 3.00% | $1,630,800 | $203,850 | $203,850 | $203,850 | $203,850 | $203,850 | $203,850 | $203,850 | $203,850 |
| MARKETING | 1.75% | $951,300 | $118,913 | $118,913 | $118,913 | $118,913 | $118,913 | $118,913 | $118,913 | $118,913 |
| TOTAL | | $2,582,100 | $322,763 | $322,763 | $322,763 | $322,763 | $322,763 | $322,763 | $322,763 | $322,763 |
| INFRASTRUCTURE "Already in Place" | | | | | | | | | | |
| ROAD/SITE WORK " | $0 | $0 | 0 | 0 | | | | | | |
| ENGINEERING " | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| TOTAL | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| ADMIN & OVERHEAD | | | | | | | | | | |
| OVERHEAD | 1.25% | $679,500 | $84,938 | $84,938 | $84,938 | $84,938 | $84,938 | $84,938 | $84,938 | $84,938 |
| REAL EST TAXES " | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| CONTINGENCIES | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| TOTAL | | $679,500 | $84,938 | $84,938 | $84,938 | $84,938 | $84,938 | $84,938 | $84,938 | $84,938 |
| DEVELOPER PROFIT | 0.00% | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| TOTAL DEVELOPMENT EXPENSES | | $3,261,800 | $407,700 | $407,700 | $407,700 | $407,700 | $407,700 | $407,700 | $407,700 | $407,700 |
| UNLEVERAGED NET CASH FLOW | | $51,098,400 | $6,387,300 | $6,387,300 | $6,387,300 | $6,387,300 | $6,387,300 | $6,387,300 | $6,387,300 | $6,387,300 |

| UNLEVERAGED VALUATION | | | |
|---|---|---|---|
| 15.00% | $37,410,000 RD | $2,487,369 /AC | $57.10 /SF |
| 17.50% | $35,665,000 | $2,372,674 /AC | $54.47 /SF |
| 20.00% | $34,075,000 | $2,265,826 /AC | $52.01 /SF |

From the above, it can be seen that the sensitivity of such a model is very high, and differing assumptions can appear reasonable yet produce dramatically different value estimates. While the appraisers' methodology and reasoning is considered acceptable, it is not possible within this limited time frame for review to come to a conclusion as to the accuracy of the value estimate.

OFFICE OF THE SPECIAL TRUSTEE
OFFICE OF APPRAISAL SERVICES

RESERVATION: N/A
REQUEST #: H50-2007-00001

I. *Overall Appraisal/Recommendation.*
The appraisers correlated the sales approach conclusion of $52,000,000 with the value range produced by the discounted cash flow analysis at $48,000,000, the upper range of the DCF analysis. It is the opinion of the reviewer that the appraiser has complied with USPAP and in substance with UASFLA. It is concluded that the subject report is acceptable for use in negotiations regarding the release of additional collateral.

This review statement is neither an acceptance nor a rejection of the appraiser's value conclusion and it is not intended to limit, restrict or influence the bargaining prerogatives of the Department of the Interior or its options regarding the seeking of a second appraisal estimate.

John S. Cote, ASA
Review Appraiser
MA# 1526

7/21/07
Date of Review

I recommend approval of this appraisal report for negotiation purposes and neither accept nor reject the appraisers' opinion of value.

Kenneth D. Carmack
Acting Regional Appraiser
U.S.D.O.I./OST/Office of Appraisal Services
WA General Certification #1101654

7-23-07
Date

OFFICE OF THE SPECIAL TRUSTEE
OFFICE OF APPRAISAL SERVICES

RESERVATION: N/A
REQUEST #: H50-2007-00001

**Section 4: Reviewer Certification**

I certify that; to the best of my knowledge and belief:

- The facts and data reported by the reviewer and used in the review process are true and correct.
- The analysis, opinions, and conclusions in this review report are limited only by the assumptions and limited conditions stated in this review report and are my own personal, impartial, and unbiased professional analysis, opinions, and conclusions.
- I have no present or prospective interest in the properties that are the subject of this report and no personal interest with respect to the parties involved.
- I have no bias with respect to the properties that are the subject of this report or to the parties involved in this assignment.
- My engagement on this assignment was not contingent upon developing or reporting predetermined results.
- My compensation is not contingent on an action or event resulting from the analyses, opinions, and conclusions in this review or from its use.
- My analysis, opinions, and conclusions were developed and this review report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice and to the Uniform Appraisal Standards for Federal Land Acquisitions.
- I have made a personal inspection of the subject properties under review.
- No one provided significant appraisal review assistance to the person signing this certification.

John Cote
Review Appraiser
MA# 1526

9/21/07
Date of Review

OFFICE OF THE SPECIAL TRUSTEE
OFFICE OF APPRAISAL SERVICES
REVIEW APPRAISER CERTIFICATION

RESERVATION: N/A
REQUEST #: H50-2007-00001

I certify that; to the best of my knowledge and belief:

1) The facts and data reported by the reviewer and used in the review process.are true and correct.

2) The analyses, opinions, and conclusions in this review report are limited only by the assumptions and limiting conditions stated in this review report, and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3) I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

6) I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

7) My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6) My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in this review or from its use.

7) My analyses, opinions, and conclusions were developed and this review report was prepared in conformity with applicable governmental regulations.

8) I did not personally inspect the subject property of the work under review.

9) No other person provided significant appraisal review assistance to the person signing this certification.

Kenneth D. Carmack
Acting Regional Appraiser
U.S.D.O.I./OST/Office of Appraisal Services
WA General Certification #1101654

7-23-07
Date

**ASSUMPTIONS AND LIMITING CONDITIONS:** The certification of the Appraiser(s) appearing in the appraisal report is subject to the following conditions and to such other specific and limiting conditions as are set forth by the Appraiser(s) in the report.

1. Possession of the report or copies thereof do not carry the right of publication nor may be used for other than its intended use; the physical report remains the property of the **Bureau of Indian Affairs** for the use by the client (Superintendent). The release of data contained in the appraisal report or the appraiser's workfile must be approved by the Office of the Special Trustee Regional Appraiser. This appraisal report is subject to the requirements of the Freedom of Information Act.

2. The legal description has been provided by the Realty Department and is assumed to be correct.

3. This appraisal is to be used only in its entirety. No part or portion thereof is to be used by any party without the whole report. All conclusions and opinions concerning the analysis which are set forth in the report were prepared by the Appraiser(s) who signatures appear on the appraisal report, unless indicated as "Review Appraiser." No change of any item in the report shall be made by anyone other than the Appraiser(s). The Appraiser(s) and OST/OAS shall have no responsibility if any such unauthorized change is made. The appraiser(s) may not divulge the material (evaluation) contents of the report, analytical findings or conclusions, or give a copy of the report to anyone other than the client or his/her designee as specified in writing except as may be required by state Certification Boards as they may request in confidence for ethics enforcement, or by court of law or body with the power of subpoena.

4. No responsibility is assumed for legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated in this report. The property is appraised as though held in fee simple ownership.

5. The property is appraised free and clear of any or all liens and encumbrances unless otherwise stated in this report.

6. Responsible ownership and competent property management are assumed unless otherwise stated in this report.

7. The information furnished by others is believed to be reliable. However, no warranty is given for its accuracy.

8. It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them. The client is urged to retain an expert in this field.

9. It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless otherwise stated in this report.

10. It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless a nonconformity has been stated, defined, and considered in this appraisal report.

11. Any sketch in this report may show approximate dimensions and is included to assist the reader in visualizing the property. Maps and exhibits found in this report are provided for reader reference purposes only. No guarantee as to accuracy is expressed or implied unless otherwise stated in this report. A survey establishing boundaries is recommended if such a survey has not been performed. The Appraiser(s) reserve the right to alter the report should a survey provide information contrary to the acreage and location used in the report.

12. It is assumed that the utilization of the land and improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless otherwise stated in this report.

13. The appraiser(s) are not qualified to detect hazardous waste and/or toxic materials. Any comment by the appraiser(s) that might suggest the possibility of the presence of such substances should not be taken as confirmation or the presence of hazardous waste and/or toxic materials. Such determination would require investigation by a qualified expert in the field of environmental assessment. The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property. The appraiser(s) value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value unless otherwise stated in this report. No responsibility is assumed for any environmental conditions, or for any expertise or engineering knowledge required to discover them. The appraiser(s) descriptions and resulting comments are the result of the routine observations made during the appraisal process.

14. Any possible future land cost associated with trash removal or noxious weeds control, as well as any improvement costs incurred in cleaning, renovation, destruction, or removal, are not considered in this appraisal unless otherwise noted.

15. The Appraiser(s) reserve the right to alter statements, analysis, conclusions or any value estimate in the appraisal if there becomes known facts pertinent to the appraisal process which were unknown at the time of the report preparation.

16. It is assumed that the subject property has reasonable ingress and egress.

*Professional Qualifications*

## *JOHN S. COTÉ, ASA*

***PROFILE: Review Appraiser, DOI/OST/OAS Western Region*** Appraiser/consultant and investment analyst specializing in complex transactions involving all property types including investment properties, partial interests, conservation easements, land development, deal structuring, tax analysis and litigation.

*1992 TO 2003* - Commercial real estate appraiser/counselor based in Western Massachusetts and covering the New England States and eastern New York. Assignments have included shopping centers, specialty retail, large industrial complexes, hospitality properties, residential land developments, mobile home parks, nursing homes, elderly and subsidized housing, airport facilities and transportation facilities. Specialized experienced in complex transactions including life estates, conservation easements and environmentally sensitive properties.

*1990 TO 1992* - AVP, Chief Appraiser, BNE-West. Established a new real estate appraisal department for the *Bank of New England - West* in Springfield, MA retaining a staff of five and implementing appraisal policy, procedures and support systems, as well as providing real estate consulting to lending officers.

*1988 TO 1990* - Analyzed and underwrote pension fund real estate investments at *Hart Advisers Inc.* of Hartford, Connecticut. Evaluated numerous investment proposals covering all major investment property types including large scale mixed use urban developments valued well in excess of $100MM. Provided consulting services to the City of Hartford and other clients and marketed real estate assets nationwide.

1978 TO 1988 - Developed investment analysis, and management skills in the real estate division of *Mass Mutual Life Insurance Company* advancing to Director of Real Estate Investment and at *Prudential Realty Group* as Director of Portfolio Management for that company's real estate separate investment account portfolio. Maintained quality control over a national staff of independent approved appraisers.

*EDUCATION:*

JD Western New England College School of Law
MBA Urban & Regional Management, University of Massachusetts
AB History, Holy Cross College, Worcester, MA

*Appraisal Institute Courses:*

1A1 Intro to RE Appraisal; 1A2 Appraisal Procedures; 1B1 Capitalization
1B2 Advanced Capitalization; 2-1 Case Studies; 2-2 Report Writing;
Professional Practice; Litigation Valuation; Investment Analysis;
Nursing Facilities; Detrimental Conditions; Internet Strategies; Scope of Work

*American Society of Farm Managers and Rural Appraisers:*

Advanced Rural Case Studies. UASFLA Seminar
Timberland Valuation Eminent Domain
Intro to Appraisal Review Appraisal Review under USPAP
Appraisal Review under UASFLA Advanced Review Case Studies

*International Right of Way Association*

Appraisal of Partial Interests

*The Prudential Realty Group:* Hotel Investment Analysis

*Lincoln Institute for Land Policy* Valuing Land Affected by Conservation Easements
Theory and Practice of Land Valuation
GIS CAMA, & Spatial Analysis

*OTHER:* Certified General R.E. Appraiser, MA #1526, exp. 5/28/08
Licensed Real Estate Broker (inactive)
Accredited Senior Member, American Society of Appraisers
Conservation Commission Service/Planning Board Service