WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CV-14-00161-PHX-PGR |
| Plaintiff, | **ORDER** |
| v. | |
| Barron Collier Company, | |
| Defendant. | |

This case involves the largest and one of the most complex interstate land exchanges ever consummated by the United States Department of Interior ("Interior"). It involves the exchange of land located in Florida that was owned by defendant Barron Collier Company ("Collier") for land located in Phoenix that was owned by the United States Government (the "Government"). The Government filed this action after Collier stopped making payments under the agreements through which the land exchange was consummated. The Government seeks specific performance of a contractual provision, imposition of a constructive trust under a theory of unjust enrichment, and recovery of damages based on a claim for waste. The parties have each filed a motion for summary judgment (Doc. 148, 150). Also pending is a Motion for Collier's Fees and Costs Incurred as a Result of Two Additional 30(b)(6) Depositions (Doc. 116), and the Motion for Leave to File Supplemental Authority or Take Judicial Notice of a Pleading in Court of Federal Claims Case (Doc. 184). The Court will grant in part and deny in part the respective parties' motions for summary judgment, will grant in part and deny in part Collier's motion for fees and costs, and will grant the motion for leave to file

1  supplemental authority.[1]

## **Background**

In the mid-1980s, Collier and Interior began discussing the sale to the United States of more than 100,000 acres of wetlands in the Florida Everglades that were owned by Collier.  Interior desired to add these wetlands, which were environmentally sensitive, to a national refuge, but lacked sufficient appropriated funds for an outright purchase of the wetlands.   The parties explored alternatives and eventually conceived of a land exchange which involved the exchange of the Florida wetlands for property located in Phoenix on which an Indian School, that was scheduled to be closed, was located. Because the Phoenix property was more valuable than the Florida wetlands, the parties entered into an initial Exchange Agreement that required Collier to pay $34.9 million in cash at closing to equalize the exchange.

The planned land exchange required ratification by Congress before it could be implemented.  Collier worked with Congress to gain approval of the exchange and to include in the approving legislation a financing option permitting Collier to pay the $34.9 million over a period of 30 years.  Collier also negotiated a side deal with the City of Phoenix (the "City") under which Collier would trade all but 15 acres of the Indian School property it was about to acquire from the United States for development rights to two undeveloped commercial lots in the heart of downtown Phoenix (the "Downtown Lots").  This side deal meant that little of the federal property being transferred to Collier by Interior would remain in Collier's control once the land exchange and the side deal with the City were consummated.

Congress provided the needed ratification for the land exchange in 1988 by passing the Arizona-Florida Land Exchange Act (the "Act"),  Public Law 100–696, 102 Stat. 4577 (November 18, 1988).  Under the Act, Collier would exchange 108,000 acres

---

[1] The Court finds that oral argument would not assist in resolving this matter and accordingly finds the pending motions suitable for decision without oral argument.  *See* LRCiv 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

- 2 -

of land near the Florida Everglades for a portion of the Phoenix Indian School property and make a payment to the United States of $34.9 million.  The Act requires the $34.9 million payment to be used for the purpose of establishing two Indian education trust accounts, the "Arizona InterTribal Trust Fund" and the "Navajo Trust Fund" (collectively, the "Trust Accounts"), which would support Indian education following the closure of the Phoenix Indian School.  The Act authorizes the Secretary of Interior to accept the $34.9 million from Collier as either (i) a cash payment at closing or (ii) over time with annual interest payments on the $34.9 million at an interest rate of between 8.5% and 9.0% per annum for thirty years, followed by a balloon payment of the principal at the end of the thirty years.

As required by the Act, Interior consulted with the Intertribal Council of Arizona ("ITCA") about the thirty-year payment option, and the ITCA expressed a preference for a lump sum payment, unless such demand became an obstacle to closing the deal. Interior ultimately offered Collier the thirty-year payment option because Interior believed that the exchange would fall apart unless Collier was given that option.   In December 1991, Collier accepted the land exchange offer, as ratified by Congress, subject to reaching a satisfactory payment agreement.

Over the following year, Collier and Interior continued to negotiate, and finally executed a comprehensive agreement (the "Trust Fund Documents") in December 1992 that implemented the Act and the exchange agreement.  The Trust Fund Documents include a Trust Fund Payment Agreement ("TFPA"), a Deed of Trust, and a Promissory Note.  Despite execution of the Transfer Agreement in 1992, the transaction did not finally close until four years later, in December 1996.  During this four year interim, Collier was not obligated to pay interest or principal.  Instead, the Transfer Agreement required Collier to being making annual payments in December 1997.

A.      **The Trust Fund Documents**

       1.      Promissory Note[2]

---

[2] A copy of the Promissory Note is located at Doc. 146-3 at pages 67-73, and at

The Promissory Note requires Collier to pay annual interest payments of $2,966,500, reflecting an interest rate of 8.5%, with the interest payments to be "payable to the United States for deposit by the United States into the Arizona Trust Fund Account and the Navajo Trust Fund Account to be established in accordance" with the Act.  The Note also requires that, along with the thirtieth and final annual interest payment, Collier is to pay the $34.9 million principal amount.  The Note provides that Collier has no right to prepay any annual interest payment or the principal amount.

The Note also contains a "No Personal Recourse" provision, stating:

> Notwithstanding anything to the contrary contained in this Promissory Note or the Trust Fund Agreement or elsewhere, neither [Collier] nor any affiliate of [Collier] nor any partner of [Collier] (whether individually or as a trustee), nor any legal representative, successor, heir, estate, or assignee of any of them shall have any personal liability for the payment of any sum which may be payable under this Promissory Note or the Annuity, or for the performance or discharge of any obligation of [Collier] under this Promissory Note, the Annuity, or the Agreement. In the enforcement of any of its rights under this Promissory Note, the United States shall solely resort to, and proceed *in rem* against the Trust Estate and the Annuity.

(Promissory Note, ¶ D.)

Although obligations owed under the Promissory Note, the Annuity, and the Trust Fund Agreement (referred to as "the Agreement") are referenced in this "No Personal Recourse" provision, obligations owed under the Deed of Trust are not.

### 2.   Trust Fund Payment Agreement[3]

The TFPA requires Collier to obtain and fund an Annuity Contract "in favor of the United States." (TFPA, art. 5)  The Annuity Contract was to permit Collier to make thirty annual payments to the Annuity Company and was required to "be sufficient, on the completion of such annual payments, to pay to the United States a lump sum" of $34.9 million – the principal sum due under the Promissory Note – on the maturity date of the

---

Doc. 151-1 at pages 72-78.

[3] A copy of the Trust Fund Payment Agreement is located at Doc. 146-3 at pages 3-66, and at Doc. 151-1 at pages 7-71.

Note, "thirty years from the Closing Date."  This Annuity, along with the "Trust Estate (as such term is defined in the Deed of Trust)," secured the Promissory Note.

The TFPA also contains a "Limitations on Personal Recourse" provision, stating:

> Notwithstanding anything to the contrary contained in this Agreement or the Promissory Note or elsewhere, neither [Collier] nor any affiliate of [Collier] nor any partner of [Collier] . . . shall have any personal liability for the payment of any sum which may be payable under the Promissory Note or the Annuity, or for the performance or discharge of any obligation of [Collier] under this Agreement, the Promissory Note, or the Annuity.  In the enforcement of any of its rights under this Agreement or the Promissory Note, the United States shall solely resort to, and proceed *in rem* against the Trust Estate (as defined in the Deed of Trust) and the Annuity.

(TFPA, § 9.5.)  Although obligations owed under the Promissory Note, the Annuity, and the Trust Fund Agreement (referred to as "this Agreement") are referenced in this limitations provision, obligations owed under the Deed of Trust are not.

3.    Deed of Trust[4]

The Deed of Trust defines the "Trust Estate" as the "entire estate, property, right, title, and interest," in the property Collier acquired through the Land Exchange.  The Trust Estate includes all of Collier's "right, title, and interest in and to" the remaining 15 acres of the Indian School property ("Indian School Lot") and, to the extent it constitutes a real property interest, all of Collier's "right, title and interest in and to the Disposition and Development Agreement by and between the City of Phoenix and Barron Collier" in the Downtown Lots.

The Deed of Trust includes a provision allowing for a "partial reconveyance" to Collier when certain conditions are met.  Under § 6.2,

> At any time, and from time to time, upon request by [Collier] to [the Government] and upon satisfaction of the condition specified in Section 6.2(b) of this Deed of Trust, the [Government] shall reconvey to [Collier] an Envelope or Envelopes held under the Trust Estate.

---

[4] A copy of the Deed of Trust is located at Doc. 146-3 at pages 73-142, and at Doc. 151-1 at pages 78-147.

(Deed of Trust, § 6.2.)

An "Envelope" is defined as "that part of the Trust Estate compromising a development envelope as described in a Site Plan for all or part of the Trust Estate." (*Id.*) A "Release Envelope" is defined as "an Envelope subject to a pending request for reconveyance." (*Id.*)  "Site Plan" in turn is defined as "the site plan or site plans applicable to the real property described in Exhibit A-1 [the Indian School Lot] and Exhibit A-2 [the Downtown Lots] filed by [Collier] with, and approved by, the City." (*Id.*)

The conditions that must be met for Collier to be entitled to a reconveyance of an Envelope are set out in § 6.2(b), which provides:

> [Collier's] right to require, and the [Government's] obligation to cause, the reconveyance of a Release Envelope shall be subject to the following condition: the fair value of the Unreleased Property less the value of the Release Envelope exceeds one hundred thirty percent (130%) of the Release Level Amount.

(Deed of Trust, § 6.2(b).)[5]

The Deed of Trust also includes a separate "Maintenance of Collateral Value" provision, located in § 6.3(a), which states:

> If, after a reconveyance of an Envelope, the fair value of the remaining Unreleased Property falls below one hundred thirty percent (130%) of the Release Level Amount, Trustor shall add to the Trust Estate United States Government-backed Securities sufficient in value to restore the fair value of the Unreleased Property to one hundred thirty percent (130%) of the Release Level Amount.

(Doc. 151-1 at 109.)

The Deed of Trust defines "Events of Default" as including the "[f]ailure to pay any monies due hereunder or under the Promissory Note or under other Trust Fund Documents," or the "[f]ailure to comply with any of the agreements made by or

---

[5] The Deed of Trust also sets out the method through which the values of the Unreleased Property, the Release Envelope, and the Release Level Amount are to be determined.  (*See* Deed of Trust, § 6.2(a), (c); Deed of Trust, ex. F.)   These values and the calculation of the values are not at issue in the case and thus will not be further discussed.

requirements of [Collier] in this Deed of Trust or in any of the other Trust Fund Documents" within thirty days "after written notice by [the Government] of such failure is received or deemed received by" Collier.  (Deed of Trust, § 3.1(a), (b).)

As to remedies upon an occurrence of an Event of Default, the Deed of Trust provides that the Government may, among other remedies, "[c]ommence an action to foreclose the lien of this Deed of Trust as a mortgage, appoint a receiver, or specifically enforce any of the covenants hereof"; "[e]xercise all other rights and remedies provided herein, in any Trust Fund Document or other document or agreement now or hereafter securing or guarantying all or any portion of the Obligations, or by law, including, without limitations, the rights and remedies provided in A.R.S. Section 33-702.B"; and "[e]lect, subject to applicable laws, to receive the Trust Estate pursuant to a Deed in Lieu of Foreclosure."  (Deed of Trust, § 3.2.)

Section 3.6 of the Deed of Trust provides that, upon an Event of Default, the Government is "entitled to enforce payment and performance of any and all of the Obligations and to exercise all rights and powers under the Trust Fund Documents and under the law now or hereafter in effect, notwithstanding some or all of the Obligations may now or hereafter be otherwise secured or guaranteed."   (Deed of Trust, § 3.6.) Further, "[n]o remedy herein conferred upon or reserved to [the Government] is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing under the law."  (*Id.*)  "Every power or remedy given by any of the Trust Fund Documents or by law to [the Government], or to which [the Government] may be otherwise entitled, may be exercised, concurrently or independently, from time to time, and as often as may be deemed expedient."  (*Id.*)

Finally, § 9.1 of the Deed of Trust contains a "No Recourse" provision which provides:

> Notwithstanding anything to the contrary contained in this Deed of Trust, the Promissory Note, the Annuity, the Trust Fund Payment Agreement or any other of the Trust Fund Documents, or elsewhere, neither [Collier] nor any affiliate of [Collier], nor any partner of [Collier] (whether individually or as a trustee), nor

any legal representative, successor, heir, estate, or assignee of any of them shall have any personal liability for the payment of any sum which may be payable under any of such documents or for the performance or discharge of any obligation under any of such documents.  In the enforcement of any of their rights under this Deed of Trust or any of such documents, the [Government and Collier] shall solely resort to, and proceed only *in rem* against, the Trust Estate (as defined in the Deed of Trust) and the Annuity.

(Deed of Trust, § 9.1.)

**B.**     **The Partial Reconveyances**

Collier made two different requests under § 6.2 of the Deed of Trust for release of a portion of the collateral.  The first request was made in 1998 for the east side Downtown Lot, also known as Block 24.  After an appraisal that confirmed that the remaining collateral exceeded 130% of the Release Level Amount, the Government approved the release of the east side Downtown Lot.

Collier made the second request for release in 2007 for the west side Downtown Lot, also known as Block 23.  After an appraisal that confirmed that the remaining collateral exceeded 130% of the Release Level Amount, the Government approved release of the west side Downtown Lot.  After the 2007 release, the only remaining collateral in the Trust Estate was the 15-acre Indian School Lot.  The appraisal submitted by Collier and accepted by the Government prior to the 2007 release valued the Indian School Lot at $48 million.  This 2007 appraisal exceeded 130% of the Release Level Amount at the time of the second collateral release.

**C.**     **The Default**

In late 2012, Collier arranged a meeting with Interior to discuss Collier's payment obligations under the Trust Fund Documents.  The meeting was held on December 6, 2012, and during the meeting Collier indicated that continuing to make the interest and annuity payments no longer made economic sense to Collier.  Collier then failed to make its required December 18, 2012, interest payment to the Government and also failed to make its annual annuity payment.

In a letter dated January 7, 2013, Collier advised Interior that it would no longer

make its payment obligations, explaining that its attempts to sell the Indian School Lot had drawn only one offer of $6 million; that the drop in the collateral value of the Lot made "the economics of the deal untenable for our organization;" and that Collier was "simply not in a position to continue to make payments of such a significant magnitude with the corresponding value of the land so far below our remaining obligation." (Doc. 151-3 at 86-87.)

Interior responded to Collier in a letter dated January 29, 2013. (Doc. 151-4 at 88-89.) In this letter, Interior demanded that Collier perform its obligations under the Trust Fund Documents, including making the annual interest and annuity payments. Interior also noted that the value of the unreleased property appeared to be less than 130 percent of the Release Level Amount, and demanded that Collier, pursuant to its obligation under Section 6.3 of the Deed of Trust, "promptly add to the trust estate United States government-backed securities sufficient in value to maintain the fair value of the unreleased property to 130 percent of the release level amount, as required by Section 6.3 of the Deed of Trust." (*Id.*)

In a letter dated March 18, 2013, Collier again reiterated that the "deal is no longer economically viable" for Collier, but that Collier was committed "to finding a solution for all parties. . . ." (Doc. 151-3 at 94-95.) In a letter dated April 24, 2013, Interior responded to Collier and Collier's statement that the deal is "no longer economically viable" for Collier. (Doc. 151-3 at 97.) In this letter, Interior again demanded that Collier make the interest and annuity payments, and promptly add United States government-backed securities to the Trust Estate "sufficient in value to maintain the fair value of the unreleased property to 130 percent of the release level amount." (*Id.*) Interior also informed Collier that its failure to make the required payments was "presently having real-life detrimental consequences on the tribes of Arizona who are now faced with trying to cover the shortfalls of their jeopardized education funds." (*Id.*)

Collier did not comply with the demands of Interior, and did not make the 2012 annual interest payment or annual annuity fund payment it is obligated to make under the Trust Fund Documents, nor did Collier add government-backed securities to the Trust

Estate.  Instead, under cover of a letter dated November 13, 2013, Collier sent to the Justice Department papers that sought to assign all of Collier's interests in the Annuity Contract and the Indian School lot to the United States, referring to the package as a "Deed in Lieu."  (Doc. 151-5 at 8-9.)  The Justice Department declined the tender of the "Deed in Lieu," and commenced the present action.

**Discussion**

**A.      Motions for Summary Judgment**

The Government moves for summary judgment on its claim for specific performance, unjust enrichment, and waste.  Collier moves for summary judgment on these same claims, contending that the non-recourse provisions of the Trust Fund Documents override and preclude any of the relief sought by the Government.

Summary judgment is appropriate if, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  As discussed below, the Court will grant summary judgment in favor of the Government on its claims for specific performance and waste, but will grant summary judgment in favor of Collier on the Government's claim for unjust enrichment.

**1.      *Claim for Specific Performance***

The Government seeks summary judgement on its claim for specific performance by Collier of its obligations under § 6.3(a) of the Deed of Trust to add to the Trust Estate government-backed securities "sufficient in value to restore the fair value of the Unreleased Property to one hundred thirty percent (130%) of the Release Level Amount." (Deed of Trust, § 6.3(a).)

Collier also seeks summary judgment on the Government's claim for specific performance, contending that § 6.3(a) of the Deed of Trust was only intended to apply at the time of a reconveyance, and did not impose a continuing obligation on Collier to provide supplemental collateral to the Trust Estate.  Collier further contends that specific performance is not available because, under the "no recourse" provision of the Deed of

Trust,[6] the Government's only remedy is an *in rem* action against the Trust Property. Collier argues that the intent of the parties supports its argument, and provides an extensive recount of the parties' negotiations.

The Government, in turn, cites to the integration clause, which is located in § 9.14 of the Deed of Trust.  That provision states that the "Trust Fund Documents contain the complete understanding and agreement of Trustor and Beneficiary and supersede all prior representations, warranties, agreements, arrangements, understandings, and negotiations." (Deed of Trust, § 9.14.)   The Government argues that § 6.3(a)'s additional collateral provision, the integration clause, and the other terms of the Deed of Trust and other Trust Fund Documents are clear and unambiguous, and that the Court should not look beyond the plain wording of these documents in interpreting the documents' terms.

Under Arizona law,[7] "[w]hen the terms of a contract are clear and unambiguous, the trial court gives effect to it as written."  *Skydive Arizona, Inc. v. Hogue*, 360 P.3d 153, 163 (Ariz. Ct. App. 2015).  However, "when the parties submit competing interpretations of the contract, rendering its terms unclear, the court should consider the proffered evidence."  *Id.* (citing *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1140 (Ariz. 1993)).  "If the court 'finds that the contract language is reasonably susceptible to the interpretation asserted by its proponent, the evidence is admissible to determine' the parties' intent."  *Id*.  However, if the contract language is not reasonably susceptible to the proponent's interpretation, the extrinsic evidence is inadmissible under the parol evidence rule.  *See id.*; *Taylor*, 854 P.2d at 1139-40.

The Court will begin by determining the meaning of the "Maintenance of Collateral" provision in § 6.3(a) of the Deed of Trust, which forms the basis for the

---

[6] Collier relies on similar no recourse provisions contained in the TFPA and the Promissory Note.  However, as noted previously, the TFPA's and Promissory Note's no recourse provisions limit recourse for obligations owed under the Promissory Note, the Annuity, and the TFPA.  Those provisions do not reference, and therefore do not limit, obligations owed under the Deed of Trust.

[7] The parties agreed that the Trust Fund Documents would be governed by and construed in accordance with Arizona law (*see* TFPA at  § 9.6; Doc. 150 at 6 n.4).

Government's claim for specific performance.  The Court will then go on to examine the No Recourse provision in § 9.1 and the impact of that provision on any obligation owed under § 6.3(a).

Section 6.3(a)'s Maintenance of Collateral provision states:

> If, after a reconveyance of an Envelope, the fair value of the remaining Unreleased Property falls below one hundred thirty percent (130%) of the Release Level Amount, Trustor shall add to the Trust Estate United States Government-backed Securities sufficient in value to restore the fair value of the Unreleased Property to one hundred thirty percent (130%) of the Release Level Amount.

(Deed of Trust, § 6.3(a).)

The Government contends that § 6.3(a) came into play once Collier was granted a release of an Envelope, which occurred in 1998, and that from that point on, § 6.3(a) imposes an ongoing duty on Collier to add government-backed securities to the Trust Estate when the fair value of the Trust Estate falls below the 130% level.  (Doc. 150 at 14-15.)

Collier, on the other hand, contends that § 6.3(a) was intended to apply only *at the time* of a release of collateral and was never intended to impose a continuing obligation on Collier to maintain the collateral at the 130% level.  (*See, e.g.,* Doc. 148 at 6, 12, 17-24.)   Collier relies extensively on extrinsic evidence to support its interpretation of § 6.3(a). The Court has reviewed this evidence in light of the language of § 6.3(a) and Collier's interpretation of § 6.3(a).  As discussed below, the Court finds that the language of § 6.3(a) is not "'reasonably susceptible' to the interpretation asserted by" Collier.  The extrinsic evidence relied on by Collier is therefore inadmissible.  *See Skydive Arizona*, 360 P.3d at 163; *Taylor*, 854 P.2d at 1139.

First, § 6.3(a) does not say it is to be applied "at the time" of a reconveyance.  To the contrary, § 6.3(a) states that Collier "shall add" government-backed securities to the Trust Estate "[i]f, *after* a reconveyance of an Envelope, the fair value of the remaining Unreleased Property *falls below*" the 130% level.  (Deed of Trust, § 6.3(a) (emphasis added).)   To say that "after a reconveyance" means "at the time" or "before" a reconveyance is nonsensical.  Further, the "falls below" language of § 6.3(a) also

indicates that the provision was to be applied later, after a reconveyance had already been granted, and not "at the time" of or "before" a reconveyance.

Second, § 6.2(b) of the Deed of Trust addresses the conditions that must be met before Collier is entitled to obtain, and the Government is obligated to grant, a reconveyance. Reading § 6.2(b) in conjunction with § 6.3(a) demonstrates that § 6.2(b) addresses the conditions that must be met before Collier is entitled to obtain a reconveyance, i.e., the conditions *before and at the time* of a reconveyance; and § 6.3(a) addresses a contingency that may arise in the future, i.e., *after* a reconveyance has been granted.

Third, Collier's reliance on the absence in § 6.3(a) of terms such as "at any time" or "from time to time" is misplaced. (Doc. 148 at 20; Doc. 167 at 19-20.) The term "after a reconveyance" sufficiently describes the time frame at issue, and there was no need to add terms such as "at any time" or "from time to time."

Collier contends that the "unreasonableness" of the Government's (and the Court's) interpretation of § 6.3(a) "is further supported by the fact that, if Collier had not sought a release, Collier's duty to supplement collateral would never have been triggered, even if the initial collateral package fell below 130% of the remaining obligation." (Doc. 148 at 14.) Indeed, Collier points out that at the time the Trust Fund Documents were executed, the initial collateral package was less than 100% of Collier's obligation. (*Id.* at 22.)

Contrary to Collier's position, the fact that § 6.3(a)'s Maintenance of Collateral provision did not come into play until and unless Collier sought a release of part of the collateral makes sense. The Government agreed to the initial collateral package of the land obtained through the exchange, which included the two Downtown Lots Collier obtained through the side deal with the City and the remaining 15-acres that constitute the Indian School Lot. Thus, prior to the release of either of the Downtown Lots, the Government was limited to an *in rem* proceeding against that initial collateral. The release of a portion of that initial collateral, pursuant to § 6.2(b), triggered § 6.3(a), and

brought the provisions contained therein into play.   The release meant that the Government would be giving up some of the initial collateral that would otherwise be providing security for the obligation owed by Collier.   It would not make sense for the Government to allow a release of part of the initial collateral without some type of assurance that Collier's remaining obligation under the Trust Fund Documents was currently, and continued to be, sufficiently secured.   The current security was accomplished through § 6.2(b)'s requirement that the current value of the remaining collateral be at the agreed-upon 130% level.   The continuing security was accomplished through § 6.3(a)' Maintenance of Collateral requirement that Collier provide additional collateral in the form of government-backed securities in the event that the remaining collateral fell below the agreed-upon 130% value.   Indeed, even Collier admits that the obligation set forth in § 6.3(a) was a *quid pro quo* for the Government's agreement to release some of the collateral.  (*See* Doc. 148 at 23 (Collier stating that § 6.3(a) "provides a quid-pro-quo means by which Collier may seek a favorable release of collateral").) Thus, although prior to the release of the Downtown Lots, the Government was limited to an *in rem* proceeding against the initial collateral, upon the release of the Downtown Lots, § 6.3(a) was triggered as a *quid pro quo* for that release.

Collier contends that the course of conduct of the parties since the execution of the Trust Fund Documents demonstrates that the parties did not intend Collier to be required to supplement collateral other than at the time of a release of collateral.   Specifically, Collier contends that the "Government's conduct after each release, especially given the historical fluctuations in real estate values, supports Collier's interpretation that § 6.3(a) applies only at the time of a release"; that the "Government never asked Collier to supplement or even monitor the value of the collateral except at the time of a release"; and that the "Government never requested that Collier supplement the collateral until January 2013, after Collier defaulted."

The subsequent conduct of the parties can be used to aid the Court in interpreting the terms of the Deed of Trust.  *See Darner Motor Sales, Inc. v. Universal Underwriters*

1    *Ins. Co.*, 682 P.2d 388, 398 (Ariz. Ct. App. 1984) (interpretation of a negotiated

2    instrument may be aided by evidence of subsequent conduct).  However, the mere fact

3    that the Government had not previously sought to enforce § 6.3(a)'s Maintenance of

4    Collateral provision does not demonstrate that the provision only applies at the time of or

5    before a reconveyance.  This is particularly true here given Collier's previous 15-year

6    history of making its annual interest and annuity payments and thus complying with its

7    payment obligations under the Trust Fund Documents, and the lack of evidence that the

8    Government had reason to be concerned about Collier's continuing compliance with its

9    payment obligations.

10        Collier further contends that the lack of an explicit provision as to how the value

11   of the remaining collateral was to be determined for purposes of § 6.3(a), and lack of an

12   explicit requirement regarding the monitoring of the value of the collateral demonstrates

13   that the parties did not intend Collier to be required to supplement collateral other than at

14   the time of a partial release of collateral.  The Court disagrees.

15        As noted previously, the language of § 6.3(a) is not susceptible to such an

16   interpretation.  Further, § 6.3(b) does set forth some provisions for valuing the unreleased

17   property and addresses the situation where "Envelopes" have been previously

18   reconveyed, demonstrating that valuation under § 6.3(a) ("after" reconveyances) was

19   distinct from valuation under § 6.2 (before or at the time of a reconveyance).  (Compare

20   Deed of Trust, § 6.2 and § 6.3.)  Moreover, that § 6.3 does not include explicit terms

21   regarding the obligation to monitor the collateral or a method for valuation of collateral

22   does not render the provision unenforceable or otherwise support Collier's interpretation.

23   Under Arizona law, if – as here – the contract terms are reasonably certain and provide "a

24   basis for determining the existence of a breach and for giving an appropriate remedy," the

25   missing terms do not prevent enforcement.  *AROK Constr. Co. v. Indian Constr. Svs.*, 848

26   P.2d 870, 873 (Ariz. Ct. App. 1993) (citations omitted); *see Schade v. Diethrich*, 760

27   P.2d 1050, 1058-59 (Ariz. 1988) (missing term does not render contract unenforceable

28   where other terms of contract provide "reasonable certainty" that the parties intended to

1   make a binding agreement).

2          In sum, § 6.3(a) was triggered once the Government granted a reconveyance of

3   some of the initial collateral, and imposes a continuing obligation on Collier to

4   supplement the Trust Estate with government-backed securities if the remaining collateral

5   in the Trust Estate falls below the 130% level.

6          The Court now turns to the "no recourse" provisions contained in the Trust Fund

7   Documents.   Collier contends that these "no recourse" provisions bar enforcement of

8   § 6.3(a) and the remedy of specific performance because, under those provisions, the

9   government's only remedy is an *in rem* action against the Trust Estate.

10         The TFPA, Promissory Note, and Deed of Trust all contain no recourse provisions

11  upon which Collier relies.   However, as noted previously, the no recourse provisions of

12  the TFPA and Promissory Note do not address obligations owed under the Deed of Trust.

13  (*See* TFPA, § 9.5; Promissory Note, ¶ D.) Those no recourse provisions are not,

14  therefore, relevant to the determination of whether the obligation owed by Collier under

15  § 6.3(a) of the Deed of Trust is enforceable.

16         The Deed of Trust no recourse provision, which does address obligations owed

17  under the Deed of Trust, states:

18
19         Notwithstanding anything to the contrary contained in this Deed of Trust, the
           Promissory Note, the Annuity, the Trust Fund Payment Agreement or any other of
20         the Trust Fund Documents, or elsewhere, neither [Collier] nor any affiliate of
           [Collier], nor any partner of [Collier] . . . shall have any personal liability for the
21         payment of any sum which may be payable under any of such documents or for
           the performance or discharge of any obligation under any of such documents.  In
22         the enforcement of any of their rights under this Deed of Trust or any of such
           documents, the [Government] shall solely resort to, and proceed only *in rem*
23         against, the Trust Estate.  Nor shall [Collier or its affiliates, partners, etc.] be
           personally liable for the payment of any deficiency that may result from the
24         application of the proceeds of any sale or other disposition of the Trust Estate to
25         any amount due under this Deed of Trust or any of such documents . . . .

26  (Deed of Trust, § 9.1.)

27         In light of § 9.1's "notwithstanding" language and *in rem* limitation, the Court

28  must determine whether Collier's Maintenance of Collateral obligation under § 6.3(a) is

enforceable.  In determining that enforceability, the Court must seek to give effect to all provisions of the Deed of Trust and avoid an interpretation that would render any provision unenforceable or illusory.  *See Tenet Healthsystem TGH, Inc. v. Silver*, 52 P.3d 786, 790 (Ariz. Ct. App. 2002) (rejecting contract interpretation that would "vitiate the guaranty of payment provision and thereby render the agreement substantially meaningless, if not illusory"); *Bryceland v. Northey*, 772 P.2d 36, 39 (Ariz. Ct. App. 1989) ("We will interpret a contract in a manner which gives a reasonable meaning to the manifested intent of the parties rather than an interpretation that would render the contract unreasonable."); *Ash v. Egar*, 541 P.2d 398, 402 (Ariz. Ct. App. 1975) ("A written contract will, if possible, be construed so as to give effect to all its parts."); *Kirkeby–Natus Corp. v. Kramlich*, 470 P.2d 696, 702 (Ariz. Ct. App. 1970) ("It is true that a construction which gives effect to all portions of a contract is to be preferred to an interpretation which leaves one or some parts without effect.").

Further, although the TFPA states that there are no third-party beneficiaries under the agreement (TFPA, § 9.7), the payments made by Collier under the Trust Fund Documents were dedicated to the public purpose of Indian education.  The Court must, therefore, liberally construe the Trust Fund Documents, including the Deed of Trust, in favor of that public purpose.  *See Valencia Energy Co. v. Ariz. Dep't of Revenue*, 959 P.2d 1256, 1267 (Ariz. 1998) (equitable remedies will "not apply to the detriment of the public interest"); *Spur Indus., Inc. v. Del E. Webb Dev. Co.*, 494 P.2d 700, 706 (Ariz. 1972) ("[T]he courts have long recognized a special responsibility to the public when acting as a court of equity."); *Sanders v. Folsom*, 451 P.2d 612, 618 (Ariz. 1969) ("Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.").

With this authority in mind, the Court will now turn to the Deed of Trust, and seek to reconcile and give meaning and effect to both § 9.1 and § 6.3(a).

The plain language of § 9.1 prevents the Government from seeking recovery

against Collier for sums due under the Trust Fund Documents; from seeking to recover any deficiency from Collier if the Government takes back the Trust Estate property and sells or otherwise disposes of that property; and from seeking specific performance of any of the payment provisions of the agreement.  Section 9.1 also limits the Government, in enforcing its rights under the Deed of Trust, allows the Government to proceed "only *in rem* against, the Trust Estate," and provides that Collier cannot be held personally liable for the "performance or discharge of any obligation under" the Trust Fund Documents.  (*Id.*)  Further, as Collier exhaustively argues, this no recourse provision contains the statement, "Notwithstanding anything to the contrary," which indicates that the no recourse provision was intended to trump any conflicting provision in the Deed of Trust.

The evidence submitted by the parties demonstrates that the no recourse and *in rem* limitations in § 9.1 were essential aspects of the parties' agreement.  However, the evidence also demonstrates that the collateralization provisions, including § 6.3(a)'s Maintenance of Collateral provision, were also essential aspects of the parties' agreement.  Indeed, the collateralization provisions were essential precisely because of the *in rem* and no recourse provisions; because of the anticipated release of some of the initial collateral; and because the Government wanted to ensure that the debt owed by Collier remained sufficiently collateralized.  Even Collier admits that § 6.3(a) was a *quid pro quo* for Collier to obtain a release of some of the initial collateral.  (Doc. 148 at 23.)

To interpret § 9.1 as barring enforcement of § 6.3(a) and thus relieving Collier of its obligation to comply with § 6.3(a) is particularly troubling here.  Collier obtained the release of collateral on two different occasions.  Collier thus reaped the benefit of the *quid pro quo* arrangement and thereby triggered the § 6.3(a) obligations of the *quid pro quo* arrangement, but is now seeking to avoid those obligations by arguing that enforcement of the obligations are barred by § 9.1.  Interpreting § 9.1 as a bar to enforcing the obligations owed by Collier under the *quid pro quo* arrangement after Collier obtained the benefit of that arrangement would be inequitable and, further, would

1    render § 6.3(a) illusory.  This is an interpretation that this Court must avoid.

2         Collier contends that, to the extent § 6.3(a) imposed a duty on Collier to maintain

3    the collateral at 130% after a reconveyance, such a duty existed only as long as Collier

4    did not default on its payment obligations, but that, upon default, any requirement

5    imposed under § 6.3(a) to maintain collateral went away.  Thus, Collier contends that,

6    upon default, if it "wants to continue to own the Unreleased Property, it must cure its

7    default and comply with § 6.3.  If Collier does not, it relinquishes the Unreleased

8    Property and the Annuity," but would not have any further obligation.  (Doc. 172 at 8-9.)

9         The Court finds this attempt to reconcile § 9.1 and § 6.3(a) to be unavailing.  First,

10   Collier's interpretation finds no support in the language of § 6.3(a).  Second, this

11   interpretation ignores the fact that, under the Deed of Trust, it is the Government, not

12   Collier, that retains the right to determine what remedy to pursue in the event of default

13   by Collier.  (*See, e.g.,* Deed of Trust, § 3.2 (setting forth remedies and providing that the

14   Government may exercise any or all of the remedies); Deed of Trust, § 5.4 (setting forth

15   additional remedies that the Government may, at its option, pursue).)  Thus, Collier does

16   not have the right to elect between keeping the property and returning it.  Instead, it is the

17   Government that has the right to elect which remedies to pursue in the event of Collier's

18   default.  Here, the Government elected to pursue its right under the Deed of Trust to

19   require Collier to pledge government-backed securities sufficient to bring the value of the

20   Trust Estate back up to the 130% level.  Once the Trust Estate is in compliance with the

21   requirements of § 6.3(a), the Government would be entitled to proceed *in rem* against the

22   Trust Estate if it chose to do so.

23        Collier also contends that the remedy of specific performance of any obligation

24   owed under § 6.3(a) is barred.  The Deed of Trust provides that, upon an event of default,

25   the Government may, at its option, exercise "any or all of the remedies" specified in § 3.2

26   and § 5.4.  (*See* Deed of Trust, § 3.2.)   Under § 3.2(b), upon an event of default, the

27   Government is entitled to "[c]ommence an action to foreclose the lien of this Deed of

28   Trust as a mortgage, appoint a receiver, or *specifically enforce* any of the covenants

hereof."  (Deed of Trust, § 3.2(b) (emphasis added).)

Collier argues that this specific performance provision is limited to foreclosure actions because the specific performance provision is in the same sentence as the provision allowing for foreclosure on the lien and appointment of a receiver.  (Doc. 148 at 23.)   However, the Court does not read § 3.2(b)'s specific performance remedy as narrowly as Collier proposes and does not find the remedy of specific performance to be limited to foreclosure.   The Court also finds unconvincing and circular Collier's argument that the *in rem* restriction of § 9.1 requires the Court to interpret § 3.2(b)'s specific performance remedy to be limited to foreclosure.

Interpreting the provisions of the Deed of Trust to avoid rendering either § 9.1 or § 6.3(a) unenforceable or illusory, and liberally construing the Deed of Trust and the other Trust Fund Documents in favor of the public purpose of funding Indian education, the Court concludes as follows:  Following the release of the Downtown Lots, § 6.3(a) of the Deed of Trust imposes a continuing duty on Collier to maintain the collateral in the Trust Estate at the 130% level; and that § 3.2(b) of the Deed of Trust provides the remedy of specific performance for the obligation owed by Collier under § 6.3(a).   The Trust Estate against which the Government can proceed *in rem* under § 9.1 of the Deed of Trust is a Trust Estate that has been properly maintained as required by § 6.3(a) at the 130% level.   Thus, § 9.1 does not foreclose enforcement of § 6.3(a) but instead anticipates that the continuing obligation under § 6.3(a) to maintain the Trust Estate at the 130% level can be enforced and has been met, and that the Government may proceed *in rem* against the properly maintained Trust Estate.   There are no genuine disputes of material fact regarding the Government's claim for specific performance and the Government is entitled to specific performance by Collier of the continuing obligation owed under § 6.3(a) as a matter of law.

## 2.   *Claim for Unjust Enrichment*

The Government also seeks recovery for unjust enrichment and, as a remedy, requests the imposition of a constructive trust on Collier's interest in the Downtown Lots.

1    Because the Court has determined that the Government is entitled to specific performance

2    of Collier's continuing obligations under § 6.3(a) of the Deed of Trust, the Government

3    has received the benefit of its contractual bargain to have Collier's debt sufficiently

4    collateralized, and a claim for unjust enrichment is not, therefore, available.  *See Adelman*

5    *v. Christy*, 90 F. Supp. 2d 1034, 1045 (D. Ariz. 2000) (theory of unjust enrichment is

6    unavailable to a plaintiff who has received the benefit of her contractual bargain).

7              **3.      *Claim for Waste***

8              The Government seeks recovery under common law and Arizona statutory law for

9    waste resulting from Collier's non-payment of property taxes on the Indian School Lot.

10   It is undisputed that since December 2012, Collier has failed to pay the property taxes as

11   they became due on the Indian School Lot.  It is also undisputed that, as a result of the

12   nonpayment of taxes, Maricopa County has placed tax liens on the property for the

13   delinquent taxes, and that as of December 2015, the amount required to redeem the

14   property was $290,573.49.

15             To recover for waste, the Government must establish that Collier (1) engaged in an

16   act constituting waste, (2) that Collier was legally in possession of the property, and (3)

17   that the act constituting waste injured the Government's interest.  *See 333 West Thomas*

18   *Medical Bldg. Enterp. V. Soetantyo*, 976 F. Supp. 1298, 1300 (D. Ariz. 1995); A.R.S.

19   § 33-806(b).  Although Arizona courts have not yet addressed the issue, other courts have

20   found that the failure to pay real property taxes constitutes waste. *See, e.g., Travelers Ins.*

21   *Co. v. 633 Third Assoc.*, 14 F.3d 114, 123 (2nd Cir. 1994) (holding that intentional failure

22   to pay property taxes is waste under New York law, and listing cases holding similarly);

23   *Nippon Credit Bank, Ltd. V. 133 North Cal. Boulevard*, 103 Cal. Rptr. 2d 421, 425-28

24   (Cal. Ct. App. 2001) (affirming judgment for "bad faith" waste against borrowers who

25   failed to pay real property taxes).

26             Collier does not deny that it did not pay the taxes on the Indian School Lot, that it

27   was legally in possession of that property, and that its failure to pay the taxes has resulted

28   in tax liens and delinquent taxes owing on the property.  Instead, Collier relies on § 9.1's

1   nonrecourse provision to argue that any recovery for waste is barred.  However, as the

2   Government makes clear, the waste claim is not based on the provisions of the Trust

3   Fund Documents but is instead based on state law and common law.   Thus, the

4   nonrecourse provisions do not bar recovery for waste.

5          Collier also argues that the Government had the duty to mitigate damages by

6   accepting Collier's attempt to tender the "Deed in Lieu" for the property.  As noted

7   previously, the Government was not obligated to accept the tender and indeed it is the

8   Government, and not Collier, that has the right under the Trust Fund Documents to

9   determine which remedies to pursue upon an event of default

10         The Court concludes that there are no genuine disputes of material fact regarding

11  the Government's claim for waste and that the Government is entitled to recover for

12  waste under common law and Arizona statutory law as a matter of law.  The Government

13  is therefore entitled to summary judgment on its claim for waste.

14  **B.     Motion for Collier's Fees and Costs**

15         Collier moves to recover attorney's fees and costs incurred as a result of the taking

16  of follow-up 30(b)(6) depositions ordered by the Court. The Court ordered a limited

17  follow-up deposition because one of the Government's 30(b)(6) witnesses was not

18  prepared to answer a question regarding an issue of performance, which was included in

19  the subject matter covered by Topic 6 on which the witness had been designated.  (Doc.

20  88 at 14.)  The Court declined, however, to impose sanctions on the Government under

21  Fed. R. Civ. P. 37(d)(1)(A)(i).  The Court explained that the lack of preparedness on one

22  issue covered by Topic 6 was insufficient to warrant the imposition of sanctions.  (*Id.*)

23  The Court also explained that Collier could have raised the witness's lack of

24  preparedness with the Government at the time of the deposition and requested the

25  deposition be continued to allow the witness to adequately prepare on the topic, and

26  thereby could have potentially avoided the need for a follow-up deposition and Court

27  intervention.  (*Id.* at 14-15.)  The Court noted, however, that the imposition of some costs

28  incurred by Collier as a result of the limited follow-up deposition might be appropriate in

light of the witness's failure to be prepared on the issue.

The parties have conferred but have been unable to resolve the costs and fees issue.  Accordingly, Collier has filed a motion seeking recovery of attorney's fees and costs in the amount of $3,589.55, broken down as follows:    Attorney's Fees in the amount of $2,687.50, and costs in the amount of $902.05.  (Doc. 116 at 5-6.)

The parties dispute whether the Court has authority, outside of the sanction provisions of Fed. R. Civ. P. 37, to order an award of attorney's fees for the follow-up depositions.  The Court need not resolve that dispute because the Court did not intend to award attorney's fees for the limited follow-up deposition, and the Court's use of the term "costs and fees" at some points in its Order requiring the follow-up depositions was not intended to indicate otherwise.  Rather, as the Court stated in that order, the Court believed that "the imposition of some costs incurred as a result of the limited follow-up deposition may be appropriate." (Doc. 88 at 15.)

The Court recognizes and appreciates the parties' cooperation in arranging for the follow-up depositions during a time when Collier's counsel was already scheduled to be in Washington, D.C., and Collier's attempts to keep the additional costs incurred as a result of the follow-up depositions to a minimum.  Collier seeks recovery of $902.05 in costs, broken down as follows:  $306.20 for the court reporter for the Black follow-up deposition and $595.85 for the court reporter for the Moran follow-up deposition.  Collier's explanation for these additional costs satisfies the Court that the costs were reasonably incurred as a result of the follow-up depositions.  Accordingly, the Court will award costs for the follow-up depositions in the amount of $902.05, and order the Government to pay such costs to Collier in the normal course of Government-issued payments.

C.    **Motion to File Supplemental Authority and Take Judicial Notice**

Collier requests leave to supplement the factual record with information from a related case that Collier has filed against the Government in which the Government admits that it is not proceeding *in rem* against the collateral maintained by Collier.  The

1   Government opposes the motion, contending that the information Collier seeks to present

2   is not new and is already before the Court because the Government has readily admitted

3   during discovery that the present action is technically *in personam*.  The Court will grant

4   the motion and has reviewed the supplemental information provided by Collier in

5   deciding the pending motions for summary judgment.

6                                           **Conclusion**[8]

7          The Court will grant in part and deny in part the parties' respective motions for

8   summary judgment.  Summary judgment will be granted in favor of Collier on the

9   Government's claim for unjust enrichment.  Summary judgment will be granted in favor

10  of the Government on its claims for specific performance and waste.

11         The Court will grant in part and deny in part Collier's motion for fees and costs.

12  The court will award costs to Collier in the amount sought in its motion, but will deny

13  recovery of attorney's fees.

14         The Court will grant Collier's motion to file supplemental information.

15         IT IS ORDERED that Defendant's Motion for Summary Judgment (Doc. 148) is

16  granted in part and denied in part.  The motion is granted as to the Government's claim

17  for unjust enrichment.  The motion is otherwise denied.

18         IT IS FURTHER ORDERED that Plaintiff's Motion for Summary Judgment

19  (Doc. 150) is granted in part and denied in part.  The motion is granted as to the

20  Government's claims for specific performance and waste.  The motion is otherwise

21  denied.

22         IT IS FURTHER ORDERED that the Motion for Collier's Fees and Costs

23  Incurred as a Result of Two Additional 30(b)(6) Depositions (Doc. 116) is granted in part

24  and denied in part.  The motion is granted to the extent that Collier seeks recovery of

25  costs in the amount of $902.05.  The motion is otherwise denied.

26         IT IS FURTHER ORDERED that the Government shall pay Collier the $902.05 in

27  _____

28         [8] The Court has considered but finds it unnecessary to address the multiple other
arguments raised by the parties.

- 24 -

costs in the normal course of Government-issued payments.

    IT IS FURTHER ORDERED that the Motion for Leave to File Supplemental Authority or Take Judicial Notice of a Pleading in Court of Federal Claims Case (Doc. 184) is granted.

    Dated this 29th day of June, 2016.


                                        Paul G. Rosenblatt
                                        United States District Judge